UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FORTRESS BIBLE CHURCH AND REVEREND DENNIS G. KARAMAN,<br><br>     **Plaintiffs,**<br><br>    **v.**<br><br>PAUL J. FEINER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE SUPERVISOR OF THE TOWN OF GREENBURGH, EDDIE MAE BARNES, IN HER OFFICIAL CAPACITY AS COUNCILWOMAN FOR THE TOWN OF GREENBURGH, STEVEN BASS, IN HIS OFFICIAL CAPACITY AS COUNCILMAN FOR THE TOWN OF GREENBURGH, DIANA JUETTNER, IN HER OFFICIAL CAPACITY AS COUNCILWOMAN FOR THE TOWN OF GREENBURGH, TIMMY WEINBERG, IN HER OFFICIAL CAPACITY AS COUNCILWOMAN FOR THE TOWN OF GREENBURGH, THE TOWN BOARD OF THE TOWN OF GREENBURGH, AND THE TOWN OF GREENBURGH,<br><br>     **Defendants.** | **03 Civ. 4235 (SCR)**<br><br>**ORDER AND OPINION** |

**STEPHEN C. ROBINSON, United States District Judge:**

  Fortress Bible Church ("Fortress Bible Church" or "the Church") and Reverend Dennis Karaman ("Reverend Karaman") (collectively, "Plaintiffs" or "the Church"), brought this action against Paul Feiner, Eddie Mae Barnes, Steven Bass, Timmy Weinberg, the Town Board of the Town of Greenburgh ("the Town Board"), and the Town of Greenburgh ("the Town of Greenburgh" or "the Town") (collectively, "Defendants" or "the Town").  Plaintiffs seek relief under: (1) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*

("RLUIPA"); (2) 42 U.S.C. § 1983, alleging violations of Plaintiffs' First Amendment Free Exercise, First Amendment Free Speech, First Amendment Free Assembly, Fourteenth Amendment Equal Protection, and Fourteenth Amendment Procedural Due Process rights; (3) the New York State Constitution, alleging violations of Plaintiffs' rights of free exercise, free speech, and equal protection; (4) New York State Environmental Quality Review Act, N.Y. ENVIR. CONS. LAW §§ 8-0101 *et seq.* ("SEQRA"), alleging that Defendants' acted arbitrarily, capriciously, and unlawfully in processing Fortress Bible Church's land use application; (5) various New York State statutes and the Greenburgh Town Code.

## I.    BACKGROUND

### a.   Procedural History

Plaintiffs commenced this action on June 11, 2003.  By Notice of Motion dated July 3, 2003, Plaintiffs sought an Order compelling the Town Board to, among other things, adopt and issue a Final Environmental Impact Statement ("FEIS") and SEQRA Findings Statement, thereby completing the SEQRA review process.  By Notice of Motion dated July 28, 2003, Defendants moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim.

By Decision dated March 29, 2004, this Court denied Plaintiffs' motion to compel the Town Board to complete the SEQRA process.  In a separate Decision, also dated March 29, 2004, this Court denied Defendants' motion to dismiss.  On or about April 22, 2004, Plaintiffs filed a Second Amended Complaint.

Thereafter, the parties engaged in a lengthy period of discovery that included approximately eighteen depositions and significant document productions.

By Decision dated May 4, 2006, this Court denied Defendants' motion for summary judgment, except with respect to a cause of action alleging denial of substantive due process. The Court reserved decision on Plaintiffs' motion in limine for sanctions and for an adverse inference based on spoliation of evidence.  *See* Trial Tr. at 21:1-6.[1]  Trial commenced on October 11, 2006.

### b.  Trial

The twenty-six day bench trial conducted in this action commenced on October 11, 2006, and proceeded thereafter on non-consecutive days until its conclusion on March 6, 2007.  On its case-in-chief, the Church presented testimony from seven fact witnesses and one expert witness, designated pursuant to Federal Rule of Civil Procedure 26.  The Church called the following witnesses:

(i)     David Schiff, AICP, of Saccardi & Schiff, the Church's planning consultant ("Church Planning Consultant Schiff"), *see* Trial Tr. at 61-319*;*

(ii)    William Lachenauer, of Dolph Rotfeld Engineering, P.C., the Church's site engineering and hydrology consultant, *see* Trial Tr. at 325-504;

(iii)   Phillip Grealy, Ph.D., P.E., of John Collins Engineering, P.C., the Church's traffic consultant ("Traffic Consultant Grealy"), *see* Trial Tr. at 526-877;

---

[1] Citations herein take the following form: "Trial Tr. at _____ (_____)" are citations to the page and line numbers of the trial transcript, with reference to the name of the testifying witness in parentheses; "Pl. Exh. __" are to Plaintiffs' exhibits received at trial; "Def. Exh. __" are to Defendants' exhibits received at trial; and "Jt. Exh. __" are to the Joint Trial Exhibits; "Stipulated Fact No. __" are to the Joint Stipulated Facts submitted to the Court on January 17, 2006; "Dep. Tr. at _____ (_____)" are to the page and line numbers of deposition transcripts whose deposition testimony was offered by Plaintiffs and accepted by the Court in lieu of their live testimony on Plaintiffs' case, with reference to the name of the witness in parentheses.

(iv)      Anthony Russo, AKRF, Inc., former Planning Commissioner to the Town in connection with the Church's application ("Town Planning Commissioner Russo"), *see* Trial Tr. at 882-980;

(v)       John Saccardi, AICP, of Saccardi & Schiff, a certified planner ("Church Planning Consultant Saccardi"), *see* Trial Tr. at 980-1041;

(vi)      Stuart Turner, of Turner/Geneslaw, retained by the Town after close of the DEIS stage of SEQRA review to serve as a planning consultant in connection with the Church's application ("Town Planning Consultant Turner"), *see* Trial Tr. at 1048-1552;

(vii)     Plaintiff Reverend Dennis Karaman, Pastor of Fortress Bible Church, *see* Trial Tr. at 1577-1678*;* and

(viii)    Vincent Vetrano, of Wolf & Company, Plaintiffs' designated expert on the increased costs of construction due to the Town's conduct, *see* Trial Tr. at 1715-65.

Plaintiffs did not present any rebuttal witnesses.

In addition, Plaintiffs designated, and this Court received into evidence, deposition testimony from the following witnesses[2]:

(i)       Defendant Eddie Mae Barnes, a Member of the Town Board of the Town of Greenburgh ("Councilwoman Barnes")[3];

---

[2] Pursuant to this Court's Individual Practice Rules, copies of the transcript of the designated deposition testimony and a summary of each witness's testimony was provided to this Court prior to the commencement of trial.

[3] This action is captioned against Eddie Mae Barnes, Steven Bass, Diana Juettner, and Timmy Weinberg in their official capacities as Town councilpersons. During the proceedings before this Court, these individuals were referred to both as councilpersons and as town board members. All references to the entity on which these individuals serve, however, were to the Town Board of Greenburgh. Accordingly, this Court uses the terms councilpersons and town board members interchangeably to refer to these individuals in their capacities as members of the Town Board of Greenburgh.

(ii)      Defendant Steven Bass, a Member of the Town Board of the Town of Greenburgh ("Councilman Bass");

(iii)     Frederick Doneit, of Turner/Geneslaw, a planning consultant who assisted Town Planning Consultant Turner in connection with the Church's application ("Town Planning Consultant Doneit");

(iv)      Defendant Paul Feiner, a Member of the Town Board and Supervisor of the Town of Greenburgh ("Supervisor Feiner");

(v)       Allan Hochberg, a non-party witness who served as the President of the Poet's Corner Civic Association;

(vi)      Gerry Iagallo, the Town Assessor for the Town of Greenburgh ("Town Assessor Iagallo");

(vii)     Janet Insardi, the Deputy Town Attorney for the Town of Greenburgh ("Deputy Town Attorney Insardi");

(viii)    Defendant Diana Juettner, a Member of the Town Board of the Town of Greenburgh ("Councilwoman Juettner");

(ix)      John Kapica, the Chief of Police of the Town of Greenburgh ("Police Chief Kapica");

(x)       Kevin Loyst, FPM Group, the Town's hydrology consultant ("Town Consultant Loyst");

(xi)      John Lucido, the Building Inspector for the Town of Greenburgh ("Town Building Inspector Lucido");

(xii)     Robert Mauro, the Chief of the Fairview Fire Department ("Fire Chief Mauro");

(xiii)   Kevin Phillips, Ph.D., P.E., of FPM Group, the Town's hydrology consultant ("Town Consultant Phillips");

(xiv)   Mark Stellato, the Commissioner of Planning for the Town of Greenburgh ("Town Planning Commissioner Stellato"); and

(xv)   Defendant Timmy Weinberg, a former Town Board Member ("Councilwoman Weinberg").

Defendants presented testimony at trial from the following sixteen fact witnesses:

(i)   Alan Hochberg, *see* Trial Tr. at 1788-1835;

(ii)   Blase Spinozzi, appointed Deputy Town Supervisor in connection with the Church's application, *see* Trial Tr. at 1837-81;

(iii)   Councilwoman Weinberg, *see* Trial Tr. at 1882-1953;

(iv)   Police Chief Kapica, *see* Trial Tr. at 1958-2004;

(v)   Town Building Inspector Lucido, *see* Trial Tr. at 2006-17;

(vi)   Fire Chief Mauro, *see* Trial Tr. at 2021-79;

(vii)   Councilwoman Juettner, *see* Trial Tr. at 2084 - 2129;

(viii)   Councilman Bass, *see* Trial Tr. at 2129-71;

(ix)   Town Planning Consultant Doneit, *see* Trial Tr. at 2174-2300;

(x)   Supervisor Feiner, *see* Trial Tr. at 2303-2423, 2426-2521, 2538-71;

(xi)   Councilwoman Barnes, *see* Trial Tr. at 2575-2629;

(xii)   Town Consultant Phillips, *see* Trial Tr. at 2638-2697, 2789-2829;

(xiii)   Town Consultant Loyst, *see* Trial Tr. at 2700-88;

(xiv)   Town Planning Commissioner Stellato, *see* Trial Tr. at 2837-2990, 3149-3236;

(xv)   Deputy Town Attorney Insardi, *see* Trial Tr. at 2994-3146; and

(xvi)   Michael Maris, the Town's traffic consultant ("Town Traffic Consultant Maris"), *see* Trial Tr. at 3249-3419.

Defendants did not designate or otherwise attempt to introduce testimony from any expert witness.

Over the course of the trial, the Court admitted more than three hundred exhibits into evidence, including joint exhibits and exhibits introduced by the respective parties.  The Court also received a Statement of Stipulated Facts.

Following the trial, Plaintiffs submitted to the Court "Plaintiffs' Post-Trial Statement of Proposed Findings of Fact and Conclusions of Law" ("Plaintiffs' Post-Trial Statement") and Defendants submitted "Defendants' Proposed Post Trial Findings of Fact and Conclusions of Law" ("Defendants' Post-Trial Statement").  The Court also held oral arguments on the parties' post-trial submissions on July 30, 2007.

As set forth above, Plaintiffs and Defendants had a full and fair opportunity to present their cases to the Court.  The Findings of Fact and Conclusions of Law set forth below, pursuant to Federal Rule of Civil Procedure 52(a), are based on the extensive record developed over the course of the bench trial.


II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that in bench trials, the court "shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58."  FED. R. CIV. P. 52(a).  Rule 52(a) further provides that such findings of fact, "whether based on oral or documentary evidence, shall not be

set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Id.*


**III.     FINDINGS OF FACT**

> **a.   The Parties**

>> **i.   Plaintiffs**

1.   Plaintiff Fortress Bible Church is a Pentecostal church.  *See* Trial Tr. at 1578:23-1579:5 (Karaman).  Fortress Bible Church was established in the early 1940's and has been at its present location in Mount Vernon, New York, for more than forty years.  *See* Stipulated Fact No. 3.  Fortress Bible Church is one of approximately one hundred churches throughout the United States affiliated with the Christian Church of North America ("CCNA").   *See* Trial Tr. at 1579:12-1580:4 (Karaman).   The CCNA denomination has more than eighty churches in the United States and almost two thousand and five hundred churches internationally.  *See* Trial Tr. at 1579:20-1580:1 (Karaman).  Fortress Bible Church has approximately one hundred seventy-five members.  *See* Stipulated Fact No. 2.  The Church also maintains the Fortress Christian academy, which as an educational program that spans Kindergarten through Grade Twelve.  *See* Stipulated Fact No. 6.  Religious activities conducted by the Church include weekly religious worship, Bible instruction, fellowships, Bible studies, ministries (and support of ministries within the United States and overseas), and Christian education.  *See* Stipulated Fact No. 4.  Starting in September 1982.  *See* Stipulated Fact No. 5.  As membership grew, it added a Sunday night service and a music ministry and significantly expanded its Sunday school.  *See id.* Fortress Bible Church is a tax-exempt religious organization.  *See* Stipulated Fact No. 1.

2.   Plaintiff Reverend Dennis Karaman is an ordained minister and pastor of Fortress Bible Church.  *See* Trial Tr. at 1578:2-3 (Karaman).  Reverend Karaman has served as pastor of Fortress Bible Church since June 1, 1977.  *See id.* at 1578:10-15 (Karaman).  Reverend Karaman also serves as principal of the Fortress Christian Academy.  *See* Trial Tr. at 1590:19-21 (Karaman).  Additionally, Reverend Karaman serves as General Overseer of the Christian Church of North America ("CCNA"), the parent denomination to which Plaintiff Fortress Bible Church belongs.  *See* Trial Tr. at 1579:6-16 (Karaman).  As General Overseer of the CCNA denomination, Reverend Dennis Karaman supervises the United States and international activities of the denomination.  *See* Trial Tr. at 1579:20-1580:1 (Karaman).

### ii.  Defendants

3.   Defendant Town of Greenburgh ("the Town" or "the Town of Greenburgh") is a municipal corporation organized and existing under the laws of the State of New York and is located in the County of Westchester, New York.  *See* Second Amended Complaint ¶ 13; Verified Answer to Second Amended Complaint.[4]

4.   Defendant Town Board of the Town of Greenburgh ("the Town Board") is the duly elected governing body of the Town of Greenburgh.  Pursuant to state and local laws, the Town Board is authorized to grant site plan approval in connection with land use applications.  *See* Second Amended Complaint ¶ 12; Verified Answer to Second Amended Complaint.  The Town Board is comprised of five elected officials: four elected Town Board Members and the Town Supervisor.  *See* Trial Tr. at 2325:4-6 (Feiner).  The position of Town Board Member is a

---

[4]   By virtue of either a direct admission in their Verified Answer to the Second Amended Complaint, or pursuant to the operation of Federal Rule of Civil Procedure 8(b)(6) (formerly Rule 8(d), Defendants have admitted the allegations contained in the following paragraphs of Plaintiffs' Second Amended Complaint: 7, 12, 13, 23, 24, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 42, 50, 66, 70, 71, 72, 74, 78, 79, 81, 82, 83, and  84.

part-time, salaried position.  *See* Dep. Tr. at 8:15-16 (Bass).  The position of Town Supervisor is a full-time, salaried position.  *See* Trial Tr. at 2303:23-2304:3 (Feiner).

5.   Defendant Paul Feiner has served as Supervisor of the Town of Greenburgh for sixteen years.[5]  *See* Trial Tr. at 2303:19-22 (Feiner); Dep. Tr. at 7 (Feiner).  Supervisor Feiner is a licensed attorney.  *See* Trial Tr. at 2304:21-2305:5 (Feiner); Dep. Tr. at 8:10-14 (Feiner).  Prior to being elected as Supervisor of the Town of Greenburgh, he served as a Westchester County legislator for eight years.  *See* Trial Tr. at 2304:13-17 (Feiner)**.**

6.   Defendant Timmy Weinberg was elected to the Town Board in or around 1992 and served on that Board through December 31, 2005.  *See* Trial Tr. at 1884:5-12 (Weinberg). Prior to being elected to the Town Board, she served for approximately five and one-half years on the Zoning Board of Appeals for the Town of Greenburgh.  *See* id. at 1883:21-1884:2 (Weinberg).  Councilwoman Weinberg serves as the Town Board's liaison to the Planning Board for the Town of Greenburgh.  *See* Dep. Tr. at 33:9-10 (Weinberg).

7.   Defendant Diana Juettner has been a member of the Town Board of the Town of Greenburgh for more than fifteen years.  *See* Trial Tr. at 2086:3-7 (Juettner).  Councilwoman Juettner is an attorney licensed to practice in the State of New York.  She is a tenured professor of legal studies at Mercy College, where she directs the legal studies program and is also Co-Chair of the Social and Behavioral Sciences Division.  *See* Trial Tr. at 2085:3-7 (Juettner). Councilwoman Juettner serves as liaison for the Town Board to the Town Attorney's office.  *See* Trial Tr. at 2087:1-4 (Juettner).

8.   Defendant Eddie Mae Barnes has been a member of the Town Board for fifteen years.  *See* Trial Tr. at 2575:20-25 (Barnes).  Councilwoman Barnes holds a Bachelor of Science Degree in Nursing and a Master's Degree in Nursing Administration and Psychiatric Nursing.

---

[5] All references to employment history, including length of service, connote service as of the conclusion of trial.

*See* Trial Tr. at 2575:14-17 (Barnes).  She has worked at Rye Hospital Center for twenty-six years, where she currently serves as Director of Nursing.  *See* Trial Tr. at 2575:10-19 (Barnes).

9.   Defendant Steven Bass has served as a member of the Town Board since February 2001.  *See* Trial Tr. at 2130:14-18 (Bass).  Councilman Bass has been employed as a legislative aide to the Westchester County Board of Legislators for eight years.  *See* Trial Tr. at 2130:2-9 (Bass).

### b.  Background

#### i.  The Mount Vernon Facility

10. The Church's current facilities are inadequate to accommodate its current activities and expanding membership.  *See* Stipulated Fact No. 7.  The Church's current facilities are located in Mount Vernon, New York.  *See* Stipulated Fact No. 6.  They consist of a sanctuary of approximately. 1,800 square feet with a basement of approximately 1,200 square feet.  *See* id.

11. The Fortress Christian Academy is currently located in the Church basement, as well as in a separate, adjacent building (a converted house).  *See* Stipulated Fact No. 6; Stipulated Fact No. 8.  There are currently four classrooms (one with no windows) located in the basement of the Church.  *See* Stipulated Fact No. 8.  Seven other classrooms are located in the basement, former bedrooms, and living and dining rooms of the adjacent converted house.  *See* id.  Some of the classrooms are not separated by walls and multiple grades are taught in the same room.  *See* id.  The school is a ministry of the Church.  *See* Trial Tr. at 1582:7-14 (Karaman).

#### ii.  The Proposed Greenburgh Facility

12. On or about March 16, 1998, the Church purchased a 6.53 acre parcel of real property situated in the Town of Greenburgh, Westchester County, New York ("the Pomander Drive property").  The Church purchased the Pomander Drive property for the purpose of

constructing a new church facility at that site.  *See* Stipulated Fact No. 9.  The Pomander Drive property is vacant, except for a single-family dwelling located on the northern edge of the parcel. *See* Stipulated Fact No. 11.  The parcel has frontage along Pomander Drive to the north, on Dobbs Ferry Road (Route 100B) to the south, and is bordered by residential uses to the north and east.  *See* id.  Immediately to the west is the Sprain Brook Parkway.  *See* id.  Dobbs Ferry Road (Route 100B) in Hartsdale, New York is a state road.  *See* Stipulated Fact No. 62.

13. Prior to the purchase of the Pomander Drive property, Reverend Karaman met with Town of Greenburgh Commissioner of Planning Steven Lopez ("Town Planning Commissioner Lopez") and Town Building Inspector Lucido.  *See* Trial Tr. at 1612:3-7 (Karaman); Dep. Tr. at 14:4-16:6 (Lucido).  Reverend Karaman advised the Town of his intent to construct a church and school on the property, but told them that if the property was not suitable for its intended purpose then he would not pursue the purchase.  *See* Trial Tr. at 1612:3-1615:1 (Karaman).

14. With its purchase of the Pomander Drive property, the Church formulated plans for its development.  *See* Stipulated Fact No. 13.  These plans included the construction of a single structure to house the church and school, including a sanctuary, offices, library, kitchen, gymnasium and classrooms designed by Maranatha Church Builders in North Dakota.  *See* Stipulated Fact No. 13.

15. The proposed church is designed to accommodate a maximum of five hundred people, while the school would have a maximum potential enrollment of one hundred and fifty students in classes ranging from Kindergarten through Grade 12.  *See* Stipulated Fact No. 14. The facility would also include offices, a kitchen, classrooms, a gymnasium, and a library.  *See*

Stipulated Fact No. 13.  A pre-existing single-family house on the Pomander Drive property would remain as the parsonage for the Church.  *See* Stipulated Fact No. 14.

16. All of the foregoing structures and uses proposed in connection with development of the Pomander Drive property are permitted, as of right, within the R-10 zoning district in the Town of Greenburgh.  *See* Stipulated Fact No. 15.

### iii.  The Pomander Drive Property Neighborhood

17. The Pomander Drive property is located in a mixed use neighborhood which includes the following types of uses within an approximate one-half mile radius: churches, schools, commercial entities, private residences, major roads, office space, and a town park.  *See* Jt. Exh. 69(a) at p. II-C-1 (Response C1); Pl. Exh. 13; Pl. Exh. 14.  The commercial entities include the Knollwood Shopping Center (which contains a supermarket, drugstore, movie theatre and other retail use), a gas station, a restaurant, and parking for a New York State Department of Transportation storage facility.  *See* Pl. Exh. 14; Trial Tr. at 2003:13-19, 1986:19-21 (Kapica); Trial Tr. at 87:11-88:3 (Schiff).  The major roads include the Sprain Brook Parkway, a six lane regional highway, and Dobbs Ferry Road.  *See* Pl. Exh. 13; Pl. Exh. 14.  Rum Brook Park is located across the Sprain Brook Parkway from the Pomander Drive property.  *See* Pl. Exh. 14.

18. The Pomander Drive property lies within the R-10 (residential) zoning district for the Town of Greenburgh.  *See* Stipulated Fact No. 12; see also Jt. Exh. 7 at § 285-14 (Town of Greenburgh Zoning Ordinance).

### c.  SEQRA Review

### i.  SEQRA and Land Use Approvals and the Fortress Bible Church Application

19. To construct its proposed building, the Church needed to obtain the following land use approvals from the Town: (i) site plan approval from the Town Board (with a referral to the Planning Board for review and comment); (ii) a waiver from the Town Board of the requirement to construct landscaped parking islands; and (iii) a variance from the Zoning Board of Appeals from the side yard set back requirement to permit the building to be located further away from the adjacent single family homes and closer to the Sprain Brook Parkway. *See* Stipulated Fact No. 16.

20. The Town has a process by which the Church, as a land use applicant, can receive waivers and variances. *See* Trial Tr. at 1084:12-15 (Turner); Jt. Exh. 59 at p. I-3. The Church's need to obtain these discretionary approvals from the Town triggered the environmental review processes under the New York State Environmental Quality Review Act ("SEQRA"), 6 N.Y.C.R.R. § 617.

21. Before any of these three approvals could be issued by the Town, the following SEQRA process was required:

    ii.  A "lead agency" needed to be designated to perform the SEQRA review.

    iii.  The lead agency needed to review the Environmental Assessment Form ("EAF") and related application materials.

    iv.  The lead agency needed to make a determination of environmental significance, rendered through the issuance of a negative, positive or conditioned negative declaration.

        1.  If the lead agency issues a Negative Declaration—*i.e.*, a finding that the project as proposed will not result in any significant adverse environmental impacts—the SEQRA process is concluded

and the Town could then consider and take action on the three required land use approvals.

2.   If the lead agency issues a Conditioned Negative Declaration—*i.e.*, a finding that the action as initially proposed may result in one or more significant adverse environmental impacts, but can be mitigated through measures required by the lead agency, such that no significant adverse environmental impacts will result—the SEQRA process is concluded and the Town could then consider and take action on the three required land use approvals.

3.   If the lead agency issues a Positive Declaration—*i.e.*, a finding that the project may have a significant impact on the environment—then an Environmental Impact Statement ("EIS") must be completed.  Completion of the EIS requires:

   a.   preparation of a draft Scoping document identifying the areas of environmental significance to be reviewed in the EIS;

   b.   public input on the draft Scope;

   c.   adoption of the Scope (by the lead agency);

   d.   preparation of the Draft EIS ("DEIS") (by the applicant);

   e.   determination that the DEIS is complete (by the lead agency);

   f.   public input on the DEIS;

g. preparation of the Final EIS ("FEIS") (usually by the applicant);

h. determination that the FEIS is complete (by the lead agency);

i. issuance of a written Findings Statement (by the lead agency).

v. Issuance of any of the required approvals could come only at the time the Findings Statement is promulgated.

*See generally* 6 N.Y.C.R.R. §617.

22. The proposed Fortress Bible Church project did not require or involve a subdivision.  *See* Trial Tr. at 1276:13-17 (Turner).

23. As part of the SEQRA process, the Town typically holds public hearings on site plan applications.  No SEQRA public hearings were ever held with respect to the Fortress Bible application.  *See* Trial Tr. at 144:1-18 (Schiff); *see also* Jt. Exh. 13; Jt. Exh. 14; Jt. Exh. 47; Jt. Exh. 68; Jt. Exh. 112; Jt. Exh. 129; Jt. Exh. 130 (Plaintiffs' requests that the Town hold a public hearing on the application).

### vi.  Fortress Bible Church's Application

24. On or about November 24, 1998, the Church submitted an application to the Town Board for site plan approval, together with an EAF, as required by SEQRA ("November 1998 application").  *See* Stipulated Fact No. 17; Jt. Exh. 1(b).  The November 1998 application proposed the construction of a church and school within a single building with one hundred and twenty-five parking spaces on 1.45 acres of the 6.53 acre site.  *See* Stipulated Fact No. 18.

25. On December 9, 1998, Chief Mauro of the Fairview Fire Department advised the Town by letter that "[t]he Fairview Fire Department has reviewed the application and plans for [the Fortress Bible Church project] and the Department takes no exceptions to the plans as presented." *See* Jt. Exh. 2.

26. Plaintiffs met with the Town Board at its work session on December 15, 1998 to discuss the application. *See* Jt. Exh. 3.

27. On January 7, 1999, the Church requested that its application be placed on the January 13, 1999, Town Board Agenda for lead agency determination and referral to the Planning Board. *See* Jt. Exh. 3. The Town Board did not discuss the application on January 13, 1999. On or about January 27, 1999, the Church and its professional consultants appeared before members of the Town Board and the Town's planning staff at a Town Board work session to discuss the site plan application. The Town's planning staff requested that the Church study the issues of traffic and access to the Pomander Drive property prior to the Town proceeding with the application and making a determination of environmental significance under SEQRA. *See* Stipulated Fact No. 19.

28. On or about February 2, 1999, representatives of the Fortress Bible Church, including Reverend Karaman, the Church's attorney, and the Church's site engineer, met with residents who live near the Pomander Drive property. *See* Stipulated Fact No. 20; Second Amended Complaint at ¶ 41; Answer to Second Amended Complaint. In attendance at this meeting was Blase Spinozzi who lives at 21 Primrose Avenue, near the Pomander Drive property. *See* Trial Tr. at 1840:4-11 (Spinozzi). The purpose of this meeting—the first of two held by the Church—was to discuss the Church's proposed development and seek input from its neighbors. *See* Stipulated Fact No. 20; Second Amended Complaint at ¶ 41; Answer to Second

Amended Complaint' Trial Tr. at 1615:6-24 (Karaman). The primary concern expressed at the meeting by local residents involved increased vehicular traffic, particularly on Pomander Drive. *See* Second Amended Complaint at ¶ 41; Answer to Second Amended Complaint.

29. Under New York State and local law, the Fortress Bible Church has the right to use Pomander Drive for the purpose of gaining vehicular access to its property. *See* Second Amended Complaint at ¶ 41; Answer to Second Amended Complaint.

30. On or about February 10, 1999, the Town Board circulated a notice of its intent to designate itself as lead agency pursuant to SEQRA for review of the Church's project. *See* Stipulated Fact No. 21; Jt. Exh. 5.

31. In March 1999, Saccardi & Schiff was retained to represent the Church as its planning consultant. *See* Stipulated Fact No. 22. The Church also retained John Collins Engineers, P.C. ("JCE") as traffic consultants, Dolph Rotfeld Engineers, P.C. ("DRE") as its new site engineer and the Slaker Design Group as its landscape architect. *See* id. In compliance with the Town's request, Saccardi & Schiff coordinated with JCE the performance of a traffic study of the various roadways and intersections in the vicinity of the Pomander Drive property. *See* Stipulated Fact No. 22.

32. Plaintiffs performed a traffic study pursuant to the requests of both the community and the Town's planning staff. *See* Jt. Ex. 160(a) at p. I-4.

33. On May 6, 1999, based on the Town's request that JCE seek preliminary input from the New York State Department of Transportation ("NYSDOT"), JCE provided NYSDOT with a sketch that modified the Church's November 1998 application. The modifications included:

    i. relocating the access driveway opposite Spencer Court;

    ii.  restriping Dobbs Ferry Road to provide a dedicated left turn lane into the Church;

    iii.  rebuilding the shoulder along a widened portion of the road;

    iv.  providing a dedicated left turn lane onto the Sprain Brook Parkway; northbound entrance ramp from Dobbs Ferry Road eastbound.

*See* Pl. Exh. 19; Trial Tr. at 553:22-554:1 (Grealy).

34. Some of the modifications the Church proposed were made in order to accommodate requests that Pomander Drive not be used for vehicular access to the property. *See* Trial Tr. at 72:25-74:2 (Schiff).

35. On June 11, 1999, the Church obtained approval "in concept" from NYSDOT for Plaintiffs' proposed restriping of Dobbs Ferry Road (Route 100B) to provide a left turn lane. *See* Jt. Exh. 8.

36. On July 21, 1999, JCE advised Town Planning Commissioner Lopez that Fortress Bible Church had obtained conceptual approval from NYSDOT for the improvements described above. *See* Pl. Exh. 20; Trial Tr. at 543:13-545:17 (Grealy). NYSDOT will not issue formal approval on any request for traffic modifications until the SEQRA process has been completed. *See* Trial Tr. at 552:19-553:7, (Grealy); Trial Tr. at 3360:24-3361:1 (Maris).

37. Despite the Church's January 7, 1999, request to forward the site plan application to the Planning Board, the Town Board never did so. *See* Jt. Exh. 3; Trial Tr. at 144:6-18, 315:1-3 (Schiff); Trial Tr. at 373:17-21 (Lachenauer). When acting as lead agency on a land use application, it is the usual practice of the Town Board to refer the application to the Planning Board for comment. *See* Trial Tr. at 144:11-15 (Schiff).

38. Lucido has been the Building Inspector for the Town of Greenburgh for more than fifteen years.  *See* Trial Tr. at 2006:10-14 (Lucido).  In the Town, the Building Inspector makes the determination as to whether a plan complies with the state and local codes and zoning ordinances.  *See* Trial Tr. at 2006:15-2007:24 (Lucido).

39. On April 22, 1999, then-Town Planning Commissioner Lopez advised the Church that, in his opinion, the Church required a use variance because Town Code § 285-39.C.5 restricts development to one principal use per lot in a single family residential zone, but there were two principal uses proposed for the Pomander Drive property—a church and a school.  *See* Jt. Exh. 6.  Then-Town Planning Commissioner Lopez also stated that a special permit would be required if the property was to be operated as a private school because the school would then be considered a second primary use.  *See* id.  Town Building Inspector Lucido testified that, typically, Town Planning Commissioner Lopez would ask for his interpretation regarding the need for use variances, but that on the Fortress Bible Church application, Town Planning Commissioner Lopez made the determination without conferring with Lucido.  *See* Dep. Tr.  at 30:2-16 (Lucido).   In fact, neither a use variance nor a special permit was required.  *See* Stipulated Fact No. 16 (no special use permit requirement).

40. On August 13, 1999, the Church's attorney advised then-Town Planning Commissioner Lopez by letter that Lopez's assertion that Fortress Bible Church's application proposed two principal uses on a single lot, allegedly in violation of the Town of Greenburgh Zoning Code Section 285-39.C.5, was incorrect.  *See* Jt. Exh. 9.  The Church advised Lopez that: "[T]he restriction of a single principal use on a single lot does not apply to non-residential buildings, such as the church and school proposed by Fortress Bible.  Therefore, the application does meet the Town's code standards as pertains to this use and a use variance is not required."

*See* Jt. Exh. 9.  The Town never responded to this letter.  Town Building Inspector Lucido agreed

with Fortress Bible Church's August 13, 1999 letter that a use variance was not required with

respect to the Church's application.  *See* Dep. Tr. at 31:22-32:18 (Lucido).

### vii.   The Expanded EAF Plan

41. On or about January 17, 2000, the Church submitted to the Town a revised site

plan, together with a full EAF, Parts 1 and 2, and Visual EAF Addendum, which included a

comprehensive traffic study, drainage study, architectural renderings, floor plans, watershed

map, site sections and photographs of the site ("January 2000 application").  *See* Stipulated Fact

No. 23; Stipulated Fact No. 63; Jt. Exh. 11(b).  An EAF is to be used by the lead agency in

determining the environmental significance or non-significance of a project.  *See* 6 N.Y.C.R.R.

§617.2(m).

### 1.   Planning Elements

42. The Church's Environmental Assessment form provided the following narrative

description of the project:

D.  Informational Details

*Project Description and Location*

The proposed action involves construction of a 14,600± square
foot (footprint) Fortress Bible Church and school building and 126
parking spaces on a 6.53 acre site located in the Town of
Greenburgh in Westchester County, and designated as Volume 7,
Sheet 43H, Section 24, P2, P2A and P2B on the Town's Tax Map.
The property is located between Pomander Drive and Dobbs Ferry
Road (Route 100B) towards the western end of the Town.  (See
Regional and Site Location Figures).   The property is
predominantly vacant, with a single residential dwelling located in
the northern portion of the property.  The zoning is R-10, Single
Family Residential, with a 10,000 square foot minimum lot size.

Fortress Bible Church was established in the early 1940's.  For the
last four decades, it has been worshiping in its present location in
Mt. Vernon, New York.  Its congregates come from a variety of

backgrounds and reside in various communities in and around Westchester, including Brewster, the Bronx, Bronxville, Cortlandt Manor, Dobbs Ferry, Eastchester, Hartsdale, Mahopac, Mt. Vernon, New Rochelle, Rockland County, Scarsdale and Yonkers. Fortress Bible Church has, as an important objective, the provision of service to the community.

The subject site for the church is bounded by residential uses to the north and east.   To the west lies the Sprain Brook Parkway, providing easy regional access to the site, and to the south lies Dobbs Ferry Road, from which vehicular access to the site will be provided.  Across Dobbs Ferry Road, to the south, is a residential neighborhood with single family homes.

*Possible Impacts*

1.  Visual and Aesthetic

The site is rectilinear in shape, approximately 245 feet wide in the east-west direction, and approximately 1,150 feet long along the north-south axis.  It is predominantly vacant and wooded with mostly deciduous vegetation.  The site slopes down from the east to the west, and is relatively level along the longer axis.  Due to the dense existing vegetation, views in and out of the site are restricted during full foliage months, with greater visibility between the Fall and Spring months.  (See attached photos).

The proposed buildings will be located along the north-south axis, set back approximately 320 feet from Dobbs Ferry Road.  Parking will be provided to the south and east of the proposed buildings.  In addition, a detention pond will be created at the southwestern end of the property.  Most of the vegetation in the southern portion of the property will be cleared and a number of terraces will be created to locate the buildings, the parking areas and the detention pond.  The proposed structures will be two stories high, with the height of the tallest structure expected to be 43± feet from the lowest floor level (elevation 103) to the peak of the roof.

*Character of the Proposed Building*

The proposed building will comprise two main segments: an octagonal shaped main church structure; and, a rectangular shaped second structure housing the school.  In addition, there will be a connecting segment joining the two portions.   Due to the topography of the site, the entire building will be visible from the west, while only views of a single story will be available from the east.   Both building portions will have sloping roofs.  Proposed

22

architectural design elements include:  arched windows at the upper level, projected keystones over the window arches, overhanging eaves and highlighted quoins.  The main entrances to the structures will be located at the eastern and western side between the two main portions, and will be identified by covered pediments.  Sufficient architectural elements, including numerous window openings, will be provided to break the facades and ensure that the building walls will not dominate the landscape.

*Potential Impacts and Mitigation*

The structures are designed such that the peak of the highest building is at approximately the same elevation as the backyards of the existing homes immediately to the east.  This will help to ensure that the new structures will not dominate or significantly impact the existing views from the residences.  Also, a significant difference in grade between the residences and the parking areas will act as a visual buffer between the two.  See enclosed cross-section.

From the south, the proposed driveway will open up views of the main church structure.  Due to the physical layout, the second structure will be hidden.  See attached elevations.  A deep setback from Dobbs Ferry Road will reduce the visual impact of the large structure since the distant perspective will help to reduce the scale of the structure from the road and neighborhood.

The project will be most visible from the west, where a large portion of the existing vegetation between the buildings and the property boundary will be removed and where the gentler topography does not provide a natural visual barrier.  There is, however, existing evergreen and deciduous vegetation outside the property, within the right-of-way for the Sprain Brook Parkway, that will provide a limited visual buffer.

From the north, there are limited locations where a view of the proposed project may be available.  Due to the existing single-family house located at the northern end of the site, views to the interior of the property are restricted.  In addition, a large part of the existing vegetation will remain intact between the new structures and the single family home, and will assist in providing a fairly strong visual buffer.

*See* Jt. Exh. 11(b) at I-I-1, 3.

43. As depicted on the site sections contained in the Expanded EAF, the roof of the proposed church was at an elevation lower than the adjacent existing residences to the east. *See* Trial Tr. at 79:9-80:3 (Schiff). The peak of the roof of the Church was at elevations 145 while the adjacent residence was at elevation 146.9. *See* id. A six foot fence was also proposed along the property boundary. *See* id.

44. The Expanded EAF included the following site drawings:

    1 of 8—Existing Conditions

    2 of 8—Overall Site Plan

    3 of 8—Site Layout Plan

    4 of 8—Site Grading Plan

    5 of 8—Site Utility Plan

    6 of 8—Site Sediment & Erosion Control Plan

    7 of 8—Sediment & Erosion Control Details

    8 of 8—Construction Details

*See* Jt. Exh. 11(e).

## 2.  Traffic and Parking

45. The Town's Zoning Code requires one parking space for every four seats in the Church. *See* Jt. Exh. 7 at § 285-38E. Therefore, the Church required 125 spaces for its 500 seats. *See* Trial Tr. at 1278:3-10 (Turner). In its January 2000 submission (the EAF plan), the Church proposed 126 parking spaces. *See* Trial Tr. at 75:22-77:17 (Schiff).

46. In late 1999, JCE prepared an extensive traffic study that evaluated the traffic impacts associated with the peak conditions of Plaintiffs' project. *See* Jt. Exh. 11(c); Trial Tr. at 94:6-13 (Schiff); Trial Tr. at 555:20-557:11 (Grealy).

47. The JCE traffic study included computations of traffic volume and turn movements as well as capacity analysis. *See* Jt. Exh. 11(c). The analyses included by JCE in the traffic study included:

      i.  existing and future conditions during weekday peak school morning and afternoon hours;

      ii.  traffic counts conducted on specific dates in March, September and November 1999;

      iii.  existing and future conditions for the Church;

      iv.  capacity analyses for signalized and unsignalized intersections.

*See* Jt. Exh. 11(c) at pp. 2-6.

48. JCE concluded:

> As summarized above, this study provides a conservative analysis of the peak hours associated with both the "School" and "Church" operation. With the proposed left turn lane and construction of access opposite Spencer Court, traffic can be adequately handled entering the site. In addition due to the nature of the Project ("Church"/"School"), traffic entering and exiting this site would not occur regularly and would occur primarily during the times outlined in section 2 and 3.

*See* Jt. Exh. 11(c) at p. 8.

49. The Expanded EAF specifically included reference to NYSDOT's conceptual approval of the relocation of access and associated offsite traffic improvements, including road widening and construction of a left turn lane. *See* Jt. Exh. 11(c) at p. 6.

### 3. Drainage and Stormwater

50. The Expanded EAF also included a drainage analysis prepared by DRE to examine the impact of construction of the project on existing drainage patterns. *See* Jt. Exh.

11(d).   In its stormwater analysis, DRE examined the potential impacts to drainage patterns during 2, 10, 25 and 100 year storm events.   *See* Jt. Exh. 11(d).   DRE concluded that the installation of the underground detention gallery and the detention basin mitigate the increase in the peak rate of runoff after construction.   *See* Jt. Exh. 11(d).   The DRE report contained watershed maps and detailed drainage calculations for the 2, 10, 25 and 100 year storm events. *See* id.

### viii.   The Town's Review

51. Upon submission of the Expanded EAF, on January 17, 2000, the Church again requested that the Town Board refer the application to the Planning Board for a report and recommendation on the site plan.   *See* Jt. Exh. 11(a).   The Town did not refer the application. *See* Trial Tr. at 144:6-18 (Schiff).

52. On February 8, 2000, Town Building Inspector Lucido asserted that the Town's Zoning Ordinance requires that the church have for its school "a curriculum approved by the Board of Regents of the State of New York."   In fact, non-public schools are not required by State Law to be registered with the Board of Regents under 8 N.Y.C.R.R. §100.26(p) and only the local school board can approve the curriculum of a non-public school.   *See* 8 N.Y.C.R.R. §100.26(p).

53. Fire Chief Mauro reviewed the EAF plans submitted on January 17, 2000 and responded by letter on February 11, 2000 as follows:

> The Fairview Fire Department has reviewed the plans in the above reference[d] case.   Our comment is that this is a church and a school building.   The construction standards for the school should be covered under the New York State Department of Education.   It should be maintained under the New York State Department of Education inspection standards.
>
> Please be advised that Dobbs Ferry Road is the major thoroughfare that connects both ends of the Fairview Fire District.   It is used

> extensively by fire apparatus traveling east and west.  In addition,
> it is a major entry point for the Sprain Brook Parkway.  Provisions
> should be made for fire apparatus to safely maneuver in a response
> mode.

*See* Pl. Exh. 22.

54. By letter dated March 28, 2000, Plaintiffs again requested that the Town place the Church's application on its public agenda and refer the application to the Planning Board for a report and recommendation.  *See* Jt. Exh. 13.

55. By letter dated April 11, 2000, Plaintiffs yet again requested that Town place the Church's application on its public agenda and refer the application to the Planning Board for a report and recommendation.  *See* Jt. Exh. 14.

56. By April 25, 2000, the Town had replaced Town Planning Commissioner Lopez with AKRF, Inc. as the Town's Commissioner of Planning.  AKRF provided comments on all aspects of the Church's land use application including traffic, engineering and planning.  Russo was an employee of AKRF from before November 1998 through the advent of this litigation.  *See* Trial Tr. at 882:18-21 (Russo).  Russo worked on the Fortress Bible Church matter.

57. By letter dated April 26, 2000—three months after submission of the January 2000 application—the Greenburgh Town Attorney stated that Fortress Bible Church would be placed on the Town Board's May 9, 2000, agenda, for referral to the Planning Board and determination of environmental significance under SEQRA.  However, it was not placed on that agenda.

58. The Church's planning consultant sent a letter dated April 27, 2000, to Supervisor Feiner, urging the Town to make a determination of environmental significance:

> In the nearly year and a half during which the Church has been
> discussing this project with the Town, traffic has been the only
> significant impact issue that has been raised.  By preparing an in-
> depth traffic study and then agreeing to the extensive mitigation

measures outlined above—measures which would help to improve existing traffic conditions which pre-date this application—the Fortress Bible Church has eliminated the potential for its project to create any significant environmental impacts. Without such adverse impacts, we believe that a Positive Declaration and DEIS are not required under SEQRA. Thus, we respectfully request that the Town Board issue a Negative Determination in conjunction with this application.

*See* Jt. Exh. 15.

59. The Church's application was not addressed at the May 9, 2000, Town Board Meeting.

### d.  The Town's Determination of Significance

#### i.  Lead Agency's Options

60. Under SEQRA, the Town Board, as Lead Agency, could have issued a "Negative Declaration of Significance," a "Conditioned Negative Declaration of Significance," or a "Positive Declaration of Significance." A Negative Determination of Significance, or "Negative Declaration" is issued when "the implementation of the action as proposed will not result in any significant adverse environmental impacts." A Conditioned Negative Declaration is a declaration determining that a project will have no impact on the environment "assuming that the applicant provide certain improvement measures as part of the site plan." A Positive Determination of Significance or "Positive Declaration" is a written statement prepared by the Lead Agency indicating that implementation of the action as proposed may have a significant adverse impact on the environment and that an environmental impact statement will be required. *See* 6 N.Y.C.R.R. §617.2(ac).

61. Following the issuance of a positive declaration by a lead agency, an applicant is required to prepare an Environmental Impact Statement. A Positive Declaration on the Fortress

Bible Church application prolonged the SEQRA process and caused the Church to incur significant expense.  *See* Trial Tr. at 957:25-958:6 (Russo).

### ii.  Evidence that a Positive Declaration Was Unnecessary

62. The Church's Expanded EAF provided the Town with more information and analysis than is typically provided at the EAF stage of SEQRA.  *See* Trial Tr. at 96:24-97:25 (Schiff).

63. By letter to the Town Board dated April 27, 2000, the Church's planning consultant advised that the project would not result in any significant adverse environmental impacts:

> 1. The proposed use is a permitted use within the existing R-10 zoning.
>
> 2. The site has two frontages:  Dobbs Ferry Road and Pomander Drive, from which the existing house on the site is currently accessed.  Based on its initial meetings with neighborhood residents, at which they stressed that they preferred that church traffic not come through the neighborhood, the church has proposed to limit access to the Dobbs Ferry Road frontage (except for the house).
>
> 3. Initial site plan reviews by Town staff identified concerns regarding the Dobbs Ferry Road access.  As a result, the entrance was redesigned to align with Spencer Court.  Moreover, the church's traffic consultants, John Collins Engineers, prepared a detailed traffic analysis and met with the New York State Department of Transportation to explore possible improvements to the access.  As a result, the [NYS]DOT agreed to permit the use of State-owned right-of-way to accommodate the installation of a left turn lane into the site.
>
> 4. In January 2000, the church submitted a long Environmental Assessment Form (EAF) with attachments: Visual EAF Addendum plus photographs and cross-sections; drainage analysis; and, a full traffic study similar to what would be required for a DEIS.  (Note that the analysis shows that, with the agreed to prohibition on left

turns out of the church driveway, only 10 trips would travel to or from the church through the 100A/100B intersection during the weekday peak hour.).

5.    An additional meeting was then held with the Town Planning Commissioner, the Town Engineer and the Chief of Police to discuss the traffic access issue.  Based on the Chief's concerns, it was decided that a traffic signal at the new entrance would be desirable.  Again, discussions were held with the [NYS]DOT.  As a result, a plan has been developed which provides such a signal, coordinated with a signal at the Sprain Brook Parkway ramp.  In addition, the church has offered to restrict exiting traffic to right turns out only, and to design the access so as to ensure that this restriction can be enforced.  Finally, the church agreed to provide a traffic control agent at its entryway at critical times.    It is estimated that the roadway and traffic improvements would cost approximately $200,000, not including the traffic agent.

*See* Jt. Exh. 15.

64. The letter also advised the Town that, as the project was an "Unlisted Action" under SEQRA, the Town Board could issue a Conditioned Negative Declaration to impose conditions to mitigate any identified impacts, which would provide a mechanism to formalize the already proposed mitigation measures prior to site plan approval.  *See* Jt. Exh. 15.

65. Russo is employed with the firm of AKRF where he runs the Traffic and Transportation Department of the firm's White Plains office as a Technical Director and also serves as Project Manager on preparation of EAFs.  *See* Trial Tr. at 882:19-883:4 (Russo).  As an employee of AKRF, Russo personally works with municipalities.  *See* Trial Tr. at 884:10-12 (Russo).

66. AKRF represents various private clients and municipalities as environmental planners, including the Village of Mount Kisco, Town of Southeast, Town of Goshen and, previously, City of New Rochelle and the Town of Greenburgh.  *See* Trial Tr. at 883:5-14 (Russo).  During AKRF's tenure as Commissioner of Planning for the Town of Greenburgh,

Russo worked directly with the Town Board and the Planning Board.  *See* Trial Tr. at 887:3-13 (Russo).

67. Town Planning Commissioner Russo attended Town Board work sessions, meetings, executive sessions, and public hearings during the time that AKRF served as Commissioner of Planning for the Town of Greenburgh.  *See* Trial Tr. at 887:25-888:10 (Russo).

68. AKRF and Planning Commissioner Russo were involved with the Fortress Bible Church project from the EAF stage.  Russo was familiar with the Fortress Bible Church land use application and, in fact, had conducted several site visits to the Pomander Drive property.

69. Environmental issues that Town Planning Commissioner Russo identified during the EAF review included traffic as the major issue, as well as site planning issues of landscaping and lighting.  *See* Trial Tr. at 909:21-25 (Russo).  These three issues were the only issues identified by Russo prior to the Town's determination of significance.  *See* Trial Tr. at 910:1-5 (Russo).  Based on his review of the project, prior to a determination of significance, Russo believed that the Town could grant a Negative Declaration "considering traffic was the primary issue and the applicant['s] engineer had submitted a traffic study and they were willing to mitigate whatever impact they had from a traffic standpoint from the project."  *See* Trial Tr. at 912:16-21 (Russo).  Town Planning Commissioner Russo discussed his belief that a Negative Declaration could be granted by the Town Board on the Fortress Bible Church project with the Town Board itself.  *See* Trial Tr. at 912:22-913:3 (Russo).

70. Prior to the Town's determination of significance, Town Planning Commissioner Russo and JCE communicated regarding the Fortress Bible Church project's impacts on traffic. *See* Jt. Exh. 16; Jt. Exh. 17; Jt. Exh. 19; Jt. Exh. 20.  On June 21, 2000, JCE sent Russo a submission responding to comments about traffic raised at a May Town Hall meeting.  *See* Jt.

Exh. 16.   Russo responded to the submission by memo dated June 23, 2000, requesting additional information.   *See* Jt. Exh. 17.   JCE responded by memo dated June 26, 2000, addressing Russo's requests.   *See* Jt. Exh. 18.   On July 12, 2000, Russo responded, again requesting additional information.   *See* Jt. Exh. 19.   JCE responded by memo dated July 17, 2000, again addressing Russo's concerns.   *See* Jt. Exh. 20.   Plaintiffs proposed numerous means of mitigation, including creating a new left turning lane from Dobbs Ferry Road into the proposed driveway, creating a proposed right turn out only, adding a proposed traffic light to be coordinated with improved operations of existing traffic signal, and adding personnel to monitor traffic and coordination of scheduling of services with other churches in the area.   *See* Trial Tr. at 917:20-918:20 (Russo).

71. Prior to the Town's adoption of a Positive Declaration, Town Planning Commissioner Russo believed that mitigation measures proposed by Fortress Bible Church relating to traffic were "adequate" and "a good solution."   *See* Trial Tr. at 918:21-919:6 (Russo).

72. Town Planning Commissioner Russo advised the Town Board that the Board, as lead agency, could issue a Conditioned Negative Declaration on the Fortress Bible Church project.   Russo believed that on the Fortress Bible Church project, a Conditioned Negative Declaration could be an appropriate designation "considering that [] Fortress Bible was willing to put in traffic improvement measures right up front." *See* Trial Tr. at 922:5-14 (Russo).

73. During Russo's review of the Fortress Bible Church project in his capacity as Town Planning Commissioner, Fortress Bible Church never refused to answer any questions he posed or to provide any mitigation measure requested by Russo.   *See* Trial Tr. at 919:11-920:5 (Russo).

### iii.   The Town's Demand for Payment or Donation of a Fire Truck

74. On July 11, 2000, Reverend Karaman, an attorney for the Church, Church Planning Consultant Schiff, and a representative of JCE attended a Town Board Work Session meeting at Town Hall.  In attendance on behalf of the Town, in addition to the Town Board members, were the Town Attorney, Town Attorney Susan Mancuso, and Town Planning Commissioner Russo.  The purpose of this work session was to discuss the Fortress Bible site plan and the Town's determination of environmental significance.  *See* Trial Tr. at 920:6-16 (Russo); Trial Tr. at 108:21-109:1 (Schiff).

75. In response to questions at the July 11, 2000, work session, the Supervisor and Board responded that the main complaint about the Church project was traffic.  However, Supervisor Feiner stated that "50 percent" of the issue was traffic, the other "50 percent" was the Church's tax exempt status.  During that work session, Supervisor Feiner asked the Church to donate a fire truck to the Fairfiew Fire District or to make some other payment in lieu of taxes ("PILOT") to the Town of Greenburgh.  *See* Stipulation No. 48.

76. Reverend Karaman understood Supervisor Feiner's request for donation of a fire truck to be a basis for favorable processing of the application by the Town.  *See* Trial Tr. at 1618:18-1619:1 (Karaman).

77. During her deposition, when asked whether she was present at the Town Board meeting when Supervisor Feiner requested that the Church donate a fire truck, Councilwoman Weinberg initially laughed.  *See* Dep. Tr. at 81:9-19 (Weinberg).  When asked whether she believed the request was appropriate, she answered "[n]o comment."  *See* Dep. Tr. at 81:20-22 (Weinberg).  At trial, she stated that the request was inappropriate because of the context in which it might be taken by an applicant with a pending land use application.  *See* Trial Tr. at 1939:22-1940:8 (Weinberg).

78. Councilman Bass also admitted that Supervisor Feiner's request that the Church donate a fire truck to Fairview Fire District was inappropriate.  *See* Dep. Tr. at 56:21-24 (Bass). He stated that "[I]t's not the proper way to proceed to it with an applicant."  *See* Dep. Tr. at 56:21-24 (Bass); *see also* Trial Tr. at 2159:9-11 (Bass).

79. Supervisor Feiner testified that Fortress Bible Church's tax exempt status was "hampering or hindering" approval of its land use application.  *See* Dep. Tr. at 166:13-18 (Feiner); *see also* Trial Tr. at 2391:14-2393:23 (Feiner).

80. It is apparent that the Church's status as a tax exempt *religious* organization was a source of consternation for some members of the Town Board.  For example, one board member stated that she did not want "another church" in that area of Greenburgh.  *See* Trial Tr. at 908:11-17 (Russo) (describing statement by Councilwoman Weinberg).  Also, Supervisor Feiner supported locating a joint Town Hall/public library facility in the vicinity of the Pomander Drive property.  *See* Trial Tr. at 2379:24-2380:9 (Feiner).  Supervisor Feiner admitted that the Fall 2002 purchase of a large commercial building to be used as the new Town Hall resulted in a large commercial property being eliminated from the Town's tax roll.  *See* Trial Tr. at 2401:22-2402:11 (Feiner).  Supervisor Feiner acknowledged that the old Town Hall, also located in the Fairview Fire District, was never restored to the tax rolls when the Town occupied the new Town Hall and that, under the current plans of the Town, that property would not return to the tax rolls. *See* Trial Tr. at 2402:4-8 (Feiner).   Furthermore, Supervisor Feiner testified that it was acceptable to him that the commercial property purchased to serve as the new Town Hall was eliminated from the Town's tax rolls.  *See* Trial Tr. at 2402:12-15 (Feiner).

81. Saccardi is a principal in the planning and development consulting firm of Saccardi & Schiff.  *See* Trial Tr. at 980:25-981:5 (Saccardi).  Saccardi has more than thirty-six

years experience as a land use planning consultant.  *See* Trial Tr. at 981:25-982:5 (Saccardi). Saccardi worked as a consultant to the Town of Greenburgh prior to this case and has also represented land use applicants with applications pending in the Town of Greenburgh.  *See* Trial Tr. at 982:6-983:5 (Saccardi).   Saccardi has personally appeared before the Town Board, Planning Board and Zoning Board of Appeals of the Town of Greenburgh.  *See* Trial Tr. at 982:18-21 (Saccardi).

82. Church Planning Consultant Saccardi testified that, in his twenty-eight years of experience, he was only aware of one instance in which a not-for-profit land use applicant was asked to contribute/make a donation in association with its land use application, which was the Hebrew Home in the Town of Greenburgh wherein the applicant contributed a fire truck as part of the project.  The contribution of a fire truck by the Hebrew Home as a land use applicant in the Town of Greenburgh was done during Supervisor Feiner's tenure as Supervisor of the Town of Greenburgh.   Saccardi testified that he has never been involved in discussions in other municipalities concerning the potential for tax exempt land use applicants to make donations. *See* Trial Tr. at 1026:4-9 (Saccardi).

83. Although Defendants at trial sought to characterize Supervisor Feiner's demand for a financial donation or donation of a fire truck as a PILOT, it is not.  Church Planning Consultant Saccardi stated that his experience with PILOTs is that they are usually conducted through an industrial development agency whereby the industrial development agency owns property, leases the property to a developer and the developer pays a lease payment/PILOT payment equal to or in some cases less than taxes which would be due on the property.  *See* Trial Tr. at 1026:19-24 (Saccardi).

84. Prior to July 19, 2000, the Church informed Supervisor Feiner and the Town Board that the Church would not agree either to donate a fire truck to the Fairview Fire District or to make a PILOT.  *See* Stipulated Fact No. 49.  On or about July 19, 2000, the Town issued the Positive Declaration.  *See* Stipulated Fact No. 54.

### iv.   The Town's Hostility Toward the Church

85. During a meeting early in the SEQRA process, Councilwoman Weinberg, then a member of the Board, stated that she did not want the Fortress Bible Church project and that "we do not need another church in Greenburgh, especially in that area of Greenburgh where there are already several religious institutions."  *See* Trial Tr. at 908:11-16 (Russo).  Councilwoman Weinberg instructed Town Planning Commissioner Russo to "help stop the project or kill the project."  *See* Trial Tr. at 908:16-17 (Russo).  Russo testified that Councilwoman Weinberg told him to stop or kill the project on more than one occasion.  *See* Trial Tr. at 908:16-25 (Russo).

86. Town Planning Commissioner Russo testified that, in reaction to Councilwoman Weinberg's statement at the meeting that Weinberg did not want another church in Greenburgh and to Weinberg's instruction to Russo to try to stop the Fortress Bible Church project, Councilwoman Juettner shook her head "yes" and banged her hand on the table.  *See* Trial Tr. at 906:3-7 (Russo).

87. Russo testified that, based on his experience and review of the Fortress Bible Church application, the Town Board "could have gone with a negative declaration," rather than issuing a positive declaration "which required the preparation of a full Environmental Impact Statement which is a long, expensive process to go through."  *See* Trial Tr. at 913:10-20 (Russo).

88. This Court finds that Town Planning Commissioner Russo's testimony was credible.  AKRF's termination by the Town did not involve Russo.  Russo had no direct interest

in the outcome of AKRF's fee dispute with the Town and, in fact, Supervisor Feiner wanted to retain Russo as Planning Commissioner after AKRF's termination. *See* Trial Tr. at 979:16-25 (Russo).

### v. The Positive Declaration

89. At its July 19, 2000, meeting, the Town Board adopted a Positive Declaration pursuant to SEQRA in connection with the development of the Pomander Drive property, thereby triggering the requirement that Fortress Bible Church undertake the costly task of preparing a DEIS and completing the entire SEQRA review process. *See* Stipulated Fact No. 54; Second Amended Complaint at ¶ 50; Answer to Second Amended Complaint; Jt. Exh. 21.

90. In its Positive Declaration, the Town provided the following basis for issuing the Positive Declaration:

> The proposed action would disturb a site which contains a relatively large wooded area adjacent to the Sprain Brook Parkway. The proposed action would alter the existing visual character of the Sprain Brook Parkway and the neighboring residential neighborhood. Traffic access, pedestrian access and safety concerns would possibly be significant due [to the] access location adjacent to the Sprain Brook Parkway access ramps.

*See* Jt. Exh. 15.

91. However, when asked at trial to identify which of the items in the Positive Declaration the Church had failed to mitigate prior to issuance of the Positive Declaration, Town Planning Commissioner Russo did not name any issues, but rather stated the Church had been cooperative and responsive to the Town's concerns. *See* Trial Tr. at 919:14-920:5 (Russo).

92. Prior to issuance of the Positive Declaration, based on his technical review of the correspondence with Fortress Bible Church, Town Planning Commissioner Russo was satisfied that Fortress Bible Church "had developed a good mitigation plan" regarding traffic. *See* Trial Tr. at 919:14-920:2 (Russo).

93. Prior to issuance of the Positive Declaration, Town Planning Commissioner Russo believed that proposed traffic mitigation by Fortress Bible Church would include:

  i. a left turn lane into the driveway which would have its own lane, such that it "would not queue and block other traffic";

  ii. a right turn only exit from the project site, such that it would "keep the bulk of the traffic between the site and the Sprain Brook Parkway";

  iii. a traffic signal that was going to "improve operations by coordinating [the proposed] traffic signal with [an existing] traffic signal to [e]nsure that there wasn't a lot of queuing or backing up;"

  iv. if necessary, personnel to monitor traffic "to [e]nsure that they would have no back up or traffic conflict"; and

  v. if necessary, services staggered with the services of other churches in the area, to avoid having " everybody going and coming at the same time."

*See* Trial Tr. at 917:23-918:20 (Russo).

94. A Positive Declaration was not warranted as Fortress Bible Church had mitigated all identified potential adverse impacts.  Prior to the issuance of a Positive Declaration under SEQRA, Plaintiffs had informed the Town that NYSDOT had provided conceptual approval and review of improvements to the site access on Dobbs Ferry Road to adequately mitigate any traffic impacts from the project.  *See* Jt. Exh. 16.  Fortress Bible Church did not refuse to implement any traffic mitigation measures proposed by or to provide any information requested by the Town's then-Commissioner of Planning and/or traffic consultant.  *See* Trial Tr. at 919:14-920:5 (Russo).  In fact, Plaintiffs repeatedly revised their proposal and provided additional

information to comply with the Town's comments and requests.  *See* Jt. Exh. 17; Jt. Exh. 18; Jt. Exh. 19; Jt. Exh. 20.

95. Church Planning Consultant Saccardi testified that neither of the other expanded EAFs on which he represented an applicant in the Town received a Positive Declaration.  *See* Trial Tr. at 982:22-983:12 (Saccardi).  The Town Board, however, has adopted Conditioned Negative Declarations for other land use applicants.  *See* Pl. Exh. 78; Trial Tr. at 2366:16-25 (Feiner).

96. The Court finds that the Town used the SEQRA process and the issuance of a Positive Declaration punitively because of the Church's refusal to make a significant donation of value or monetary payment to the Town and because of certain Town Board members' desire to delay the project and increase the expense of the SEQRA process for the Church.  The Town Board's Positive Declaration under SEQRA for the Fortress Bible Church project was not fully justified on this record and was capricious.  move to findings??

**e.  The Scoping Phase**

97. After adoption of the Positive Declaration on July 19, 2000, the Church submitted to the Town a draft DEIS scoping outline.  *See* Jt. Exh. 22.  In accordance with SEQRA, the purpose of the Scoping Outline is to identify specific potentially significant adverse impacts and to eliminate consideration of those impacts that are irrelevant or non-significant.  *See* Trial Tr. at 67:24-68:5 (Schiff).  Scoping is the process by which the Lead Agency identifies the potentially significant adverse impacts related to the proposed action that are to be addressed in the DEIS, including the content and level of detail of the analysis, the range of alternatives, and the mitigation measures needed.  *See* 6 N.Y.C.R.R. §617.2(af); *see also* Trial Tr. at 67:24-68:5 (Schiff).

98. On August 16, 2000, the Church held an informational meeting with the property's neighbors at the property's caretaker's house.  Town Planning Commissioner Russo attended the meeting.  *See* Stipulated Fact No. 27; Jt. Exh. 25.

99. Russo wrote a memo to Supervisor Feiner concerning Russo's attendance at the August 6, 2000, meeting between Fortress Bible Church and neighbors of the Pomander Drive property stating:

> At the meeting the applicant presented a revised site plan that addressed some of [the] issues raised by the public at their previous meeting.  The public continued to express concerns regarding screening, lighting, and traffic.  The applicant listened to these concerns and stated that they would continue to work with the public to address these issues.
>
> Some of the people in attendance that night expressed support of the project because the Fortress Bible project's only access point is located on Dobbs Ferry Road.
>
> . . . .
>
> The meeting was very professional and the applicant seemed to be responsive to the community.

*See* Jt. Exh. 25.

100. The Town Board convened a public hearing on the scoping review on August 23, 2000.  *See* Jt. Exh. 26.  The Town Board—over the Church's objection—adjourned the public hearing of the August 23, 2000 scoping session.  *See* id.  The stated basis for the adjournment was that no stenographer was present.  *See* id.  However, the Town Clerk was present and taking minutes and the meeting was videotaped.  *See* Jt. Exh. 26; Jt. Exh. 28; Trial Tr. at 111:10-112:1 (Schiff).  Nevertheless, on motion of Councilwoman Weinberg, the Town

Board voted not to proceed with the public hearing and adjourned it until September 13, 2000. *See* Jt. Exh. 26.

101.  Minutes from the Town Board meeting of August 23, 2000, also reflect that in response to a constituent's suggestion that a formula be devised for a payment in lieu of taxes by not-for-profit property owners, Supervisor Feiner commented that a task force was being formed to "lobby for" such payments.[6]  *See* Jt. Exh. 26.

102.  During the September 13, 2000, public hearing on the proposed scope for the Fortress Bible Church project, a community member made derogatory comments concerning Plaintiffs and the religious activities he asserted would occur at the proposed building project to which no member of the Town Board objected.   *See* Pl. Exh. 135; Trial Tr. at 1627:8-25 (Karaman); Trial Tr. at 118:9-11 (Schiff).  For example, the community member stated:

103.  During the September 13, 2000, public hearing on the proposed scope for the Fortress Bible Church project, a community member made derogatory comments concerning Plaintiffs and the religious activities he asserted would occur at the proposed building.  *See* Pl. Exh. 135 (enclosure at pp. 32-34); Trial Tr. at 118:9-11 (Schiff).  For example, the community member stated:

> . . . you may recall what happened in Ghana [Plaintiffs proposed correction to "Guyana"] years ago.  Ghana [Plaintiffs proposed correction to "Guyana"] that's a Caribbean island.  Jimmy Jones and the rest of them.  I know that this Bible Church advocates—I mean some of the churches like this Bible Church have a tendency sometimes to go extreme . . . .
>
> I come from the Bronx, you know, with my family, just for a better place and a place with less noise and also try to give my life.  In fact, it is very, very sorry we may be pushed out of this very place.

---

[6] Note that the August 23, 2000, Town Board Minutes indicate a Jason "Span" agreed to serve on such task force.  *See* Jt. Exh. 26.  In December 2001, Supervisor Feiner corresponded by e-mail with a Jason "Sapan" (who objected to the Church as "outsiders") stating that he (Feiner) already anticipated that the Town Board would deny the Church's application.

You know.  So we continue to keep on going until one day we don't know where else we are going to be.  Please, at this point my kids, my wife and myself, we are opposed to the establishment of this Bible Church.  Thank you.

(Applause)

*See* Pl. Exh. 135 (enclosure at pp. 32-34).  No member of the Town Board took exception to any part of this statement.  *See* id. at p. 34; Trial Tr. at 118:9-11 (Schiff).

104.  At the close of the September 13, 2000, hearing Supervisor Feiner indicated that he would appoint a person from the neighborhood association as a Deputy Supervisor.  *See* Jt. Exh. 33; Pl. Exh. 135 (enclosure at pp. 57-58).  Feiner stated "that person will be notified whenever there is a meeting, will receive copies of all the documents, and will be able to attend closed and open meetings when we [the Town Board] are discussing the project." *See* Jt. Exh. 33; Pl. Exh. 135 (enclosure at p. 58).

105.  Plaintiffs, by letter dated September 28, 2000, objected to this appointment.  *See* Jt. Exh. 33.

106.  By letter dated October 4, 2000, Supervisor Feiner wrote to residents again announcing his intent to appoint a resident as Deputy Supervisor who "would attend open and closed meetings as [the Town] review[s] the application."  *See* Pl. Exh. 29.  In the letter, he noted that Plaintiffs objected to the appointment of a representative from the neighborhood association, but stated that "lawyers or developers cannot tell th[e] [T]own what [it] can or cannot do."  *See* id.

107.  By letter dated October 13, 2000, Supervisor Feiner informed Plaintiffs that he had appointed Blase Spinozzi, President of the Hilltop Farms Civic Association, as Deputy Town Supervisor.  *See* Stipulated Fact No. 69; Jt. Exh. 36.  In announcing his choice, Supervisor Feiner

stated that "I have the power to appoint anyone I want as Deputy Town Supervisor." *See* Jt. Exh. 36.

108.  Supervisor Feiner was aware at the time he appointed Spinozzi that Spinozzi had previously opposed the Fortress Bible Church project and that, at the time he was appointed, he continued to oppose the project.  *See* Stipulated Fact No. 67; Stipulated Fact No. 70; Feiner Tr. at 253:12-24.

109.  The Town Board approved Spinozzi's appointment on October 11, 2000.  *See* Jt. Exh. 37.

### f.   The Town's Efforts to Delay the Project

#### i.  The Scope

110.  The Town Board adopted the Scope for the DEIS on October 2, 2000.  *See* Jt. Exh. 34.

111.  The Scope for a DEIS is the "outline of all the studies that need to get done, the details of which traffic intersection[s] should be studied, which views should be looked at and all.  But it's also supposed to narrow the focus of the EIS to those issues that are truly of concern."  *See* Trial Tr. at 112:10-16 (Schiff); *see also* 6 N.Y.C.R.R. §617.8(f).

112.  Many, if not most, of the traffic issues to be listed in the Scope and to be addressed in the DEIS had already been studied and the results provided to the Town.  *Compare* Jt. Exh. 34 *with* Jt. Exh. 11(c); Jt. Exh. 16; Jt. Exh. 18; Jt. Exh. 20.

113.  Only five alternatives were required to be studied in the DEIS, per the Town's adopted scoping document.  *See* Jt. Exh. 34.  Those alternatives were "no build," a single family residential alternative, a no variance alternative and two alternative accesses.  *See* id.  Alternative Access # 1 (Alternative D) was to assess the use of Pomander Drive and/or the adjacent culs-de-

43

sac, rather than from Dobbs Ferry Road, as points of access.  *See* id.  Alternative Access # 2 (Alternative E) was to assess access from Pomander Drive and/or the adjacent culs-de-sac, as well as from Dobbs Farry Road.  *See* id.

114.  In the DEIS, the Church added an extra alternative, Alternative F, which studied an alternative site layout for the proposed structure.  *See* Jt. Exh. 59 at XIII-8-10.

115.  The adopted Scope required that various topics be addressed in the DEIS.  *See* Jt. Exh. 34.  The Scope did not require that Plaintiffs study construction of a smaller building or facility.  *See* id.

116.  At trial, Defendants argued that the Church had failed to comply with a Town request to study an alternative for a smaller facility.  *See* Trial Tr. at 3133:17-3134:12 (Insardi). However, the Town never requested that the Church do so.  *See* Trial Tr. at 244:2-9 (Schiff).  In fact, the Court specifically gave Defendants the opportunity to produce any document evidencing such a request by Defendants to the Church.  *See id.* at 3134:5-14.  Defendants failed to produce any such document at trial.  *See* Trial Tr. at 3133:17-3134:12 (Insardi).

## ii.  The DEIS

117.  On or about April 9, 2001, the Church submitted a lengthy DEIS to the Town Board.  *See* Stipulated Fact No. 64; Jt. Exh. 43(b).

118.  Every chapter required by the scope was included in the DEIS.  *See* Jt. Exh 34; Jt. Exh. 43(b).

119.  The information in the DEIS included:

    i.  a summary of the potential impacts and proposed mitigation measures;

    ii.  preliminary floor plans and building elevations;

   iii.  a description of impact on community services, including police, fire, emergency services, and sanitation;

   iv.  proposed landscape plan;

   v.  a comprehensive traffic study;

   vi.  a noise study;

   vii.  a sketch plan and narrative summary for each topic required to be evaluated in the DEIS for all of the alternatives included in the DEIS;

   viii.  illustrations of both traffic volume and traffic flow for the Pomander Drive alternatives (Alternatives D and E);

   ix.  a table summarizing the impact on each study area for each of the six alternatives studied and comparing those to the proposed action.

*See* Jt. Exh. 43(b).

120. The DEIS included a revised proposed plan which maintained the EAF Plan's off-site traffic improvements of road widening, restriping, and construction of a left hand turn lane (as conceptually approved by NYSDOT), but shifted the buildings and parking away from the residences and closer to the Sprain Brook Parkway in response to requests from the Town and neighbors. *Compare* Jt. Exh. 43(c) (DEIS Plan) *with* Jt. Exh. 11(e) (EAF Plan); *see also* Trial Tr. at 120:3-121:1 (Schiff).

121. The DEIS Plan included 127 parking spaces, exceeding the minimum parking requirements of the Greenburgh Town Code.

122. Upon receipt, Russo and other members of AKRF, in their capacities as Planning Commissioner for the Town, reviewed the DEIS, and produced a comment letter dated June 1, 2001. *See* Jt. Exh. 50. In response, Fortress Bible Church submitted a revised DEIS.

*See* Jt. Exh. 53.  Russo responded by memo dated September 14, 2001, stating that the DEIS had been "well revised" and requesting additional information regarding certain concerns.  *See* Jt. Exh. 55.

123. Russo, in his capacity as Town Planning Commissioner, had no concerns regarding the responsiveness of Fortress Bible Church and its consultants to questions generated by the Town concerning the DEIS.  Town Planning Commissioner Russo stated that Fortress Bible Church was "responsive to our comments."  *See* Trial Tr. at 927:19-23 (Russo).

124. The Church did not reject or fail to provide any of the revisions AKRF requested during the DEIS process.  *See* Trial Tr. at 927:24-928:3 (Russo).

125. By letter dated April 17, 2001, Fortress Bible Church was advised that the Town had adopted a moratorium on approvals of certain applications that involved, among others, steep slopes.  *See* Stipulated Fact No. 41.

126. By letter dated April 25, 2001, the Church advised the Town that it wanted its application to continue to be reviewed by the Town Board and Planning Board as necessary.  *See* Jt. Exh. 47.

127. On October 24, 2001—more than two and one half years after the Church filed its initial application and six and one half months after submission of the DEIS—the Town accepted the DEIS as complete.  *See* Stipulated Facts No. 42; Stipulated Fact No. 65; Jt. Exh. 59.

128. The Town's own planning consultant admitted that acceptance by the Town Board of the DEIS "indicates that the lead agency, the [T]own in this instance, believed or acknowledged that the document had addressed all the issues that the [T]own had asked the applicant to address in a scope."  *See* Trial Tr. at 1052:10-23 (Turner).

129.  At the time of acceptance of the DEIS, the plans contained in the DEIS and proposed by the Church identified adverse impacts which were mitigated to the greatest extent practical, and the Church's plans satisfied all reasonable landscaping, traffic and on-site parking concerns.

130.  The landscaping plan contained in the DEIS and adopted as complete by the Town Board was acceptable to Town Planning Commissioner Russo.  *See* Trial Tr. at 930:2-13 (Russo).

131.  Town Planning Commissioner Russo could not recall any member of the Town Board having any concern regarding retaining walls, flooding of downgradient property, internal traffic circulation, nor sight distance at the access driveway at the time the DEIS was accepted as complete in October 2001.  *See* Trial Tr. at 930:16-931:23 (Russo).

### iii.  Evidence of the Town's Intent

#### 1.  Demands by Supervisor Feiner

132.  On May 3, 2001, Reverend Karaman met with Supervisor Feiner to discuss processing the Fortress Bible Church project.  *See* Stipulated Fact No. 29.  During that meeting, Supervisor Feiner suggested to Reverend Karaman that the Church give a sum of money to the Fairview Fire Department each year.  *See* Stipulated Fact No. 59; Trial Tr. at 1619:12-1620:15 (Karaman); Dep. Tr. at 102-105 (Feiner).

133.  Reverend Karaman testified that when he met with Supervisor Feiner on May 3, 2001, he asked: "What can I do, and how can you help me, to move the building of my church along?"  *See* Trial Tr. at 1620:1-6 (Karaman).  Supervisor Feiner suggested that Reverend Karaman meet with neighbors and "[p]ay some taxes to the Fire Department, a thousand or fifteen hundred dollars."  *See* id. at 1620:7-12.  Reverend Karaman testified about his

conversation with Supervisor Feiner: "And he said—and I will quote—'This will go a long way.'" *See* Trial Tr. at 1620:12-13 (Karaman).

134.  Councilman Bass was present when Supervisor Feiner, at a public Town Board work session, commented about the possibility of Fortress Bible Church donating a fire truck or other PILOT to the Town.  *See* Trial Tr. at 2140:11-17 (Bass).

135.  The meeting at which Councilman Bass was present must have occurred after February 2001, as Bass was not a member of the Town Board until that time.  *See* Trial Tr. at 2130:14-18 (Bass).

136.  Thus, Supervisor Feiner suggested that Fortress Bible Church donate a fire truck on at least two occasions: in 2000 and some time after February 2001.

## 2.  Reliance on the Steep Slope Ordinance

137.  AKRF served as Planning Commissioner until January 2002.  *See* Stipulated Fact No. 25.

138.  During the time that AKRF served as Planning Commissioner for the Town of Greenburgh, AKRF employee John Feingold was working on issues concerning steep slopes and wetlands law for the Town.  *See* Trial Tr. at 958:10-15 (Russo).

139.  Town Planning Commissioner Russo recalled a discussion with Feingold that occurred in Town Hall, the content of which was that the steep slopes and wetlands law contemplated by the Town "would be one way to stop the Fortress Bible project."  *See* Trial Tr. at 959:3-25 (Russo).

## 3.  Instructions to Kill the Project

140.  Councilwoman Weinberg repeated her instruction to Town Planning Commissioner Russo to try to "kill" the Fortress Bible Church project at a subsequent meeting.

*See* Trial Tr. at 908:20-909:18 (Russo) (clarifying two separate comments by Weinberg, the first

of which was overheard and approved of by Councilwoman Juettner).

### 4.   Te Town Board's Request for Help in Averting Consequences Under RLUIPA

141.  Two months after the Town Board accepted the DEIS as complete, Supervisor

Feiner engaged in the following e-mail exchange with a constituent, Jason Sapan:

> Paul,
>
> I want to register my total disdain for the thought that the Town Board will not stand up against the application of the Fortress Church to develop on Dobbs Ferry Road . . . .
>
> . . . .
>
> I fully understand the difficulty of fighting against religious institutions, however, it is the duty of local government to represent their constituents and not those of outsiders.  I expect to see the Town Board oppose this even if that means a loss in court somewhere down the road.  We should not be so complacent to the deterioration of our quality of life so easily.
>
> Jason Sapan
>
> * * *
>
> thanks for calling yesterday.  Although I anticipate that the Town will vote against this, I think we have to do as much research as possible re: new federal law which makes it very difficult to stop religious institutions.  Any research or ideas you could provide us with to help us would be appreciated.  I'll have the Town work on this but the more ideas the better[.]
>
> paul feiner
>
> * * *
>
> Paul,
>
> Can I get a copy of the new Federal regulation so I can start my research?
>
> Jason

* * *

I . . . will ask [Town Attorney] Susan Mancuso to send you a copy
of the federal laws.  It was just signed into law last year.

paul feiner

*See* Pl. Exh. 35.

142.  When asked what discussion he had with Sapan regarding the Fortress Bible

Church application, Supervisor Feiner stated: "I don't recall any discussion."  *See* Dep. Tr. Vol.

3 at 45:12-14 (Feiner).  Supervisor Feiner's attention then was directed to his statement in an e-

mail to Sapan: "Thanks for calling yesterday."  *See* id. at 45:15-16.  Supervisor Feiner stated that

he did not recall the conversation but admitted that he "might have" had such a telephone

conversation with Sapan.  *See* id. at 45:15-20.

143.  When asked at trial whether he anticipated as early as December 2001 that the

Board would not permit Fortress Bible Church to develop its property, Supervisor Feiner

explained his "anticipation" as based on traffic concerns.  *See Trial* Tr. at 2445:25-2447:11

(Feiner).  He further stated that those traffic concerns were brought to his attention by "[t]he

[P]olice [C]hief and Mr. Maris."  *See* Trial Tr. at 2447:14-18 (Feiner).  However, Police Chief

Kapica testified that he never discussed the Fortress Bible Church matter with Supervisor Feiner.

*See* Trial Tr. at 1973:20-1974:2 (Kapica).  Further, Town Traffic Consultant Maris was not

retained by the Town on any matter until early 2002—months after the e-mail in which

Supervisor Feiner conveyed his anticipation that the Church's application would be denied.  *See*

Trial Tr. at 3254:8-15 (Maris); see also Stipulated Fact No. 31; Stipulated Fact No. 32.[7]

---

[7] When confronted at trial with this e-mail, Supervisor Feiner had great difficulty answering
whether, on or about December 14, 2001, he anticipated that the Town Board would deny the
Church's application.  *See* Trial Tr. at 2446:4-2449:20 (Feiner).  In fact, Supervisor Feiner
refused to answer yes or no.  *See* id. at 2449:9-2450:14.  In light of Supervisor Feiner's prior
testimony throughout his trial, this Court was troubled by his refusal to answer a simple question

144.  When confronted at trial with his December 2001 e-mail exchange with Sapan, Supervisor Feiner admitted that the assistance he requested from Sapan was for ideas, in light of RLUIPA, of a way in which the Town could vote against the Fortress Bible Church application. *See* Trial Tr. at 2459:10-14 (Feiner).

145.  Moreover, Supervisor Feiner confirmed that he did, in fact, direct Town staff, including the Town Attorney's office, and consultants to perform research and provide ideas for ways in which federal law would support the denial of the Fortress Bible Church application. *See* Trial Tr. at 2459:21-2461:5 (Feiner).

146.  As promised in the e-mail correspondence, Supervisor Feiner directed the then-Town Attorney to send Sapan a copy of the RLUIPA statute.  *See* Trial Tr. at 2460:23-2461:5 (Feiner).

147.  Supervisor Feiner is a licensed attorney.  At the time he engaged in the e-mail exchange with Sapan IN December 2001, Supervisor Feiner had read the RLUIPA federal statute.  *See* Trial Tr. at 2462:13-18 (Feiner).

**g.  SEQRA Process Continues**

**i.  DEIS Public Hearing**

148.  On December 12, 2001, and January 9, 2002, the Town held public hearings in connection with the DEIS.  *See* Stipulated Fact No. 66.

149.  The Westchester County Planning Board advised the Town that there were no county or intermunicipal planning issues of concern to the County Planning Board.  *See* Jt. Exh. 62.

---

and gave his counsel the opportunity to speak with him about answering the questions truthfully. *See* Trial Tr. at 2450:15-25 (Feiner).

150.  During the public comment period on the DEIS, by letter dated November 14, 2001, NYSDOT submitted comments and advised that the methodology used in the traffic impact study prepared by JCE, the Church's consultant, was acceptable.  *See* Jt. Exh. 60.

### ii.   Town Terminates AKRF and Retains New Consultants

151.  In January 2002, AKRF's services were terminated by the Town.  *See* Trial Tr. at 979:19-25 (Russo).

152.  In January 2002, Stellato was appointed as Commissioner of Planning.  *See* Stipulated Fact No. 30.

153.  In Spring 2002, the Town retained three new sets of consultants to analyze engineering, planning and traffic aspects of the Fortress Bible Church application.  *See* Stipulated Fact No. 31.  The Town retained Michael Maris Associates as its traffic consultant.  *See* Stipulated Fact No. 32.   The Town retained FPM Group to provide engineering and stormwater drainage comments.  *See* id.  The Town retained Turner as its planning consultant to provide advice on the SEQRA process and general planning comments.  *See* id.

154.  Deputy Town Attorney Insardi admitted that she did not attempt to explain to the applicant, nor any representative of the applicant, the rationale for hiring three sets of new consultants to review the Fortress Bible Church project at the FEIS stage.  *See* Trial Tr. at 3007:19-3009:10 (Insardi).

155.  Deputy Town Attorney Insardi was involved in hiring consultants for the Fortress Bible Church project.  *See* Trial Tr. at 3006:11-14 (Insardi).  She had previously worked with both Town Traffic Consultant Maris and the FPM Group.  *See* Trial Tr. at 3001:17-18, 3006:19-22 (Insardi); Trial Tr. at 3253:20-3254:2 (Maris).

156.  Deputy Town Attorney Insardi contacted Maris about performing work for the Town of Greenburgh.  *See* Trial Tr. at 3254:3-7 (Maris).

157.  In early 2002, Deputy Town Attorney Insardi approached FPM Group to ask if they would work with the Town of Greenburgh.  *See* Trial Tr. at 2643:20-2644:3 (Phillips).

158.  Town Consultant Phillips of FPM Group knew and had worked with Deputy Town Attorney Insardi before Insardi joined the Town Attorney staff.  *See* Trial Tr. at 2644:9-14 (Phillips).

### iii.  The Church Modifies Project to Respond to Defendants' Comments

159.  In March 2002, the Church's consultants met with, among others, Police Chief Kapica, Town Traffic Consultant Maris, Town Planning Commissioner Stellato, and Deputy Town Attorney Insardi, to review the Fortress Bible Church project and specifically to respond to concerns of Police Chief Kapica.  *See* Stipulated Fact No. 33.

160.  As a result of that meeting and in response to concerns raised by Police Chief Kapica, the plan for the project was revised to provide additional parking.  *See* Stipulated Fact No. 34.  The Church submitted this plan as Alternate G in the FEIS.  *See* id.; *see also* Jt. Exh. 69(a).

161.  At that March 2002 meeting, Police Chief Kapica indicated that his concerns would be satisfied with the addition of a traffic signal at the Fortress Bible Church driveway on Dobbs Ferry Road and additional parking.  *See* Trial Tr. at 658:11-659:4 (Grealy); Trial Tr. at 134:8-135:17 (Schiff).

162.  On April 5, 2002, the Church submitted to the Town its proposed FEIS, including Alternative G.  *See* Stipulated Fact No. 53; Jt. Exh. 68; Jt. Exh. 69(a).  Alternative G modified the DEIS Plan by adding (i) thirty-three additional parking spaces and (ii) a traffic light

at the proposed driveway that would be coordinated with an existing traffic light at the Sprain Brook Parkway entrance ramp, while maintaining all off-site improvements previously proposed by the Church and conceptually approved by NYSDOT. *See* Jt. Exh. 69(b) (Alternative G Plan); Jt. Exh. 69(a).

163. The provision of one hundred and sixty parking spaces exceeded the Greenburgh Town Code minimum parking requirement.

164. The Church had already received conceptual approval for installation of a traffic signal at Dobbs Ferry Road from NYSDOT. *See* Stipulated Fact No. 61; *see also* Trial Tr. at 615:17-617:5 (Grealy).

**h. Defendants' Implement the Directive of Finding a Way to Defeat the Project**

165. By abandoning these normal practices and prolonging the SEQRA process at great expense to the Church, Defendants used the SEQQRA process to delay and frustrate the Fortress Bible Church application.

166. Supervisor Feiner directed Town Staff, including the Town Attorney, to "work on" ways in which the Town could deny the Church's application without adverse consequences under RLUIPA. *See* Trial Tr. at 2460:5-2461:5 (Feiner).

167. Maris was the first of the new consultants hired by the Town to work on the Fortress Bible Church project, and both he and Deputy Town Attorney Insardi attended a March 2002 meeting with Police Chief Kapica. *See* Stipulated Fact No. 33; Trial Tr. at 2849:21-2850:9 (Stellato); Trial Tr. at 3091:1-3 (Insardi).

168. The Town's new consultants were instructed not to speak directly with representatives from Fortress Bible Church, but instead to filter all comments through the Town Attorney's office. *See* Trial Tr. at 1070:23-1071:7 (Turner); Trial Tr. at 3098:9-3101:6 (Insardi).

### i. Intentional Delays

169.  FPM Group, one of the Town's own consultants anticipated that its work on the Fortress Bible Church application on behalf of the Town would last only approximately two months, until July 2002.  *See* Pl. Exh. 101.  However, the Town prolonged the FEIS process until December 24, 2003—after commencement of this litigation and one and a half years longer than their own consultant reasonably anticipated.

170.  Upon submission of the FEIS, the Church again requested that the Town schedule a public hearing on the site plan.  *See* Jt. Exh. 68.

171.  Deputy Town Attorney Insardi advised the Church that, upon submission of the FEIS, it would be appropriate to convene a public hearing on the site plan given the late stage of the SEQRA and land use approval process.  *See* Jt. Exh. 68; Trial Tr. at 3004:1-3005:10 (Insardi).

172.  Yet, the Town Board never conducted a public hearing on the site plan.  *See* Trial Tr. at 144:11-18, 314:19-25 (Schiff).

173.  The Town initially did not provide the FPM Group with the full FEIS prepared by the Church, but rather, on or about April 12, 2002, selectively provided the drainage analysis from the DEIS.  *See* Def. Exh. MMM.

174.  The Town Attorney's office instructed Town Traffic Consultant Maris to await instructions before reviewing the traffic section of the FEIS forwarded to him by the Church's consultants.  *See* Trial Tr. at 3094:23-3095:2 (Insardi); Trial Tr. at 3261:12-23, 3329:23-3330:1 (Maris).

175. By letter dated May 23, 2002, Plaintiffs requested: (i) the Town provide comments on the FEIS prepared by the Church; (ii) the Town refer the application to the

Planning Board for a report and recommendation; and (iii) the Town hold a public hearing on the site plan. *See* Pl. Exh. 38.

176. On that same day, May 23, 2002, Town employees and consultants met—without Plaintiffs present—to, *inter alia*, "ascertain the Town's strategy on where the project was headed." *See* Jt. Exh. 76; Trial Tr. at 2703:18-2705:17 (Loyst). The Town consultants also were instructed to refrain from speaking directly to the Church's representatives and consultants and to refer their questions/comments to the Town. *See* id. It was decided that the Town should perform a "technical review" of the DEIS, even though the Town already had accepted it as complete. *See* Jt. Exh. 76; Trial Tr. at 2703:18-2706:13 (Loyst).

## ii. Improper Review of Materials Previously Accepted by Town

177. Pursuant to SEQRA, the scope of the FEIS had been established during the scoping process on the DEIS in 2000. Nevertheless, in 2002, the Town and its new consultants began raising new issues and requesting new information, which had not been included in the scope, and were neither necessary nor appropriate for finalizing the FEIS. *See* Trial Tr. at 139:24-141:8; 168:6-169:20 (Schiff); Trial Tr. at 342:23-344:1 (Lachenauer).

178. The Town's new consultants, FPM Group, acknowledged that the DEIS stage was complete. *See* Pl. Exh. 106 at p. 2.

179. Town Consultant Phillips admitted that: (i) the DEIS for the Fortress Bible Church application had been accepted as complete by the Town prior to FPM Group being retained by the Town; (ii) in order for a DEIS to be accepted as complete, the DEIS must be submitted in compliance with requirements set forth in the SEQRA regulations; and (iii) acceptance of the DEIS by the Town Board meant that the DEIS had been accepted as being

submitted in compliance with the scope adopted by the Town Board as lead agency.  *See* Trial Tr. at 2806:21-2808:1 (Phillips).

180.  FPM Group acknowledged that they were hired at the "last stage of SEQR[A]" on the Fortress Bible Church application and therefore wanted to know what the Town's "objective is[] and how we can help them achieve it given they are in the last stage of SEQR[A]."  *See* Jt. Exh. 70.

181.  Notwithstanding that FPM Group was not retained by the Town until April 2002 to work on the Fortress Bible Church project, and, at that time, environmental review of the Fortress Bible Church application had progressed through determination of significance, scoping, acceptance of a DEIS as complete and close of the public hearings on the DEIS, FPM was investigating the impact of changes caused by the development including studying anew what flooding potential there might be from a surface standpoint and stormwater management.  *See* Trial Tr. at 2647:6-2648:16 (Phillips).

182.  FPM Group investigated the impact of changes caused by the development, including studying what flooding potential there might be from a surface standpoint and stormwater management.  *See* Trial Tr. at 2647:6-2648:16 (Phillips).

183.  FPM Group examined the DEIS drainage analysis and issued additional comments on that analysis.  *See* Def. Exh. NNN; Trial Tr. at 2655:9-17 (Phillips).

184.  FPM Group raised new issues that were not raised in the Town's examination of the DEIS during the DEIS process including during the public hearing.  *See* Def. Exh. MMM; Trial Tr. at 2656:21-2658:12 (Phillips).

185.  Town Consultant Phillips admitted that —notwithstanding that the DEIS process is intended to identify potential environmental impacts and the FEIS is intended to

respond to comments on such impacts identified in the DEIS—FPM Group and Defendants were attempting to "identify impacts through the Final Environmental Impact Statement," thus reopening the DEIS process.  *See* Trial Tr. at 2668:22-2669:8 (Phillips).

186.  Notwithstanding that Turner/Geneslaw was hired after the DEIS portion of SEQRA review had been completed for the Fortress Bible Church matter, Town Planning Consultant Doneit admitted that he was hired to review the Fortress Bible Church DEIS, as well as the FEIS.  *See* Stipulated Facts No. 31; Stipulated Fact No. 32; Stipulated Fact No. 65; Trial Tr. at 2176:8-15 (Doneit).

187.  On May 8, 2002, Town Planning Commissioner Stellato received via facsimile a May 8, 2002, letter from Dr. Philips concerning his review of the Fortress Bible Church drainage analysis contained in the *DEIS*.  *See* Def. Exh. NNN.

188.  By letter dated May 9, 2002, Town Planning Commissioner Stellato advised Church Planning Consultant Schiff that the Town's consultants were in the process of reviewing the FEIS, but would require additional information and requested certain information.  *See* Jt. Exh. 73.

189.  By letter from Saccardi & Schiff dated May 10, 2002, the Church responded to Town Planning Commissioner Stellato's May 9, 2002 letter as follows:

> I am writing to express our confusion as to the purpose of the letter.  As you are aware, the DEIS for this project, which included a drainage study as required by the Town Board's adopted scope, was reviewed by Town staff and consultants and was accepted as complete by the Town Board on October 24, 2001.  Subsequently, the DEIS was subject to review by the public and by all interested and involved agencies.  Thus, the drainage analysis has undergone extensive review by town staff and consultants and by anyone else who so chose to review and comment on it.  In fact, there were only a few comments related to drainage; each of those is responded to in Section H of the FEIS.

Despite the above, your letter (with the exception of item 9 relative to Alternative G) appears to be a review of the DEIS drainage study rather than comments on the FEIS.  Why, at this point in the SEQR[A] process, is the Town going backwards reopening studies that it has previously determined to be complete?  That is not only unfair to the Applicant, it is an improper utilization of SEQR[A].  Moreover, we would strongly object if the Town were to attempt to bill the Applicant for reviews which duplicate previous Town reviews.

I must also take issue with the comment in your letter that additional information is required, "in light of the public comments on the Draft EIS…"  Which comments?  We believe that we have fully responded in the FEIS to all substantive comments on the DEIS; if you disagree, please identify which ones require further elucidation and we will provide it.  Otherwise, we will only be responding to item 9 of your letter.

*See* Jt. Exh. 74.

190.  The Town did not respond to this letter.

### iii.   Defendants' Conduct and Comments During the FEIS Process

191.  The Town did not provide review comments on the FEIS until June 13, 2002—more than two months after the FEIS was submitted to the Town.  *See* Jt. Exh. 78.

192.  By letter dated June 13, 2002, Town Planning Commissioner Stellato provided Church Planning Consultant Schiff with (i) a May 30, 2002, memo from Town Planning Consultant Turner to the Town Board providing comments on the FEIS and requesting further information traffic issues; (ii) a June 7, 2002, comment letter from Town Traffic Consultant Maris to Mancuso regarding traffic issues; and (iii) a June 13, 2002, evaluation from FPM Group to Mancuso regarding mitigation of drainage issues.  *See* Jt. Exh. 78.

193.  Though the Church objected to many of the Town consultants' requests and comments, the Church nonetheless provided responses to those comments and submitted

additional information as requested by the Town. *See* Jt. Exh. 86; Jt. Exh. 88; Jt. Exh. 95; Jt. Exh. 103; Pl. Exh. 39.

194. An exchange of correspondence ensued wherein the Town repeatedly made requests, asked for additional information and, at times, requested information previously provided, asserting that it had not been provided. *See* Jt. Exh. 78; Jt. Exh. 88; Jt. Exh. 95; Jt. Exh. 102; Jt. Exh. 103; Jt. Exh. 109; Jt. Exh. 113; Jt. Exh. 114; Jt. Exh. 115; Jt. Exh. 118; Jt. Exh. 120; Jt. Exh. 121; Jt. Exh. 122. The Church responded, provided additional information and at times, provided information that had been offered previously, or directed Defendants to the location of the allegedly missing information. *See* Pl. Exh. 39; Trial Tr. at 146:22-148:12 (Schiff).

195. During this time, the Church repeatedly sought to meet with Town staff and consultants to clarify outstanding issues, direct the Town to information previously provided by the Church which the Town claimed it had not received, and finalize the FEIS. Numerous examples of the Church's efforts were offered at trial, including:

      i.  Correspondence concerning the traffic portion of the FEIS, *see, e.g.*, Jt. Exh. 95; Jt. Exh. 114; Jt. Exh. 124;

      ii.  Correspondence concerning the hydrology and stormwater portions of the FEIS, *see, e.g.*, Jt. Exh. 103; Jt. Exh. 113; Jt. Exh. 115; Jt. Exh. 118;

      iii.  Correspondence concerning the planning portion of the FEIS, *see, e.g.*, Jt. Exh. 86; Jt. Exh. 88; Jt. Exh. 122.

      iv.  Correspondence referencing requests for meetings with the Town, *see, e.g.*, Pl. Exh. 38 (May 23, 2002); Jt. Exh. 88 (July 24, 2002); Jt. Exh. 95 (August 5, 2002); Jt. Exh. 103 (September 30, 2002); Jt. Exh. 106

60

(October 17, 2002); Jt. Exh. 112 (October 25, 2002); Jt. Exh. 116 (November 1, 2002); Jt. Exh. 121 (November 18, 2002); Jt. Exh. 122 (December 6, 2002); Jt. Exh. 127 (January 13, 2003); Jt. Exh. 129 (January 15, 2003); Jt. Exh. 130 (January 17, 2003); Jt. Exh. 136 (February 14, 2003).

196.  Examples of the Town's unreasonable and inappropriate responses and conduct included:

    i.  The Town's Treatment of draining/engineering engineers, such as:

        1.  The Town requested that the Church completely revise stormwater plan to comply with New York State Department of Environmental Conservation ("NYSDEC") Phase II stormwater regulations which were not yet in effect.  *See* Trial Tr. at 339:14-340:13 (Lachenauer); Trial Tr. at 150:4-15 (Schiff).[8]

        2.  The Town requested that the Church provide proof of the absence of downgradient flooding even though the Town admitted it had no report of such flooding ever occurring.  *See* Trial Tr. at 343:13-345:24 (Lachenauer); Trial Tr. at 2747:3-2757:7 (Loyst).

---

[8] Compliance with the NYSDEC Phase II regulations was not required when Fortress Bible submitted its DEIS in October, 2001.  *See* Trial Tr. at 341:4-12 (Lachenauer); Dep. Tr. at 73:13-17 (Loyst).  *NYS*DEC's Phase II stormwater regulations did not become effective until March 2003.  *See* Trial Tr. at 363:8-364:8, 444:9-12 (Lachenauer); Dep. Tr. at 73:8-12 (Loyst). Due to the Town's delay in processing the Church's application, the Church was required by the Town to submit revised plans that complied with DEC's Phase II stormwater regulations.  *See* Trial Tr. at 445:5-24 (Lachenauer).

3.  The Town Attorney's Office authorized requests for information it knew was already in the possession of the Town's consultants. *See e.g.*, Trial Tr. at 3113:19-24 (Insardi).

4.  The Town requested design drawings of retaining wall which designs are customarily provided after approval of site plan.

ii.  The Town's treatment of various planning issues, such as:

1.  The Town requested additional information on the number of emergency service calls to facilities comparable in size to the one proposed by the Church. *See* Jt. Exh. 111 (Comment 6).

2.  The Town requested a description of the manner in which the proposed project would impact fire-fighting ability, despite the fact the building would be fully sprinklered—a solution that was satisfactory to the Town during its review of the Solomon Schechter application, but not for Fortress Bible Church. *See* Trial Tr. at 168:6-169:20 (Schiff).

3.  The Town directed their own Planning Consultant not only to refrain from speaking directly with the Church, but also to refrain from Police Chief Kapica. *See* Trial Tr. at 1068:14-1071:7 (Turner).

4.  The Town ignored their Planning Consultant's suggestion of meeting with the Church. *See* Trial Tr. at 1311:20-1313:24 (Turner).

5. The Town Attorney's Office substantively edited their own Planning Consultant's review memoranda, including striking language favorable to the Church and eliminating an offer by their Planning Consultant to meet with the applicant. *See* Trial Tr. at 3103:12-3111:1 (Insardi); Jt. Exh. 108.

iii. The Town's treatment of traffic issues, such as:

1. The Town did not provide their new traffic consultant, Maris, with prior correspondence and information related to the Church's application, including information related to conceptual approval of the Church's proposed off-site improvements by NYSDOT. *See* Trial Tr. at 3331:1-13 (Maris).

2. The Town did not provide to the Church all review memoranda generated by their new traffic consultant.

3. The Town Attorney's office edited written review comments from its traffic consultant before being submitted to the Church. *See* Trial Tr. at 3103:12-3111:1 (Insardi).

4. The Town Attorney's office instructed that written review memoranda from Town Traffic Consultant Maris be stamped "DRAFT." *See* Trial Tr. at 3260:2-12 (Maris).

5. The Town instructed its Traffic Consultant not to consider certain submissions received directly from the Church. *See* Trial Tr. at 3329:23-3330:1 (Maris).

Case 1:03-cv-04235-GBD-GAY Document 109 Filed 08/12/10 Page 64 of 206

6. The Town filtered correspondence regarding traffic issues through Town staff, rather than permitting it to be exchanged directly between the Church and the Town traffic consultant. *See* Trial Tr. at 3335:16-3336:2 (Maris). As a result, Town Traffic Consultant Maris reviewed only what was provided to him by the Town. *See* id. at 3336:3-5.

197. At no time did the Church refuse to provide any information requested by the Town. *See* Trial Tr. at 3166:17-22 (Stellato).

198. Despite the Defendants' continued requests for information, and the Church's provision of such additional information, Defendants never provided review memoranda in response to the following submissions from the Church:

  i. October 25, 2002 submission of stormwater maps (Jt. Exh. 113);

  ii. October 30, 2002 submission of the traffic appendix (Jt. Exh. 114);

  iii. November 6, 2002 submission regarding stormwater and erosion (Jt. Exh. 118);

  iv. December 6, 2002 submission regarding planning and engineering (Jt. Exh. 122).

199. The Church made clear its intent in requesting a meeting with the Town and strongly objected to the Town's refusal to meet and refusal to schedule a hearing on the site plan in contravention of its usual practices. *See* Jt. Exh. 88; Jt. Exh. 95; Jt. Exh. 103; Jt. Exh. 106; Jt. Exh. 112; Jt. Exh. 116; Jt. Exh. 121; Jt. Exh. 122; Jt. Exh. 127; Jt. Exh. 129; Jt. Exh. 130; Jt. Exh. 136. For example, in a letter addressed to the Town's Planning Commissioner and copied

to all members of the Defendant Town Board, including Supervisor Feiner and the Town

Attorney, the Church's Planning Consultant wrote:

> From the beginning of this process, Fortress Bible has attempted to work with the Town to craft an acceptable site plan for what is not only a very admirable project but also one that is a permitted use under the Town's zoning.  Among other things, the building has been shifted away from the neighboring residences and, in response to the Police Chief's traffic-related concerns, which we had been led to believe were the major issues with regard to Fortress Bible, the church has agreed to add a traffic signal and additional parking, well in excess of your zoning requirement, and to work with the police to ensure that there are no problems related to parking or traffic.  These changes, which fully address the stated concerns, have had substantial cost implications for the church, costs it has agreed to absorb in its attempt to be cooperative.

> Despite these and other concessions, the Town has continued to show no inclination to work toward an agreement.  As noted above, you have not set up a meeting where we could discuss technical issues regarding the site plan and determine whether our latest revision is acceptable.  And, the Town refuses to schedule a public hearing on the site plan.  At the same time, your consultants ask for detailed information that goes beyond what is appropriate at this stage in the environmental review.  For example, Mr. Maris objects to the parking lot layout.  We disagree, but your having forwarded his comment to us leaves us with no direction.  Is that the Town's formal position?  How can we proceed with more detailed design and studies if you might require us to redesign the entire parking area?  It is precisely for that reason that we have continually requested a meeting, to no avail.

> Moreover, the FEIS review comments from the Town's consultants, none of whom were involved in the DEIS, continue to expand to new areas rather than focusing on responses to questions raised during the DEIS review as called for under SEQRA.  For example, Turner/Geneslaw now wants data on emergency service demands at other facilities although there is no evidence that this is really an issue and no such data was previously requested during the DEIS stage (which would have been the appropriate time if this was, in fact, an issue).  As you know, we have already provided information on the experience at Fortress Bible's current location, which more than adequately addressed this issue.

*See* Jt. Exh. 112.

**iv.   Defendants' Suspension of SEQRA Review is Evidence of Bad Faith**

200.   SEQRA regulations forbid a Lead Agency from suspending or delaying review of an application where there is a dispute over escrow fees.  *See* 6 N.Y.C.R.R. §617.13(f).

201.   By letter dated June 28, 2002, Defendants requested that the Church reimburse the Town's SEQRA review fees.  *See* Jt. Exh. 83.

202.   By letters dated July 3, 2002, and August 7, 2002, the Church requested back-up information concerning the amount of SEQRA fee reimbursement the Town was requesting.  *See* Jt. Exh. 85; Jt. Exh. 97.

203.   During the Fall 2002, the Town complained that the Church had not reimbursed the Town for its SEQRA review fees.  By letter dated November 1, 2002, the Church's attorney advised that it had requested several times to meet to discuss the SEQRA review fees.  *See* Jt. Exh. 116; *see also* Jt. Exh. 106.

204.   According to Plaintiffs, the Church offered to make partial payment toward the SEQRA review fees pending resolution of the dispute, but Town Planning Commissioner Stellato rejected this offer.  *See* Jt. Exh. 106; Jt. Exh. 116.[9]

205.   On December 19, 2002, Town Traffic Consultant Maris advised Town Planning Commissioner Stellato by letter that he was in receipt of the revised FEIS dated October 30, 2002, but would not proceed with review work until he was paid.  *See* Jt. Exh. 125.

206.   On January 13, 2003, the Church's attorney wrote a letter to Town Planning Commissioner Stellato seeking additional information on the Town's invoicing of the Church for SEQRA review fees.  *See* Jt. Exh. 127.

---

[9] Not only was the Church within its right to request substantiation of changes by the Town, its good faith dispute of those charges was justified.  The Town charged the Church fees in excess of those permitted under both SEQRA and the Greenburgh Town Code.

207.  Enclosed with the January 13, 2003 letter was a check in the amount of twenty thousand dollars in partial payment of review fees demanded by the Town, notwithstanding that the Church continued to dispute the amounts being charged by the Town.  *See* Jt. Exh. 127.

208.  At his deposition, Supervisor Feiner did not recall receiving and reading the January 17, 2003 letter from counsel for Plaintiffs in which Plaintiffs discuss the fee dispute, but assumed that he had received and read it because a copy existed in his files.  *See* Dep. Tr. Vol. 3 at 28-29 (Feiner).

209.  Church Planning Consultant Schiff wrote to the Town again on January 15, 2003, requesting that the Town move the application forward by accepting the FEIS as complete and scheduling a public hearing on the site plan.  *See* Jt. Exh. 129.

210.  In a January 17, 2003, letter, the Church's attorney advised Supervisor Feiner, the Defendant Town Board Members and other Town officials that:

> Although the church and school constitute an as-of-right use under the Town Zoning Code, the pending application has dragged on for over four (4) years.

*See* Jt. Exh. 130.

211.  The January 17 letter further advised Defendants of the conduct that Plaintiffs considered unacceptable:

> During the course of proposing its church and school, Fortress Bible has:
>
> 1.     Met with the Town's then Commissioner of Planning prior to purchasing the subject property at which time it was advised the church and school were suitable as of right uses for this location.
>
> 2.     Prior to submitting its application, Fortress Bible met with its neighbors to present its proposal after which it revised its plans based on concerns raised.

3.      Submitted its application in <u>November, 1998</u> and waited eighteen (18) months (during a time numerous other applications were processed) before action was taken when the Town then required the Church to prepare an Environmental Impact Statement ("EIS") when the law and facts did not warrant the lengthy and expensive EIS process.

4.      Revised its site plan and agreed to:

a.      relocate the driveway;

b.      improve Dobbs Ferry Road to alleviate existing traffic conditions;

c.      relocate the church and school buildings farther away from neighboring residences;

d.      relocate parking spaces farther away from the residences;

e.      provide, as requested by the Town, more parking than that which is required by the Town Code;

f.      added significant supplemental landscaping; and

g.      committed not to use its second access to Pomander Drive, given the residential nature of the street.

Fortress Bible has responded to all legitimate concerns raised by the Town.  Indeed, Town of Greenburgh Police Chief Kapica, the Town's recognized authority on traffic and related public safety, has advised us that all of his concerns regarding parking and traffic have been satisfied.  Thus, the application should proceed.

<u>The Town's Objectionable Conduct</u>

For reasons known only to your office and Town Board members, Fortress Bible has been singled out for disparate treatment. Numerous other applications submitted before and since Fortress Bible's November 1998 application – including applications for commercial uses, some more complex than Fortress Bible's – have received favorable treatment and approvals.  If the Town continues in its discriminatory conduct toward the Church, the law will require an explanation for the Town's conduct.

While you, members of your Board and some of the residents have made it clear you do not want the church in your community, no one has articulated a justifiable reason based upon recognizable planning principles or the law or the Zoning Ordinance. The community's concerns regarding parking, traffic, views and other issues have all been disproved by way of the environmental review process. It is clear that the Town is using this process for illegitimate ends – namely, to violate the Church's constitutionally protected rights.

Demands made by you and community members that Fortress Bible pay taxes, limit its services and, as suggested by you personally, "voluntarily" donate money to the Fire Department, are all impermissible conditions. I daresay that these are not conditions Town Board members would permit to be imposed on the religious institutions at which they worship. These demands serve only to underscore that the Town will look to employ illegitimate measures to keep Fortress Bible from building its church and school.

The record is replete with evidence of the Town's bad faith in processing this application ranging from illegal efforts to extract tax payments to imposing new planning requirements that go beyond the scoping document and ignore the fact that the Town has accepted the DEIS as complete. Mr. Schiff's December 6, 2002 letter details a few of these actions. For example:

The original comment from Turner/Geneslaw in their May 30, 2002 memorandum was that, "The applicant has not performed a storm water analysis for the 10 – and 25 - year storms." This was incorrect, as we pointed out in our response of June 24, 2002 which directed them to page IX-4 of the DEIS. Now it appears that they have altered their comment to request analyses for all alternatives. Is this a new requirement? The Town has not previously requested this information and we see no reason to request it now. All back up data requested have been submitted.

Additionally, the Town even refused to hold a public hearing on the site plan during the SEQRA process even though such is the typical practice for the Town in the past. The Church has been subjected to a succession of new consultants – planning, site engineering, traffic, a new Planning Commissioner and Planning Board Attorney – which has added to the expense and length of this review. That such is the case is confirmed by the apparently duplicative fees charged to Fortress Bible, as set forth in the letter dated January 13, 2003 from Nicholas M. Ward-Willis, Esq. of this firm to the Town Planning Commissioner Mark Stellato. At the

> end of the day, the SEQRA review process has indicated only the
> same concern – traffic – which has been mitigated as was provided
> for in the traffic study annexed to the DEIS.

*See* Jt. Exh. 130.

212.  On February 6, 2003, Defendants' planning consultant, Turner, advised the Town that he was reluctant to review the Church's December 6, 2006, letter submission as his firm, Turner/Geneslaw, had not been paid by the Town.  *See* Jt. Exh. 133.  Thereafter, he suspended work on the Church's application.  n fact, he did not review the Church's submission until three months later in March 2003.  *See* Jt. Exh. 140.

213.  The Court finds that the Defendants' disregard for their obligation under the SEQRA Regulations, 6 N.Y.C.R.R. §617, was knowing and calculated.

214.  In early February 2003, a letter from Plaintiffs' counsel to Supervisor Feiner relayed a conversation between them about the Fortress Bible Church application, writing that Supervisor Feiner had stated, "I will tell you it is not going to be processed until we get paid, and if we do not get paid, it will take its time."  *See* Jt. Exh. 136; Dep. Tr. at 194-96 (Feiner). Supervisor Feiner did not recall either receiving the letter or sending his own letter to correct the statement attributed to him.  *See* Dep. Tr. at 194-96 (Feiner).

215.  Plaintiffs' counsel sent a letter dated February 14, 2003, to Supervisor Feiner and three other Town officials confirming the Supervisor's statement quoted above, noting that on July 3, 2002, August 7, 2002, October 17, 2002, November 1, 2002, and January 13, 2003, the Church had made written appeals to the Town setting forth the Church's position that the Town's consultant's fees were inappropriate and again requesting a meeting to discuss the invoices and that the application be processed.  *See* Jt. Exh. 136.

216.  Deputy Town Attorney Insardi received and reviewed the February 14, 2003, letter, but did not respond to Plaintiffs.  *See* Trial Tr. at 3138:12-21 (Insardi).

217.  Approximately one week later, on February 25, 2003, the Town Board took over preparation of the FEIS by adoption of a resolution introduced by Supervisor Feiner.  *See* Stipulated Fact No. 35; Jt. Exh. 138.

218.  The Church disputed the validity of the amount of reimbursement the Town was asking the Church to pay for SEQRA review fees.  *See* Trial Tr. at 2471:4-14 (Feiner).  For example, Town Traffic Consultant Maris incurred approximately $10,000 in fees in March 2002 reviewing the DEIS traffic study and site plan.  *See* Jt. Exh. 125.  During that month, Maris performed its own field surveys, traffic counts, traffic projections and analysis and prepared a letter report.  *See* id.  All of Maris's studies were done after the Town's prior consultant, AKRF, had reviewed the traffic report contained in the DEIS, held a public hearing on the DEIS, and accepted it.  *See* id.  The Town never provided the Church with a copy of Maris' March 2002 letter report.  *See* Dep. Tr. at 207:7-12 (Stellato).  The Church objected to this charge from the Town.  *See* Jt. Exh. 127.  During this litigation, Town Planning Commissioner Stellato admitted that, in his opinion, the charge was a mistake and should not have been billed to the Church.  *See* Dep. Tr. at 207:25-208:21 (Stellato).

### i.   The Town Takes Over Preparation of the FEIS

219.  On February 25, 2003, less than one month after Defendants advised the Church that "the SEQRA review is nearing completion," the Town Board took over preparation of the FEIS by adoption of a resolution introduced by Supervisor Feiner.  *See* Stipulated Fact No. 35; Jt. Exh. 138.

220.  The Town assumed responsibility for preparing and completing the FEIS without prior notice to Plaintiffs.  *See* Stipulated Fact No. 55.  In fact, Defendants did not advise

the Church that they had taken over preparation and completion of the FEIS until March 17, 2003.  *See* Stipulated Fact No. 43; Stipulated Fact No. 56; Jt. Exh.141.

221.  Defendants acknowledged that a municipality assuming control of preparation of an FEIS from an applicant is extremely unusual.  *See* Trial Tr. at 1110:9-1111:4 (Turner).

222.  Defendants assert that their motivation in taking over preparation of the FEIS was the Church's failure to provide certain information.  *See* Trial Tr. at 2905:21, 2906:9 (Stellato).  However, the Planning Commissioner acknowledged the Church never refused to provide information and acknowledged that, prior to the Town taking over the FEIS, the Church had responded to all of his requests.  In light of such testimony, Defendants' asserted motivation is not credible.  Moreover, the Town itself, in its own FEIS never provided the very information it claims the Church did not provide, the absence of which purportedly motivated the FEIS takeover.

223.  Despite an assertion on January 29, 2003 that SEQRA review was nearing completion and despite the Town's claim in its February 25, 2003, resolution that it took over preparation of the FEIS due to the Church's "repeated fail[ure] to provide information essential to the Town's fulfillment of its Lead Agency obligations," the Town did not complete the FEIS until some ten months later in December, 2003—after the Church commenced this litigation.  *See* Jt. Exh. 131; Jt. Exh. 138; Jt. Exh. 160.

**j.   The Town Rewrites the FEIS to Facilitate Denial of the Project**

224.  The FEIS written by the Town is replete with errors, gratuitous comments and revisions intended to cast the project in the worst light possible.  At trial, the Deputy Town Attorney admitted that Defendants knew the outcome they wanted to achieve in the Findings Statement and edited the FEIS to support that outcome.  *See* Trial Tr. at 3123:9-18 (Insardi).  In

fact, the Findings Statement was being prepared even before the FEIS was complete. *See* id. at 3123:9-11.

225. Significant testimony was provided concerning numerous errors and omissions contained in the FEIS. *See* Trial Tr. at 1509:25-1510:11 (Turner); Trial Tr. at 2154:1-13, 2157:1-10 (Bass); Trial Tr. at 2270:7-18 (Doneit); Trial Tr. at 2598:22-2599:5 (Barnes); Trial Tr. at 2385:18-2387:12 (Feiner); Trial Tr. at 174:3-190:18 (Schiff); Trial Tr. at 697:17-698:2 (Grealy); Trial Tr. at 2768:3-2770:6 (Loyst). Specific examples of gratuitous comments and manipulative edits were described in a submission from Plaintiffs, dated July 13, 2007, requested by this Court to identify same.

226. A public hearing was held on the FEIS on December 15, 2003. *See* Pl. Exh. 116.

227. The purpose of the public hearing was to allow the public to comment on the completeness and accuracy of the FEIS.

228. The Church's representatives attended the December 15, 2003, public hearing on the FEIS and objected to its adoption, noting errors in the document. *See* Pl. Exh. 116 at pp. 8-10.

229. Errors in the FEIS that Plaintiffs noted at the hearing included:

    i.  Town Board's failure to mitigate potential impacts;

    ii.  Failure to evaluate the use of Pomander Drive as alternative access to the Pomander Drive property;

    iii.  Town's erroneous assertion that many of the Church's members walk to the church at its current location and use mass transportation;

Case 1:03-cv-04235-GBD-GAY   Document 109   Filed 08/12/10   Page 74 of 206

iv.  Town's erroneous assertion that there is no access to mass transportation at the Church's Pomander Drive property;

*See* Pl. Exh. 116 at pp. 8-10.

230.  At the hearing, none of the Town Board Members took any action, nor directed others to take any action, to correct or investigate these errors.  *See* Pl. Exh. 116; Trial Tr. at 2117:15-2117:24 (Juettner); Trial Tr. at 2154:2 -2155:3 (Bass); Dep. Tr. at 74:10-23 (Weinberg).

231.  On December 24, 2003, the Church's representatives further provided written objections and comments on December 24, 2003 from its attorney, its planning consultant, Saccardi & Schiff, its site engineer, Dolph Rotfeld Engineers, and its traffic engineer, JCE, all of which were submitted concurrently ("December 24, 2003, Submission").  *See* Jt. Exhs. 161(a)–161(d).

232.  Deputy Town Attorney Insardi admitted that "obviously, there were mistakes made" with regard to the FEIS for the Fortress Bible Church project.  *See* Dep. Tr. Vol. 2 at 106:10 (Insardi).

233.  The Town Board, as Lead Agency, is required to consider comments that are received during the post-acceptance period of the FEIS and to make changes deemed appropriate.  *See* Dep. Tr. Vol. 2 at 122:10-17 (Insardi); Trial Tr. at 2606:16-2607:5 (Barnes).

234.  Deputy Town Attorney Insardi admitted that the Town and its consultants "had to consider what came in post FEIS . . . ."  *See* Dep. Tr. Vol. 2 at 123:5 (Insardi). Notwithstanding the Town's obligation to consider comments received in the FEIS comment period, Defendants' consultants were instructed to disregard the Church's December 24, 2003, submission identifying numerous errors.  *See* Trial Tr. at 3361:20-3362:18 (Maris); Trial Tr. at 1369:22-1371:13 (Turner).  Despite the enumeration of multiple errors in the FEIS, Defendants

did not make any change to the FEIS they had prepared and adopted.  *See* Trial Tr. at 1510:6-11

(Turner); Trial Tr. at 2117:25-2119:6 (Juettner); Trial Tr. at 2593:5-2595:1 (Barnes).

### k.  The Town's Findings Statement

235.  Adoption of the Findings Statement was the final step in the Town's efforts—

dating back to 1999—to derail the Church from developing its Greenburgh property.

236.  On January 6, 2004, the Town purported to adopt a Findings Statement denying

the Church's application.  *See* Stipulated Fact No. 46.  The Findings Statement was subsequently

declared void by this Court because the Town violated the New York State Open Meetings Law.

*See* id.

237. The Town adopted the identical Findings Statement on April 14, 2004.  *See*

Stipulated Fact No. 47; *see also* Trial Tr. at 2385:6-13 (Feiner).

238. The Findings Statement adopted by the Town contained certain of the same

errors as set forth in the FEIS.  *See* Trial Tr. at 1254:9-19 (Turner); Trial Tr. at 2270:7-11

(Doneit).  At the December 15, 2003, hearing on the FEIS, Plaintiffs had notified the Town

Board Members of the numerous errors in the FEIS and Findings Statement.  *See* Pl. Exh. 116.

239. The Findings Statement asserts that the Town has "made every effort to

accommodate" the Church's project.  *See* Jt. Exh. 163.  Councilwoman Juettner conceded that,

despite having read the document before voting to adopt it, she did not know what efforts the

Town made to accommodate the Church.  *See* Trial Tr. at 2119:7-2120:1 (Juettner); Dep. Tr. at

73:5-9 (Juettner).

240.  Not only does the Findings Statement contain numerous material errors, it often

ignores the extensive land use record.  In some instances, the Findings Statement also references

non-existent evidence, such as purported testimony by Police Chief Kapica and Fire Chief Mauro that they deny occurred. *See* Trial Tr. at 2219:6-2221:19, 2233:20-2238:5 (Doneit).

### l. Concerns Identified in the Findings Statement

#### i. Steep Slope Ordinance

241.  In its Findings Statement, the Town relied upon the newly adopted Steep Slope Ordinance, codified at Section 285-39 of the Zoning Ordinance of the Town of Greenburgh. *See* Jt. Exh. 163 at pp. 6-8.  At trial, Plaintiffs' demonstrated that not only are calculations appearing in the Findings Statement incorrect, but the Town's Steep Slope Ordinance does not apply to the Church's project.  At trial, Defendants were not able to offer any interpretation of Town statutes that would support application of the Steep Slope Ordinance to the Church's project.

242.  At the time the Town Board accepted the DEIS as complete in October 2001, the Town had not yet adopted its Steep Slope Ordinance. *See* Stipulated Fact No. 38; Jt. Exh. 59.

243.  At the time the Church submitted its FEIS in April 2002, the Town had not yet adopted its Steep Slope Ordinance. *See* Stipulated Fact No. 38; Stipulated Fact No. 53; Trial Tr. at 145:6-11 (Schiff); Dep. Tr. at 59:4-7 (Doneit).

244.  If the Town had accepted the Fortress Bible Church FEIS as complete prior to the adoption of the Steep Slope Ordinance on June 25, 2003—four months after the Town took over the FEIS and almost five months after Supervisor Feiner stated that SEQRA review was nearly complete—steep slopes would not have been analyzed in the FEIS. *See* Dep. Tr. at 217:13-17 (Stellato); *see also* Stipulated Fact No. 38.

245.  Turner testified that Turner/Geneslaw, as consultants to the Town, reviewed the Town Code in preparing the Findings Statement. *See* Trial Tr. at 1116:13-16 (Turner).

246. The Findings Statement adopted by the Town concludes that a variance from Local Law Section 285-39 and a "significant variance" from Chapter 245 of the Town Code that regulates disturbance of steep slopes would be required for the Fortress Bible Church project. *See* Jt. Exh. 163 at p. 7.  However, the Town's planning consultant and author of the Findings Statement could not identify who, on behalf of the Town, actually made that determination.  *See* Trial Tr. at 1116:17-1117:2 (Turner).

247. The Findings Statement concludes that Section 285-39 of the Zoning Code of the Town of Greenburgh requires that minimum lot area be reduced by a percentage of steep slopes present on the property.  *See* Jt. Exh. 163 at p. 7.  However, the Town's planning consultant, who testified that he personally reviewed the cited Zoning Code and Steep Slope Law Ordinance, could not identify any section of either statute that set forth such a requirement.  *See generally* Trial Tr. at 1119:3-1134:6 (Turner).  In fact, he admitted that Section 285-39(e) does not even use the term "minimum lot area" nor does the section require that lot area be reduced due to steep slopes.  *See* Trial Tr. at 1120:7-1122:4 (Turner).

248. Town Planning Consultant Turner admitted that Section 285-39, the section cited in the Findings Statement, did not contain a requirement that minimum lot area be calculated by a reduction of the amount of steep slopes.  *See* Trial Tr. at 1122:21-1123:17 (Turner).  Turner also admitted that Section 285-39—on which he relied in reaching the conclusions set forth on page 7 of the Findings Statement—does not include any reference to impervious lot coverage.  *See* Trial Tr. at 1228:23-1129:1 (Turner).

249. Town Planning Consultant Turner admitted that, in the absence of the Town's attempted application of its Steep Slope Law to the Fortress Bible Church project, the project

complied with impervious surface coverage requirements under the Greenburgh Town Code. *See* Trial Tr. at 1129:24-1130:3 (Turner).

250. In response to Town Planning Consultant Turner's insistence at trial that application of the Town's Steep Slope Ordinance to the Fortress Bible Church was not inappropriate but inability to identify any section of the Town Code supporting his conclusion, the Court granted Turner four days to consult whatever data, information, and/or people (including attorneys) he felt were necessary in order to identify sections of the Town Code which could support the conclusions in the Findings Statement regarding application of steep slopes and reduction of lot area and impervious surface coverage. *See* Trial Tr. at 1133:9-1134:10 (Turner).

251. After having four and one-half days to consult any person, document or other type of data he felt necessary, Town Planning Consultant Turner was unable to provide evidence supporting his claim that the conclusions in the Findings Statement concerning application of Town Law regarding steep slopes and impervious surface area to the Fortress Bible Church application were accurate. *See generally* Trial Tr. at 1187:11-1199:19 (Turner).

252. Defendants did not provide any explanation for the conclusions set forth in the Findings Statement, which are purportedly based upon the Town Code. In fact, Defendants' own witnesses acknowledged that the Town of Greenburgh's Steep Slope Ordinance does not require that minimum lot area be reduced due to the presence of steep slopes on the property. *See* Dep. Tr. at 60:22-61:22 (Doneit); *see also* Trial Tr. at 1119:3-1121:4 (Turner); Dep. Tr. at 242:20-243:6 (Stellato).

253. Defendants' witnesses also acknowledged that the Town's Steep Slope Ordinance did not require reduction of impervious surface coverage. *See* Dep. Tr. at 247:4-11, 257:6-12 (Stellato); Trial Tr. at 2262:1-25 (Doneit).

254. Town Planning Consultant Doneit, Turner's colleague, testified that he performed an analysis of steep slopes and impervious surfaces relating to the Fortress Bible Church application in 2003, he prepared a calculation of steep slopes and impacts (Plaintiffs' Exhibit 87), and he performed certain of the calculations included in the Findings Statement adopted by the Town. *See* Trial Tr. at 2188:20-2189:9, 2194:9-20 (Doneit).

255. Doneit performed the calculations concerning lot area that appear in the Findings Statement and admitted that the statement on page 7 of the Findings Statement: "285-39 requires that the minimum lot area be calculated by the deduction of the sum of . . . ." is not accurate. *See* Trial Tr. at 2194:21-2195:2 (Doneit). Although he was the one who used the word "minimum," Town Planning Consultant Doneit stated at trial that it was a "poor choice of words." *See id.* at 2195:1-4. However, he made that determination only upon a review of the documents in preparation for his trial testimony. *See* Trial Tr. at 2195:9-12 (Doneit).

256. Besides the fact the Town could not justify application of the law to the project, the Town manipulated calculations in an effort to cast the project in a negative light. The calculations which appear in the Findings Statement concerning the percentage of steep slopes disturbed were improperly based on the size of the entire property, rather than a reduced lot size based on disturbed area. *See* Trial Tr. at 2268:2-16 (Doneit).

257. Defendants have admitted that there is no legal requirement in the Town Code that impervious surface coverage requirements be reduced due to the Steep Slope Ordinance.

*See* Trial Tr. at 2262:21-25 (Doneit).   Yet, that was one basis upon which the Town issued a

negative Findings Statement.  *See* Jt. Exh. 163 at pp. 6-8.

258. The Fortress Bible Church project complies with the impervious surface

coverage requirement of the Town ordinance.  *See* Trial Tr. at 1129:2-1130:3 (Turner) (Town

Code Section 285-14(b)(3)(D) permits impervious surface coverage in the R-10 Zone of 37.25%

and Church proposed 33.38%); Dep. Tr. at 247:15-18, 257:6-258:23 (Stellato).

### ii.  Police and Fire Resources

259.  Based on his experience as Chief of the Greenburgh Police Department, Police

Chief Kapica disagreed with the Town's conclusion that it was impossible to adequately mitigate

traffic impacts associated with the Fortress Bible Church project.  *See* Trial Tr. at 1996:25-

1997:4 (Kapica); Dep. Tr. at 50:5-51:17 (Kapica).

260.  Although the SEQRA Findings Statement attributes a number of concerns to

Police Chief Kapica and Fire Chief Mauro: (i) neither Chief Kapica nor Chief Mauro were given

an opportunity to review or comment upon the conclusions that are attributed to them in the

Findings Statement; (ii) neither Chief Kapica nor Chief Mauro had a basis for evaluating many

of the conclusions because they were not provided with relevant information; and (iii) for many

of those conclusions which Chief Kapica and Chief Mauro did have a basis upon which to

evaluate, they did not agree with the Town's conclusions.  *See* Trial Tr. at 1979:20-1981:24

(Kapica); Trial Tr. at 2058:17-2065:3 (Mauro).

261. On July 3, 2003, Town Planning Consultant Turner wrote to Deputy Town

Attorney Insardi about the Town's preparation of the FEIS:

> There are several areas of the document that will require further
> discussion.  For example, no hard data is available to support
> claims made by Chief Kapica of the Greenburgh Police
> Department and Chief Mauro of the Fairview Fire Department.

*See* Jt. Exh. 152.

### 1. Police

262.  All of the statements attributed to Police Chief Kapica in the SEQRA Findings Statement were drafted without his prior review and without his consultation.  *See* Dep. Tr. at 94:9-95:10 (Kapica).   Indeed, Police Chief Kapica had never seen the SEQRA Findings Statement prior to his deposition in this action.  *See* Trial Tr. at 1980:20-22 (Kapica); Dep. Tr. at 94:9-18, 95:9-10 (Kapica).

263.  With respect to the statement in the Findings Statement that Police Chief Kapica of the Greenburgh Police Department has stated that "the proposed project would further stress an already taxed agency," *see* Jt. Exh. 163 at p.8, Police Chief Kapica testified:

> I think it's contextually a little bit out of—I did make a statement first of all in the first sentence that the project would further stress an already taxed agency.  That's true.  To the extent that the project—would that be enough not to go ahead with the project?  Of course not.  So to me that sentence seems to indicate that that's the intent of it.  But that was never my intent in saying that.  As I pointed out earlier, with every project there's a tax on the police department and collectively that becomes onerous after awhile. But individually it doesn't stand on its own merits to say that any project should not move forward.  So that particular sentence I think is just out of context.  But I did say it.

*See* Trial Tr. at 1981:1-13 (Kapica).

264.  Police Chief Kapica testified that the presence of the Church on the Pomander Drive property would have a *de minimus* effect on the police department's resources:

> So my intention in that sentence was to say—it's a standard thing I put in every single request such as this, that by itself, if there was no other development in the Town of Greenburgh for that year that the church took place, yeah, we could handle it.  But if there's more developments that put a further tax on our resources, then it would have the cumulative effect of—it would help the cumulative effect where we would require more police officers.

*See* Dep. Tr. at: 58:19-59:4 (Kapica); *see also* Trial Tr. at 1996:17-24 (Kapica).

265.  During his deposition, Police Chief Kapica acknowledged that, apart from attending an initial meeting early in the SEQRA process during which several possible traffic mitigation measures were discussed, he never received any plans or documentation regarding what the Church had subsequently studied and proposed.  *See* Dep. Tr. at 34-35 (Kapica) ("I never performed anything because nobody ever provided me with a plan that said this is our proposed mitigation, this left turn lane, which is going to be X number of feet, what do you think.  I was never given the opportunity to do that."); *see also* Trial Tr. at 1980:20-1981:13, 1997:5-12 (Kapica).

266.  During his deposition, Police Chief Kapica acknowledged that, apart from attending an initial meeting early in the SEQRA process during which several possible traffic mitigation measures were discussed, he never received any plans or documentation regarding what the Church had subsequently studied and proposed.  *See* Dep. Tr. at 34:23-35:5 (Kapica).

267.  Police Chief Kapica has been employed by the Town of Greenburgh Police Department since 1971 and has been the Chief of the Greenburgh Police Department since June 1, 1992.  *See* Dep. Tr. at 7:15-8:3 (Kapica).

268.  Police Chief Kapica testified that at the time of his deposition on February 25, 2005, the Greenburgh Police Department had 114 sworn officers.  He did not anticipate that number to increase as it depended on the "[T]own [B]oard loos[en]ing up with the purse strings." *See* Dep. Tr. at 8:4-16 (Kapica).

269.  At his deposition, the Chief testified that construction of the Fortress Bible Church project would not itself require the Police Department to acquire additional resources for the Police Department, but might when combined with the other developments in the Town since

the project was proposed.  *See* Dep. Tr. at 59:7-60:12 (Kapica).  Police Chief Kapica noted, however, that the Town actually had already added resources—three officers—since the Church's application process began.  *See* Dep. Tr. at 60:15-19 (Kapica).

270.  In its Findings Statement, the Town states:

> Based on testimony of Fire and Police officials particularly in relation to alternative traffic analyses, emergency access to a use that includes place of assembly and school children is not acceptable.

*See* Jt. Exh. 163 at p. 10.

271.  Police Chief Kapica stated that neither he nor anyone from his department gave testimony regarding the Fortress Bible Church project during the SEQRA review.  *See* Trial Tr. at 2000:24-2001:19 (Kapica).

272.  Police Chief Kapica also testified that the Town relies on auxiliary police officers who are assigned traffic control duties including those for various religious and educational facilities in the Town of Greenburgh.  *See* Trial Tr. at 1998:3-8 (Kapica); Dep. Tr. at 66:13-16, 71:7-16 (Kapica); *see also* Dep. Tr. at 79:13-24 (Bass) (common for religious institutions in the Town of Greenburgh to have a Town police officer present to assist with vehicular and pedestrian traffic during services.).

273.  Police Chief Kapica testified that, at the meeting at which he reviewed the project, he did not recall expressing any concern with respect to the sight distance along Dobbs Ferry Road near the Fortress Bible Church property and he did not discuss emergency response times.  *See* Trial Tr. at 1994:4-10, 21-24 (Kapica); Dep. Tr. at 38:3-11 (Kapica).

274.  Police Chief Kapica testified that there is no signage that prohibits parking on Sunday on Pomander Drive and he did not believe there were Sunday parking restrictions on the other streets adjacent to the Church's property.  *See* Dep. Tr. at 40:20-41:12 (Kapica); *see also*

Trial Tr. at 1994:25- 1995:13 (Kapica).  *See also* Bass Tr. at 79:25-80:8 (Union Baptist application for street parking surrounding church acceptable to the Town as long as it is "legal and safe"); Barnes Tr. at 64:20-65:17 (street parking specifically considered and accepted by Town Board as lead agency in granting a Conditioned Negative Declaration on Union Baptist Church).

275.  Police Chief Kapica testified that a prohibition on making left hand turns out of the Fortress Bible Church property—to which the Church had agreed in its un-signalized plan, *see* Jt. Exh. 59—would facilitate the flow of traffic out of the church properly and be safer for the people exiting the property.  *See* Dep. Tr. at 42:19-43:21 (Kapica).

276.  Police Chief Kapica testified that he "had no idea" what the following statement contained in the Findings Statement meant: "Based on testimony of fire and police officials, particularly in relation to alternative traffic analysis, emergency access to a use that includes place of assembly and school children is not acceptable."  *See* Dep. Tr. at 104 (Kapica).

## 2.  Fire/Emergency

277.  Testimony of Fairview Fire Chief Mauro in this case reveals that the Town of Greenburgh fabricated fire safety issues.

278.  Chief Mauro, has been a member of the Fairview Fire Department since 1965 and has been Chief of the Department since 1977.  *See* Trial Tr. at 2021:17-2022:2 (Mauro); Dep. Tr. at 9:22-10:2 (Mauro).

279.  There are two fire stations in the Fairview Fire Department.  *See* Trial Tr. at 2029:12-13 (Mauro); Dep. Tr. at 11:10-14 (Mauro).

280. Early in the application process, Fire Chief Mauro wrote a letter dated December 9, 1998, advising that he had no exceptions to the plans as presented. *See* Jt. Exh. 2.

281.  At the time he wrote this letter, he was aware that the proposed structure would be fully sprinklered.  *See* Dep. Tr. at 32:12-15 (Mauro).

282.  He testified at his deposition that the significance of the sprinkler system is that it is a "big help" and makes it "a lot easier" for the fire department in its operations.  *See* Dep. Tr. at 32:16-33:1 (Mauro).

283.  Fire Chief Mauro was familiar with the May 4, 2000, letter written by the Board of Fire Commissioners of the Fairview Fire Department to the Town Board wherein the Board of Fire Commissioners stated that it had serious concerns about loading and unloading school buses.  *See* Dep. Tr. at 50 (Mauro).

284.  Fire Chief Mauro testified that any concerns he would have had about the loading and unloading of school buses on the Church's property would have been addressed by buses not loading and unloading on Dobbs Ferry Road and the inclusion of a fire lane on the property.  *See* Dep. Tr. at 51:10-52:17 (Mauro).

285.  At the time Fire Chief Mauro wrote a letter dated January 10, 2001—*i.e.*, at a time when the DEIS had been accepted as complete by the Town Board and the Town Board was holding public hearings on the DEIS—he did not know that Fortress Bible Church had proposed making certain improvements to Dobbs Ferry Road in connection with its project, including widening Dobbs Ferry Road at the intersection near the northbound entrance to the Sprain Brook Parkway, putting a new traffic signal at the entrance of the property, adding a left-turn lane to Dobbs Ferry road, and integrating the timing of signals between the entrance to the property and existing traffic signals.  *See* Trial Tr. at 2059:2-2059:22 (Mauro); Dep. Tr. at 58:7-59:12 (Mauro).

*286.* At his deposition, Fire Chief Mauro believed that he had seen the SEQRA Findings Statement prior to his deposition, but did not recall when. *See Dep. Tr. at 84:19-85:3 (Mauro).*

287. Contrary to the assertion on page 10 of the Findings Statement, Fire Chief Mauro did not testify at any public hearing during the SEQRA process. *See* Trial Tr. at 2061:23-2062:24 (Mauro).

288. Under the heading of "Fire/Emergency," the SEQRA Findings Statement attributes the following assessment to Fire Chief Mauro:

> According to Chief Mauro of the Fairview Fire Department and Emergency Services, the proposed project would have a negative impact on response time to the east and west sides of the Fire District as well as the site, the Sprain Brook Parkway and to homes and businesses located to the west of the District.

*See* Jt. Exh. 163 at p. 9.

289. Fire Chief Mauro testified that the attribution made to him in the Findings Statement was an accurate statement of his opinion. *See* Dep. Tr. at 88:24-89:12.

290. Fire Chief Mauro testified that the foregoing opinion was not based upon his review of any traffic studies, nor his consideration of any of the traffic mitigation measures which the Church had proposed. *See* Trial Tr. at 2064:5-18 (Mauro); Dep. Tr. at 89:8-24 (Mauro).

291. Fire Chief Mauro never studied the impact of proposed off-site traffic improvements by Fortress Bible Church on potential response times for Fairview Fire District emergency calls. *See* Trial Tr. at 2059:20-22 (Mauro).

292. In fact, Fire Chief Mauro was completely unaware that the Church had proposed any traffic mitigation measures. At his deposition, Fire Chief Mauro testified as follows:

Q.     Had you ever heard that Fortress Bible Church had proposed widening Dobbs Ferry Road at the intersection near the northbound entrance to the Sprain Brook Parkway?

A.     No.

Q.     Have you ever heard that the Fortress Bible Church had proposed putting a new traffic signal at the entrance to its property?

A.     No.

Q.     Have you ever heard that, as part of its application, the Fortress Bible Church had proposed adding a left-hand turn lane on Dobbs Ferry Road to allow vehicles to make a left-hand turn into its property?

A.     No.

Q.     Have you ever heard that, as part of this application, the church had proposed integrating the timing of the signals between the entrance to the property—that is its new signal that it would add at the entrance to its property, and integrating the timing of that signal with the timing of the existing traffic signal at the northbound entrance to the Sprain Brook Parkway?

A.     I—I hadn't heard any of that.

Q.     Would any of those improvements affect the opinions that you've given in these letters concerning the effect of the project on traffic conditions in the vicinity?

A.     Well, in regard to the traffic light, if the state—that's a state road.  So if the State of New York would allow a traffic signal there, it would be a help.  I'm not—I'm not very sure of—knowing the State of New York, how they hate to put traffic lights up on state roads, I don't know how you'd get it through.  But I guess if you got it through, it would be an assistance to us.

Q.     And would integrating the timing of the signals between the existing light at the Sprain Brook Parkway entrance and this new signal that I'm suggesting to you that would be added, would that also be a help in terms of traffic conditions?

A.     Oh, yes.

*See* Dep. Tr. at 58:13-60:10 (Mauro).

293. No one from the Town provided Fire Chief Mauro with any information concerning traffic mitigation measures proposed by Fortress Bible Church. *See* Trial Tr. at 2060:21-23 (Mauro).

294. Fire Chief Mauro admitted that, due to the fact that he did not have information concerning improvements proposed by the applicant on the Fortress Bible Church project, he could not make accurate decisions and recommendations on the proposed action. *See* Trial Tr. at 2060:24-2061:22 (Mauro); *see also* Jt. Exh. 160(a) at p. II-B-1 ("Many of the responses in this Section, particularly related to the Town's police and fire protection services, are a direct reflection of the professional opinions of Chief Kapica of the Greenburgh Police Department and Chief Mauro of the Fairview Fire Department.  Their intimate knowledge of the Town and its operations allow them to make accurate and educated decisions and recommendations based on the proposed action").

295. The Findings Statement also states: "The Chief has stated that both the proximity of the Sprain Brook Parkway exit and entrance would affect the department's ability to effect a rapid response to the site and the proposed project would impact the operation of the department as a result of its location and type of operation."  This statement similarly was not based upon any review of proposed improvements by the Church, as Fire Chief Mauro had not reviewed such proposed improvements.  *See* Trial Tr. at 2064:19-2065:3 (Mauro).

296. Fire Chief Mauro admitted that he had no objection to the traffic generated by the Fortress Bible Church project on Sundays.  *See* Trial Tr. at 2066:4-7 (Mauro).

297. Rather, his only concern was with respect to traffic generated by the proposed Christian school during weekdays.  *See* Trial Tr. at 2066:8-10 (Mauro).  Yet, Fire Chief Mauro

admitted that he had "no idea" how many vehicles are projected to travel to the school on the Fortress Bible Church project.  *See* Trial Tr. at 2066:11-19 (Mauro).

298.  Fire Chief Mauro admitted that, regarding operation of the Christian school, the possible significant effect on potential response times would be limited to four hours each weekday, split between the morning and afternoon.  *See* Trial Tr. at 2045:24-2046:23 (Mauro).

299.  The Findings Statement also states: "[T]he Chief has stated that 'the proximity of the proposed site to the Sprain Brook Parkway entrances and exits would directly hamper the Department's ability to affect [sic] a rapid response [to] the site." *See* Jt. Exh. 163 at p. 9.  At his deposition, Fire Chief Mauro testified the statement accurately reflected his opinion.  *See* Dep. Tr. at 89:25-90:10 (Mauro).  Mauro admitted his opinion was not based on any traffic study for the project nor on any of the improvements that were proposed by the Church.  *See* Trial Tr. at 2064:19-2065:3 (Mauro); Dep. Tr. at 90:11-22 (Mauro).

300.  The Findings Statement further states: "Based on testimony of Fire and Police officials particularly in relation to alternative traffic analyses, emergency access to a use that includes place of assembly and school children is not acceptable." *See* Jt. Exh. 163 at p. 10.  Fire Chief Mauro testified that the statement accurately reflected his opinion.  *See* Dep. Tr. at 91:24-92:12 (Mauro).  He said that the statement referred to the ability of fire engines to access the site safely at all times of the day.  *See* Dep. Tr. at 91:24-92:16 (Mauro).  However, he also testified that the ability of his fire trucks to navigate the driveway in an emergency was not a serious concern.  *See* Dep. Tr. at 93:17-95:8 (Mauro).

301.  Fire Chief Mauro's asserted that if the Fortress Bible Church project were built, the Fairview Fire District would require four additional firefighters.  *See* Trial Tr. at 2051:2-2054:22 (Mauro).   However, Fire Chief Mauro could not identify any other land use

development within the Fairview fire district that would require the addition of four firefighters to the Fairview Fire Department.  *See* Trial Tr. at 2053:23-2054:1 (Mauro).

302.  Notwithstanding his statements that he expected development of the Fortress Bible Church property to slow response times, Fire Chief Mauro testified that he did not know the hours of operation the Church intended once development of the property was completed. *See* Trial Tr. at 2045:12-23 (Mauro).

303.  Fire Chief Mauro admitted that he was not aware that the Town had required Fortress Bible Church to, or that the Church did, conduct a travel time survey.  *See* Trial Tr. at 2074:4-20 (Mauro).

304.  Fire Chief Mauro testified that the presence of traffic lights could increase emergency response time, but admitted that there are devices that allow fire department apparatus to supersede control of a traffic signal, automatically changing the light to green and allowing the fire truck or other emergency apparatus to travel through the light.  *See* Trial Tr. at 2078:20-2079:4 (Mauro).  In fact, the Church had agreed, if required by the Town, to include a traffic signal preemption control device.  *See* Jt. Exh. 69(a) at p. II-B-3 (Response B6).

305.  Fire Chief Mauro had only one conversation with Supervisor Feiner regarding the Fortress Bible Church application.  That conversation took place in a hallway at Town Hall when, in response to a greeting to Supervisor Feiner by Fire Chief Mauro, Supervisor Feiner said "Oh, by the way, Chief.  I'm going to get the Fortress Bible Church to give you guys a fire truck."  *See* Trial Tr. at 2041:2-13 (Mauro).

306.  Fire Chief Mauro testified that he never had any conversations regarding the Fortress Bible Church application with Town Planning Commissioner Stellato, Town Traffic Consultant Maris, or any of the other Town consultants, Town Board Members, or Town

attorneys, other than the comment by Supervisor Feiner regarding the fire truck.  *See* Trial Tr. at

2059:23-2060:5 (Mauro); Dep. Tr. at 75:5-78:3 (Mauro).

### iii.  Retaining Walls

307.  In its Findings Statement, the Town stated:

> The Lead Agency Finds that the proposed retaining walls are an
> attractive nuisance and are not safe.  If children or pets wander into
> the property they may easily fall and seriously injure themselves,
> or worse.

*See* Jt. Exh. 161 at p.10.

308.  By letter dated July 24, 2002, the Church's planning consultant advised the

Town:

> Based on a discussion with the Town Building Inspector, the
> Applicant would propose to install a six-foot high chain link fence
> along the top of the wall as a safety measure.

*See* Jt. Exh. 88. at p. 2 (Comment 7).

309.  The Findings Statement states: "[T]he walls are an attractive nuisance and are

not particularly safe."  Town Building Inspector Lucido testified regarding the statement that he

"could agree with that if the walls were high and you could fall off of them; but [the Town]

would require some kind of fence put on top of that wall if that were the case."  *See* Dep. Tr. at

40:2-12 (Lucido).

310.  He further testified that requiring construction of a fence on top of the proposed

wall would alleviate safety concerns and had been required "many times in the past."  *See* Dep.

Tr. at 40:13-25 (Lucido).

311.  Town Building Inspector Lucido also testified that there were "quite a few"

other sites where retaining walls were needed and fences were required to ensure safety, though

he could recall only one example.  *See* Dep. Tr. at 41:2-20 (Lucido).

312.  Building Inspector Lucido testified that he was not asked to provide comments with respect to the construction of retaining walls at the Fortress Bible Church property.  *See* Dep. Tr. at 39:21-25 (Lucido).

313.  Deputy Town Attorney Insardi believed that, at the Findings Statement stage of SEQRA, there was no longer a safety concern about children having the potential to fall off retaining walls on the proposed Fortress Bible Church project.  *See* Dep. Tr. Vol. 2 at 119:5-11 (Insardi).

314.  Insardi testified that "in the final analysis, the public safety concerns related more to traffic and not to the [retaining] wall.  *See* Dep. Tr. Vol. 2 at 119:13-15 (Insardi).

315.  Nevertheless, Deputy Town Attorney Insardi testified that she was aware that the Findings Statement adopted by the Defendant Town Board states that one of the concerns is that the retaining wall is unsafe.  *See* Trial Tr. at 3121:11-18 (Insardi); Dep. Tr. Vol. 2 at 119:19-22 (Insardi).

316.  However, Insardi never spoke with Town Building Inspector Lucido regarding the project, nor was she aware that Lucido had spoken with Church Planning Consultant Schiff regarding safety concerns for the retaining wall.  *See* Trial Tr. at 3123:21-23 (Insardi); Dep. Tr. Vol. 2 at 119:23-11 (Insardi).  Insardi also admitted that she was not aware that Town Planning Commissioner Stellato had been advised of the meeting between Schiff and Lucido.  *See* Dep. Tr. Vol. 2 at 120:12-14 (Insardi).

317.  Town Planning Consultant Turner testified that on July 28, 2002, he knew of the Church's proposal to put a fence on top of the retaining wall and that the Building Inspector was satisfied with the Church's proposal.  *See* Trial Tr. at 1171:3-1174-15 (Turner).  Nevertheless, Turner admitted he authored the statement in the Findings Statement that the retaining walls

were an attractive nuisance that could lead to children or pets being seriously injured.  *See* Trial Tr. at 1171:3-10 (Turner).

### 1.   Church's Proposed Traffic Mitigations

318. During the time AKRF served as Planning Commissioner to the Town of Greenburgh, Russo reviewed traffic mitigation measures proposed in conjunction with the Church's land use application.  This included review at the EAF stage prior to the Town Board's determination of significance.  *See* Trial Tr. at 917:1-22 (Russo).

319. One of Russo's primary functions within AKRF was to prepare traffic and transportation studies for EISs, including working with all technical areas studied within the EIS in formulating EISs on behalf of clients.  *See* Trial Tr. at 885:14-23 (Russo).  When working for a municipality, Russo reviews traffic studies submitted by applicants and also reviews other technical sections.  *See* Trial Tr. at 885:14-886:3 (Russo).

320. During AKRF's tenure as Planning Commissioner from Spring 2000 through January 2002, Russo personally served as reviewer of traffic components for all applications that were submitted to the Town, regularly attending planning board meetings and conducting site visits to land use application to which he was assigned.  *See* Trial Tr. at 886:4-887:2 (Russo).

321. Based on his review of the Fortress Bible Church project, prior to a determination of significance, Town Planning Commissioner Russo believed that the Town could grant a negative declaration "considering traffic was the primary issue and the applicant['s] engineer had submitted a traffic study and they were willing to mitigate whatever impact they had from a traffic standpoint from the project."  *See* Trial Tr. at 912:8-21 (Russo). Prior to the Town's adoption of a Positive Declaration, Town Planning Commissioner Russo

believed that the mitigation measures proposed by Fortress Bible Church relating to traffic were "adequate" and "a good solution." *See* Trial Tr. at 918:21-919:6 (Russo).

322. Based on technical review of correspondence with Fortress Bible Church in June and July 2000—prior to the Town Board's adoption of a Positive—the Town's Planning Commissioner was satisfied that Fortress Bible Church had developed a good mitigation plan regarding traffic. *See* Trial Tr. at 919:19-920:2 (Russo).

## 2. New York State Department of Transportation Final Approvals

323. In their pre-trial proposed Findings of Fact and through examinations of various witnesses, Defendants emphasized that final approvals from NYSDOT had not been received. *See* Defendants' Pre-Trial Proposed Findings of Fact and Conclusions of Law at ¶¶ 162, 167.

324. However, multiple witnesses at trial confirmed that NYSDOT would not issue final approval for traffic improvements, which are issued in the form of "work permits," until after SEQRA is completed and the Findings Statement has been issued by the Lead Agency. *See* Trial Tr. at 869:19-870:1 (Grealy); Trial Tr. at 3360:17-3361:1 (Maris).

325. Former Town Planning Commissioner Russo admitted that he could not require Fortress Bible Church to obtain a work permit from NYSDOT. *See* Trial Tr. at 933:2-6 (Russo). Although he did want "to make certain that [NYS]DOT had conceptually heard their mitigation plan," he confirmed "that was the case, they had, and they were in agreement with it." *See* id. Russo acknowledged that Fortress Bible Church's traffic consultant had forwarded to Russo a letter from NYSDOT stating "that they were on board, okay with the improvements being recommended." *See* i d. at 932:19-23. Russo was satisfied with the documentation provided by

the Church's traffic engineers with respect to NYSDOT conceptual approval.  *See* Trial Tr. at 932:24-933:1 (Russo).

326.  Defendants acknowledged that the Church's consultants "engaged in protracted discussions" with NYSDOT.  *See* Jt. Exh. 160(a) at p. I-4.

327.  Yet, the Town, in the FEIS it prepared, omitted reference to the fact that final details of the design would be completed as part of NYSDOT's permit process—a fact the Church had specifically stated in its proposed FEIS.  *Compare* Jt. Exh. 114 at p. II-I-5 (Response I-5) *with* Jt. Exh. 160(a) at pp. II-I-4, 5 (Response I5).

### 3.  The Town's Additional Traffic Concerns

328.  AKRF and Russo served as the Town's Planning Commissioner until after the Town accepted the Church's DEIS as complete in late October 2001.  *See* Stipulated Fact No. 25; Stipulated Fact No. 26; Stipulated Fact No. 42.

329. In October 2001, when the Town accepted the DEIS as complete, Town Planning Commissioner Russo believed that, although traffic was a concern, Fortress Bible Church's mitigation plan was acceptable.  *See* Trial Tr. at 929:20-930:13 (Russo).

330.  Russo also confirmed that the only consistent concern throughout the environmental review process was traffic.  *See* Trial Tr. at 914:9-12 (Russo).  However, he felt Fortress Bible Church was "going to provide the proper mitigation to offset their impact."  *See id.*

331.  Thus, no unmitigated traffic safety issues were even alleged to exist until after Supervisor Feiner's December 2001 e-mail in which he directed Town staff and the Town Attorney's office to find a way in which the Town could deny the Fortress Bible Church project in light of RLUIPA.  At the FEIS stage, following close on the DEIS public hearing in January

2002, the newly hired Town traffic consultant, Maris, together with Town staff, including the Town Attorney's Office, reexamined the DEIS traffic analysis and the traffic analysis included with the Church's proposed FEIS despite the facts that (i) the DEIS had been accepted as complete in content and in accordance with the scope; and (ii) no unmitigated traffic safety issues had been identified by the Town's previous consultant  *See* Trial Tr. at 3325:19-3326:13 (Maris); Trial Tr. at 920:3-5, 927:24-928:6 (Russo). At trial, Plaintiffs demonstrated that the Town's purported traffic concerns relating to unsafe parking, driveway location/access and the amount of traffic to be generated by the Church's project were either mitigated or manufactured.

### a.  Parking

#### i.  The Church's Proposed Parking

332.  The Church's plan proposed development of a single building to house a five hundred seat Church and a religious day school with a maximum potential enrollment of one hundred and fifty students.  *See* Stipulated Fact No. 13; Stipulated Fact No. 14.

333.  Under the Greenburgh Town Code, one parking space is required for every four seats within a Church.  *See* Jt. Exh. 7 at § 285-38E.  Therefore, the Church's proposed project requires one hundred and twenty-five parking spaces.  *See* Trial Tr. at 1278:3-6 (Turner); Trial Tr. at 121:15-17 (Schiff).

334.  At all times, the Church's plan—even when revised to comply with requests from the Town—met or exceeded the Town's own minimum parking requirements under the Town Code.  *See* Jt. Exh. 11(e); Jt. Exh. 43(c); Jt. Exh. 69(b); Jt. Exh. 103.  In fact, in response to Police Chief Kapica's request for more parking, Alternative G provided thirty-five more spaces than are required under the Greenburgh Town Code.  *See* Stipulated Fact No. 34; Jt. Exh. 69(b).

335.  The Town's new parking consultant stated that he objected to the use of "dead end" parking areas—*i.e.* parking areas in which vehicles must back out of spots— on the Fortress Bible Church proposed site plan.  *See* Trial Tr. at 3300:13-20 (Maris).  However, other locations within the Town of Greenburgh have "dead end" parking areas with heavier daily use than the proposed Fortress Bible Church development.  *See* Trial Tr. at 705:21-706:12 (Grealy). The Church proposed various mitigation measures associated with such parking areas, including use of monitors, cones to block off areas that may be full, and valet parking.  *See* Jt. Exh. 114 at pp. II-I-5, 6 (Response I5); Trial Tr. at 704:1-705:2 (Grealy).

336. Town Planning Consultant Maris objected to the Church's proposed use of monitors as inadequate mitigation.  *See* Dep. Tr. at 3345:6-21 (Maris). However, trial testimony indicated that Maris himself has represented a religious land use applicant who proposed the use of monitors as a traffic mitigation measure.  *See* Trial Tr. at 3345:22-3349:1 (Maris).

### ii.  Drive Aisle Parking

337.  Town Traffic Consultant Maris also objected to the use of "drive aisle" parking as a purported safety hazard.  *See* Trial Tr. at 3300:5-12 (Maris).

338.  However, other locations within the Town of Greenburgh and near the Pomander Drive property contain drive aisle parking, including the Hackley School, the LOSCO office development, and Rumbrook Park.  *See* Trial Tr. at 705:3-20 (Grealy); Trial Tr. at 1018:3-7 (Saccardi); Trial Tr. at 3200:10-12 (Stellato).

339.  Traffic Consultant Grealy believed that the Church's proposed use of traffic cones and traffic monitors would adequately mitigate purported safety issues related to such parking.  *See* Trial Tr. at 704:10-705:2 (Grealy).

340.  In fact, the Church proposed:

> The 52 parking spaces along the access road will be coned off and
> only used when necessary.  This will be controlled by a parking lot
> monitor who will be available during the services to deal with
> movements to and from the spaces.  The onsite parking monitor
> will be present during peak periods to direct vehicles to available
> parking spaces and this will also avoid vehicles having to back out
> of the "dead-end" areas.

*See* Jt. Exh. 114 at p. II-I-6 (Response I5).

341.  The Town removed any reference to the Church's offer to utilize cones and traffic monitors from the Response I5 in the FEIS prepared by the Town.  *See* Jt. Exh. 160(a) at pp. II-I-4, 5 (Response I5).

342.  Maris also served as the Town's traffic consultant on the LOSCO office building application located at the intersection of Knollwood Road, Dobbs Ferry Road and West Hartsdale Avenue.  *See* Pl. Exh. 149.  On the LOSCO site plan, Maris noted that it included drive aisle parking spaces, but commented only that "consideration should be given to eliminating *some* of the spaces closes to West Hartsdale Avenue in order to minimize the potential problems."  *See* Pl. Exh. 149 (enclosure at p. 2) (emphasis added).  Maris' position on Fortress Bible Church's application, however, was that all such parking spaces pose a hazard.  *See* Trial Tr. at 3300:5-2 (Maris).  The final approval for LOSCO permitted some parking spaces along the drive aisle, though it did eliminate the spaces closed to West Hartsdale Avenue.  *See* Pl. Exh. 78 at p. 5.

### b.  Sight Distance and Queuing

343.  At trial, the evidence established that neither sight distance (which was not raised by the Defendants until after the Town took over the FEIS process and no longer communicated with the applicant Church), nor queuing issues, exist in conjunction with the proposed Fortress Bible Church driveway on Dobbs Ferry Road.  Rather, sight distance is

adequate on an unsignalized driveway and queuing would not be a problem with an actuated, coordinated traffic signal.

## i.  Sight Distance

344.  The Town never raised sight distance to the Church as a potential traffic issue prior to it taking over preparation of the FEIS.  *See* Jt. Exh. 34 (sight distance is not an issue identified in the Scope).  Yet in the Findings Statement, the Town points to the site's sight distance as a safety issue that cannot be mitigated and a basis upon which to conclude that the proposed project may not go forward.

345.  Both the Church's and the Town's traffic consultants agree that sight distance is not an issue at a signalized driveway intersection.  *See* Trial Tr. at 724:10-17 (Grealy); Trial Tr. at 3359:15-18 (Maris).  Therefore, any purported issue involving sight distance would apply only to an unsignalized driveway.

346.  Traffic Consultant Grealy explained the types of sight distances, the ways in which they are measured and how safe distances are calculated.  *See* Trial Tr. at 719:12-720:1 (Grealy).  Safe stopping sight distance is the distance that a vehicle would travel on wet pavement at a certain speed before they would come to a stop, which varies based on the speed of the road. *See* Trial Tr. at 719:12-20, 722:16-21 (Grealy).  The appropriate calculations for determining safe sight distance recommendations are those set forth by the American Association of State Highway and Transportation Officials ("ASHTO").  *See* Trial Tr. at 719:21-723:19 (Grealy); Trial Tr. at 3304:5-14 (Maris).

347. Dobbs Ferry Road is a thirty mile per hour road.  *See* Trial Tr. at 722:22 (Grealy).

348. Under the appropriate ASHTO recommendations, two hundred feet of safe stopping sight distance and three hundred and thirty feet of intersection sight distance are required on a thirty mile per hour road. *See* Trial Tr. at 723:22-724:1 (Grealy).

349. The Church's traffic consultant personally measured that the sight distance is over four hundred feet, thereby confirming the existence of adequate sight distance. *See* Trial Tr. at 721:21-722:7, 724:8-9 (Grealy).

350. Police Chief Kapica agreed that adequate sight distance exists at the proposed driveway location. *See* Trial Tr. at 1994:11-20 (Kapica).

351. The Town's traffic consultant who objected to the Church's site plan on the basis of purportedly inadequate sight distance, not only failed to perform measurements himself, but also used the wrong speed limit in performing calculations under ASHTO. *See* Trial Tr. at 3358:8-3359:8 (Maris observed the driveway but did not take measurements); *see also* Trial Tr. at 3303:22-3304:4 (Maris) (Maris performed calculations using thirty-five miles per hour).

352. The proposed Fortress Bible Church driveway would be located directly across Dobbs Ferry Road from Spencer Court. *See* id. at 3406:2-4.  Thus, any purported issue concerning sight distance—especially safe stopping sight distance for cars traveling over the crest on Dobbs Ferry Road westbound toward the Sprain Brook Parkway—would also apply to cars stopped on Dobbs Ferry Road waiting to make the turn onto Spencer Court.  Yet, the Town does not prohibit such left turns. *See* Trial Tr. at 3360:2-6 (Maris).  The absence of a prohibition by the Town on left turns from Dobbs Ferry Road into Spencer Court demonstrates that the Town is not concerned about sight distance at that intersection.

353. Even if the Town considered the absence of such a prohibition to be problematic, Town Traffic Consultant Maris admitted that it is not the applicant's obligation to cure existing conditions. *See* Trial Tr. at 3406: 14-21.

354. Town Traffic Consultant Maris also admitted that a simple traffic safety device, such as a "Signal Ahead" sign, could be installed to alert motorists to the potential need to slow or stop. *See* Trial Tr. at 3359:9-14 (Maris).

355. Moreover, NYSDOT conceptually approved the location of the driveway without raising sight distance as a concern. *See* Jt. Exh. 8.

356. Thus, concerns regarding sight distance are a sham manufactured by Defendants for purposes of a negative Findings Statement.

## ii. Queuing

357. Town Traffic Consultant Maris stated that the Church's application cannot be mitigated because, without a traffic signal, sight distance is a safety issue and, with a traffic signal, queuing will occur and create a safety issue. *See* Jt. Exh. 163 at pp. 15-16; *see also* Trial Tr. at 3400:13-19 (Maris).

358. As set forth above, the Town's new traffic consultant's sight distance calculations—made in the absence of any measurements and based on the incorrect speed limit—are fatally flawed.

359. More egregious, however, is the fact that the Town's traffic consultant intentionally manipulated data in the analysis which appears in the FEIS prepared by the Town in order to make queuing results worse. This Court finds such actions were done to support a negative finding and assertion of a safety issue.

360. The Church's consultant performed detailed traffic analyses, including queuing analyses, using software recommended and used by NYSDOT. *See* Trial Tr. at 582:19-583:7 (Grealy); *see also* Jt. Exh. 11(c); Jt. Exh. 59; Jt. Exh. 69(a).

361. From the first discussion of a potential traffic signal at the Church's driveway, including those in 2000 with the Town's former Planning Commissioner, the Church proposed an actuated light which would be coordinated with an existing signal at the Sprain Brook Parkway ramp. *See* Jt. Exh. 16; Jt. Exh. 18; Jt. Exh. 11(c); Trial Tr. at 605:13-606:18 (Grealy).

362. Traffic Consultant Grealy testified that there are two types of signal operations: "actuated" and "pre-timed." Actuated means that the amount of green time at a traffic signal will adjust based on demand in a particular lane at a given time. *See* Trial Tr. at 605:13-24 (Grealy). Pre-timed means that the signal does not respond to traffic demand, but instead has cycles of set light intervals. *See* Trial Tr. at 605:25-606:6 (Grealy).

363. NYSDOT granted conceptual approval for installation of the traffic signal at Dobbs Ferry Road, as proposed by the Church. *See* Stipulated Fact No. 61.

364. NYSDOT required coordination with the existing signal. *See* Jt. Exh. 16.

365. The analyses performed by the Church's traffic consultant, Grealy, called for actuation of the signal at the proposed Church driveway. *See* Trial Tr. at 605:13-606:18 (Grealy); *see also* Trial Tr. at 3366:14-3368:4 (Maris).

366. Town Traffic Consultant Maris believed that NYSDOT likely would require that the traffic light at the intersection with the dedicated left turn lane proposed by the Church be actuated. *See* Trial Tr. at 3365:22-3366:6 (Maris).

367.  "Level of Service" is a measurement of the length of time that a vehicle would wait for a green light at a traffic signal.  *See* Trial Tr. at 562:7-18 (Grealy); Trial Tr. at 3349:15-3350:13 (Maris).

368.  With actuation, the Church's analysis shows that various Levels of Service would remain the same, or have negligible effects, if the Church developed the Pomander Drive property as proposed.  *See* Trial Tr. at 594:19-595:10; 610:25-612:25 (Grealy).

369.  The analysis set forth in the FEIS prepared by the Town, without input or consultation with the Church, changes the Churches proposal and data input from "actuated" to "pre-timed."  *See* Trial Tr. at 3315-3366 (Maris).

370.  At trial, Town Traffic Consultant Maris admitted that he changed the Church's proposal of an actuated, coordinated signal to a pre-timed signal, even though he believed that NYSDOT would have required that the light at that intersection be actuated.  *See* Trial Tr. at 3365:22-3366:10 (Maris).

371.  Maris has not offered any explanation for changing the type of signal.  *See* Trial Tr. at 3365:22-3366:10 (Maris).

372.  The only explanation for the change to the Church's proposal by Defendants from an actuated signal to a pre-timed signal is to show longer queues, thereby supporting a negative declaration.

### c.  The Town's Conclusion that Traffic Concerns Cannot Be Mitigated

373.  The Findings Statement adopted by the Town states: "The Lead Agency Finds that presently, there is no means to mitigate the adverse traffic impacts associated with the proposed project."  *See* Jt. Exh. 163 at p. 18.

374. The Lead Agency had a duty to identify potential mitigation measures for any adverse environmental impacts identified during the SEQRA process.  *See* Trial Tr. at 70:19-71:3 (Schiff); Trial Tr. at 1519:19-1521:4 (Turner); Trial Tr. at 2259:1-7 (Doneit).

375. The Town, however, failed to consider alternatives which might mitigate even the Town's manufactured traffic safety concerns.

### i.  Pomander Drive

376. The Church may use Pomander Drive as a means of access/egress as of right. Study of the use of Pomander Drive was required by the Town in the Scope adopted by the Town Board.  *See* Jt. Exh. 34.  The use of Pomander Drive was also studied as part of not one, but two alternatives in the DEIS.  *See* Jt. Exh. 59 (Alternatives D and E).

377. In an attempt to accommodate the Town and certain neighbors, the Church's proposed project utilized only Dobbs Ferry Road as a point of access/egress, rather than Pomander Drive as a sole or additional point of access/egress.  *See* Trial Tr. at 72:25-73:9 (Schiff).

378. However, the FEIS proposed by the Church noted that the Town could choose to use Pomander Drive for limited exit-only access during peak time periods.  *See* Jt. Exh. 69(a) at p. II-B-3 (Response B6); Jt. Exh. 69(a) at p. II-I-5(Response I6); Jt. Exh. 114 at p. II-I-6 (Response I6).

379. The Town never evaluated opening access to the site via Pomander Drive as a way to mitigate alleged traffic impacts.  *See* Trial Tr. at 1170:21-23, Trial Tr. at 1284:11-20, 1541:2-23 (Turner); Trial Tr. at 2160:16-20 (Bass); Trial Tr. at 2600:7-2601:4 (Barnes).  Town Planning Commissioner Stellato admitted that, although it Town discussed the possibility during preparation of the FEIS, the Town did not explore using pomander Drive as a mitigation

measure.  *See* Trial Tr. at 3233:3-19 (Stellato); *see also* Trial Tr. at 2159:17-23 (Bass) (Weinberg expressed to Bass that she did not want Pomander Driveto be used).

380.  The FEIS prepared by the Town after the Town took over the process, altered Responses B6 and I6 to eliminate the Church's reference to the use of Pomander Drive.

381.  The Town also eliminated reference to the use of Pomander Drive included by the Church in Response I6 of its proposed FEIS.  *Compare* Jt. Exh. 69(a) at p. II-I-5(Response I6) *with* Jt. Exh. 160(a) at p. II-I-6 (Response I6).

382.  The Town Board, as Lead Agency, could have adopted the use of Pomander Drive for alternative access, as  it was an alternative or addition included in the DEIS.  *See* Trial Tr. at 3071:19-3071:21 (Insardi).

383.  The Town Board, as Lead Agency under SEQRA, breached its duty by intentionally omitting consideration of a mitigation measure studied during SEQRA review.

### ii.  Other Alternatives

384.  Defendants did even consider off-site parking to alleviate any concern it had about the parking layout.  *See* Trial Tr. at 3384:12-16 (Maris).  Yet, the Town had approved off-site parking measures for other religious entities.  *See* Trial Tr. at 1998:14–1999:23 (Kapica); Trial Tr. at 2367:1-18 (Feiner); Trial Tr. at 2967:10-21 (Stellato).

385.  Defendants never considered limiting the occupancy capacity within the proposed church/school building as a means to reduce the number of vehicles parking, entering or exiting, and traveling on Dobbs Ferry Road.  However, Town Traffic Consultant Maris proposed such a capacity limitation on behalf of a religious entity he represented as applicant. *See* Trial Tr. at 3354:13-16 (Maris).

386.  The Findings Statement does not reference the Church's proposal to utilize parking monitors, traffic cones , and/or, if necessary, valet parking.  *See* Jt. Exh. 163.

387.  The Church offered to coordinate the times of its services with other religious organizations in the vicinity.  *See* Jt. Exh. 114 at pp. II-I-27, 28 (Response I41).  The Findings Statement asserts that "further analysis to determine if this will be effective and if it is feasible needs to be performed."  *See* Jt. Exh. 163 at p. 17.  Yet, Defendants took over the FEIS and did not perform such analysis.[10]

388.  Although Defendants' traffic consultant generated a parking layout which, in his estimation, provided acceptable internal circulation, Defendants did not include that alternative in their FEIS.  *See* Trial Tr. at 3398:8-3400:1 (Maris).

### m.  Evidence of the Town's Hostility

389.  In addition to the conduct of Defendants described in the foregoing Findings of Fact, the following actions and omissions serve as further evidence of the Defendants' discrimination against Plaintiffs and of Defendants' intent to prevent the building of the Fortress Bible Church project.

---

[10] The Town's statement in the Findings Statement seemingly conflicts with the Town's own FEIS, which itself edited a response included in the Church's proposed EIS.  In Comment I-38 of the Town's FEIS, the Town included a comment from Supervisor Feiner as follows:  "Will the Fortress Bible School or has the Fortress Bible School connected with all the other churches in the area to be sure that their events do not conflict?" as well as a comment from another member of the public who noted that Solomon Schechter had coordinated its schedule with other schools.  *See* Jt. Exh. 160(a) at pp. II-I-24, 25 (Comment I38).  The response in the Town's FEIS states that "[t]he Applicant would coordinate schedules with other religious institutions in the area." *See* id. (Response I38).  It does not include any reference to a requirement for further analysis as the Town requires in its Findings Statement.  *See* Jt. Exh. 160(a) (Response I38) at pp. II-I-24, 25.  Supervisor Feiner's comment appears in the Church's proposed FEIS with the following response from the Church "The church is receptive to coordinating schedules with other religious institutions and schools in the area and has initiated contacts to that end."  *See* Jt. Exh. 114 at p. II-I-27, 28 (Response I41) (emphasis added).  The Town eliminated reference to the Church taking steps to analyze and, in fact, effectuate the offer to coordinate schedules which belies the assertion in the Findings Statement.

### 1.  Meetings Between the Town and the Church

#### a.  The Town's Usual and Customary Practice of Meetings and Discussions

390. During review of land use applications, it is customary—particularly in municipalities in Westchester County and surrounding areas—for applicants to meet with the planning consultants for the municipality to discuss pending issues.  *See* Trial Tr. at 155:5-8 (Schiff); Dep. Tr. at 94:13-19 (Bass).  It is the normal and customary practice in the Town of Greenburgh for land use applicants to meet with Town planning representatives throughout the SEQRA process.  *See* Trial Tr. at 2210:21-2211:6 (Doneit); Trial Tr. at 351:12-14 (Lachenauer); Trial Tr. at 1312:3-13 (Turner); Trial Tr. at 1010:11-23 (Saccardi); Dep. Tr. at 84:10-85:14 (Juettner); Dep. Tr. at 101:21-25 (Stellato).

391. At various times throughout the SEQRA review process, certain Town Board planning consultants believed that a meeting with the Church's consultants would be appropriate. *See* Trial Tr. at 2186:2-5 (Doneit); Trial Tr. at 1314:7-11 (Turner).

392. The Town's planning consultant suggested to the Town that the Town's consultants should meet with the Church.  *See* Stipulated Fact No. 50.

#### b.  The Town Refuses to Meet with the Church

393. The Town's consultants were instructed not to meet with the planning consultants representing the Church.  *See* Trial Tr. at 2185:20-2186:1 (Doneit); Dep. Tr. at 46:25-47:18 (Doneit).

394. Town Planning Commissioner Stellato was instructed by the Town Attorney to refrain from meeting with consultants representing the Church.  *See* Trial Tr. at 2892:13-2893:1

(Stellato); Dep. Tr. at 101:8-13 (Stellato).   Stellato disagreed with this direction, but, nevertheless followed it.  *See* Dep. Tr. at 102:24-103:8.

395.  After April 2002, consultants for the Town Board never met with the Church's consultants.  *See* Trial Tr. at 149:4-7 (Schiff), Trial Tr. at 1366:17-18 (Turner); Trial Tr. at 2743:18-19 (Loyst); Trial Tr. at 3333:20-3334:2 (Maris); Dep. Tr. Vol. 2 at 141:2-6 (Insardi).

396. Councilwoman Barnes admitted that, to the extent that the Town denied Plaintiffs' repeated requests to meet with the Town's consultants to discuss the Church's land use application, the Defendants' assertion in the Findings Statement that "every effort has been made to accommodate Plaintiffs' proposed action" is not accurate.  *See* Dep. Tr. at 74:8-75:6 (Barnes).

## 2.   Dual Engineering Review

397.  The Town's hydrology and engineering consultant, Lachenauer, previously was employed by the Town of Greenburgh in the Town's Engineering Department.  *See* Trial Tr. at 328:15-19 (Lachenauer).  He subsequently was employed for approximately eighteen years by the firm of Dolph Rotfeld Engineering, P.C., providing hydrology and stormwater services to both private sector and municipal clients.   *See* Trial Tr. at 325:25-326:15 (Lachenauer). Lachenauer stated that he had never before been involved in an application in which both the Town's in-house engineering staff and an outside consultant hired by the Town issued comments on the stormwater analysis in an application. *See* Trial Tr. at 497:1-8 (Lachenauer).

398. On the Fortress Bible Church application, however, both the in-house engineering staff, as well as the outside consultant, FPM Group, issued comments.  *See* Jt. Exh. 10; Trial Tr. at 487:17-488:8 (Lachenauer).

## 3.   Town Attorneys' Involvement

399.  During the Town's SEQRA review of the Fortress Bible Church project, Susan Mancuso served as Town Attorney for the Town of Greenburgh.  *See* Trial Tr. at 2552:17-21(Feiner).

400.  Based on minutes Defendants produced of town meetings, Town Attorney Mancuso and Deputy Town Attorney Insardi attended nearly every meeting concerning Fortress Bible Church's application.  *See* Pl. Exh. 106; Pl. Exh. 107; Pl. Exh. 108; Pl. Exh. 109; Pl. Exh. 110; Pl. Exh. 111; Pl. Exh. 112; Pl. Exh. 113; Jt. Exh. 76.

401.  Town Consultant Loyst testified at trial that references to the "Town" referred to the Town Board, references to "legal" referred to Town Attorney Mancuso or Deputy Town Attorney Insardi, and references to the "Planning Board" referred to the Town Board as Lead Agency.  *See* Trial Tr. at 2781:6-14 (Loyst).

402.  Deputy Town Attorney Insardi testified that she became the principal contact in the Town Attorney's Office for the Town's consultants in February 2003, such that all correspondence went through her.  *See* Trial Tr. at 3096:19-3098:13 (Insardi).  Previously, Town Planning Commissioner Stellato had been the contact.  *See id.* at 3096:25-3097:1.

403.  Town Consultant Loyst noted that in meeting minutes that, during a March 14, 2003 meeting, the consultants were told that the Town wanted to "scale back" the proposed project, for example, by incorporating on-site changes rather than widening the roads.  *See* Pl. Exh. 107 at p. 2.

404.  Pursuant to meeting minutes dated April 15, 2003, Deputy Town Attorney Insardi rejected alternate plans developed by Town Traffic Consultant Maris because she wanted to "stay within the original configuration" of the Church's proposal.  *See* Pl. Exh. 108.  Maris revised his proposed plans per instructions from Insardi.  *See id.*

405. At a May 13, 2003, Town staff meeting, the Town's planning consultant disseminated an unidentified document (referred to in the meeting notes as "memo to review"), which was then retrieved because, according to the meeting minutes, "everything needs to be addressed and go through Greenburgh legal." *See* Pl. Exh. 110.

406. At the same meeting, according to the minutes, reference was made to a letter which had been transmitted on April 18, 2003, from Town Traffic Consultant Maris to Deputy Town Attorney Insardi "with some conclusions." *See* Pl. Exh. 110.

407. In the same meeting minutes, Town Consultant Loyst also noted certain directions given by Deputy Town Attorney Insardi concerning issues he should analyze, including "how Hackley relates to Fortress Bible with respect to amount of steep slopes disturbed." *See* Pl. Exh. 110.

408. In July 7, 2003, meeting minutes, Loyst noted that "Susan [Mancuso] would talk to the Town Board and give them an update and fill them in on the likely project outcomes to get their feedback." *See* Pl. Exh. 111.

409. Minute notes from the July 14, 2003, meeting further confirm the involvement of Town Attorneys Mancuso and Insardi:

- Susan stated that the Town Board had a work session last Tuesday and they do not feel the project will work for that site. They are aware of the Pomander Drive risk (i.e., applicant coming back with proposal for Pomander Drive access through residential neighborhood).

- Legal stated that technically we have to try and accommodate the use . . . .

- The Town's position is that they have hosted a number of these uses, therefore they are not discriminating, but feel that there are too many churches too close together at this point . . . .

 . . . .

110

- In the Introduction section, Janet wants Turner to delete the self-serving information.

*See* Pl. Exh. 112.

410.  In September 11, 2003, meeting minutes, Town Consultant Loyst noted that the draft FEIS prepared by the Town would be revised to incorporate comments from the Town Attorney's office.  *See* Pl. Exh. 113.

411.  Town Attorney Mancuso informed Town Planning Commissioner Stellato that Deputy Town Attorney Insardi, not he, would "run the show."  *See* Trial Tr. at 3169:23-3170:1 (Stellato); Dep. Tr. at 97:18-21 (Stellato).  Stellato admitted that Insardi's involvement was "significant" even before he was given Mancuso's instruction.  *See* Trial Tr. at 3169:17-18 (Stellato).

412.  As Deputy Town Attorney for the Town of Greenburgh, Insardi was hired to serve as counsel to the Town's Planning Board.  *See* Trial Tr. at 2999:5-14 (Insardi); Dep. Tr. Vol. 2 at 33:17-19 (Insardi).

413.  The Town Board's planning consultants testified that Deputy Town Attorney Insardi essentially dominated the SEQRA review process and controlled their evaluations of the Church's land use application.  *See* Trial Tr. at 1158:12-1160:2 (Turner); Trial Tr. at 2253:1-2254:18 (Doneit); Trial Tr. at 3169:11-3171:25 (Stellato); Trial Tr. at 3343:10-16, 3399:17-3400:1 (Maris).

414.  Insardi is not a professional planner, engineer or traffic expert and has no specialized training in these areas.

415.  This was a highly unusual role for a municipal attorney.  *See* Trial Tr. at 1158:25-1159:11 (Turner).  The Town Board's planning consultants believed that Insardi was

acting more like a planner than an attorney.  *See* Trial Tr. at 2254:6-18 (Doneit); Dep. Tr. at 114:24-116:10 (Doneit).

416.  Deputy Town Attorney Insardi's substantive revisions to the work of the Town Board's planning consultants were detrimental to the Church's application.  For example, in a draft memorandum dated October 17, 2002, prepared by Town Planning Consultant Turner, Insardi made substantive revisions to text and eliminated language by which Turner stated his willingness to meet with the Church to discuss its pending application.  *See* Jt. Exh. 108; Trial Tr. at 3105:21, 3106:18-3108:3 (Insardi); Dep. Tr. Vol. 2 at 79:3-14 (Insardi);  Dep. Tr. at 43:10-45:14 (Doneit).  At trial, she attempted to justify the edits as making Turner's memo "complete and comprehensive."  *See* Trial Tr. at 3107:17-20 (Insardi).

417.  Insardi also revised the October 17, 2002, memorandum to delete the statements that "We believe that a number of our original comments have been adequately addressed by the Applicant and have been left out of this memo," and "impacts on the land discussed by the Applicant do not appear to be as great as suggested."  *See* Jt. Exh. 108; Trial Tr. at 3104:2-6 (Insardi); Dep. Tr. Vol. 2 at 83:15-24 (Insardi).  At trial, she again attempted to justify these edits as making the memo "complete and comprehensive."  *See* Trial Tr. at 3104:7-9 (Insardi).

418.  Deputy Town Attorney Insardi admitted that Town Planning Consultant Turner's October 22, 2002, comment memorandum had been "substantially edited" from its original July 28, 2002, version, which had not been marked "draft."  *See* Dep. Tr. Vol. 2 at 88:17-25 (Insardi); *see also* Jt. Exh. 90; Jt. Exh. 111.

419.  The Town never provided Turner's original July 28, 2002, memorandum to the Church.  *See* Trial Tr. at 182:5-12, 184:15-17 (Schiff).

112

420. In an October 17, 2002, letter to the Town, Town Consultant FPM Group advised the Town that it did not have information regarding potential flooding of Sprain Brook Parkway entrance ramp near Plaintiffs' property.  *See* Jt. Exh. 109 (enclosure).

421.  However, Deputy Town Attorney Insardi admitted that not only did FPM Group visit the site during a rain event prior to October 17, 2002, and have information which indicated that no such flooding occurred, but that she was aware of that visit before she reviewed a draft of and authorized transmission to the Church of the October 17 letter.  *See* Pl. Exh. 93 (handwritten note from Insardi to Mancuso); Trial Tr. at 2748:14-25 (Loyst); Trial Tr. at 3112:9-3113:1, 12-24 (Insardi); Dep. Tr. Vol. 2 at 92:23-97:11 (Insardi).

422. During an April 15, 2003, meeting with the Town and its consultants, Town Attorneys Mancuso and Insardi requested that the Town's planning consultants research how the introduction of religious uses in the neighborhood could potentially affect surrounding property values.  *See* Pl. Exh. 126; Trial Tr. at 2224:11-15 (Doneit); Dep. Tr. at 67:2-68:9 (Doneit).

423. The Scope adopted by the Town Board did not include potential effects on property values as an issue to be investigated.  *See* Jt. Exh. 34.

424. Town Planning Consultant Doneit researched the issue and found information indicating that the introduction of a church use tends to *increase* property values in the surrounding neighborhood.  *See* Trial Tr. at 2224:16-24 (Doneit); Dep. Tr. at 68:7-69:5 (Doneit).

425. Doneit's research findings were not included in the FEIS or the Findings Statement adopted by the Town, even though he conveyed them to Town Planning Commissioner Stellato and the Town's consultants.  *See* Trial Tr. at 2224:25-2225:13 (Doneit); Dep. Tr. 69:2-8 (Doneit).

426.  Deputy Town Attorney Insardi directed Town Planning Consultant Turner to delete "self-serving information" from the FEIS submitted by Plaintiffs.  *See* Trial Tr. at 1287:13-1288:9 (Turner).

427.  Insardi never spoke to Town Building Inspector Lucido regarding the Fortress Bible Church project.  *See* Trial Tr. at 3123:19-23 (Insardi); Dep. Tr. Vol. 2 at 119:23-25 (Insardi).

428.  Insardi never spoke to Police Chief Kapica regarding the Fortress Bible Church project, except at a March 2002 meeting.  *See* Trial Tr. at 3123:24-3124:1 (Insardi); Dep. Tr. Vol. 2 at 156:16-157:5 (Insardi).

429.  Insardi never spoke with Fire Chief Mauro regarding the Fortress Bible Church project.  *See* Trial Tr. at 3124:2-4 (Insardi).

430.  During her deposition, Deputy Town Attorney Insardi testified:

Q.    What was the purpose of your review?

A.    Again, as I said, clarity, make sure it's English, make sure it's understandable.  A lot of times engineers, traffic engineers, they—it's difficult to understand what they are saying.

Q.    Make sure it's accurate?

A.    Well, accuracy is tough, because to some extent I don't have the expertise that they have, so if they are talking about something that is a—you know, a term of art or—I might question it, put a question mark, what does this mean, or—but it may be something like, you know, if you and I are using Latin phrases that nobody knows what we are talking about but it's understandable to a lawyer.

Q.    But if you're aware of something that was inaccurate, and was within your knowledge, you would correct it?

A.    Yes, but as an attorney, I only had a grasp on—a general grasp on things.

*See* Dep.Tr. Vol. 2 at 95:3-20 (Insardi).

431.  However, Deputy Town Attorney Insardi admitted that when a reference to the Greenburgh Town Code appeared in the FEIS, she did not review the Town Code to ensure that the reference was indeed correct.  *See* Trial Tr. at 3118:24-3119:2 (Insardi).

### 4.   Consideration of Revoking the Church's Tax Exempt Status

432.  Gerry Iagallo was Town Assessor while the Fortress Bible Church application was pending, and had been the Town Assessor for the Town of Greenburgh for twenty-three years.  *See* Trial Tr. at 2480:22-2481:7 (Feiner); Dep. Tr. at 6:18-23 (Iagallo).

433.  In his capacity as Town Assessor, Iagallo maintains an exemption file on the Fortress Bible Church property that contains information on the Church's application for a tax exemption from the Town of Greenburgh, based upon the Church's contention that they are a not-for-profit religious organization and that the contemplated use of its property is consistent with a nonprofit use.  *See* Dep. Tr. at 10:12-11:15 (Iagallo).

434.  In June 2003, the Town Assessor considered whether to revoke Fortress Bible's tax-exempt status because the contemplated use of the property was purportedly uncertain.  *See* Jt. Exh. 146; Pl. Exh.  92.

435.  In April 2003, for the first time since the Church purchased the Pomander Drive property, Town Assessor Iagallo requested certain information from Town Planning Commissioner Stellato regarding the Fortress Bible application, as he believed "it was not apparent that this property fulfilled its obligation that the property was being used for a not-for-profit purpose."  *See* Dep. Tr. at 16:9-19:8 (Iagallo).

436.  Town Assessor Iagallo also served as a "Special Assistant" to Supervisor Feiner.  *See* Trial Tr. at 2481:8-10 (Feiner); Dep. Tr. at 48:21-23 (Iagallo).

437. In a June 12, 2003, e-mail to the Town Attorney, Iagallo stated that, with respect to the Fortress Bible project, "[t]he contemplated use is very uncertain."  *See* Jt. Exh. 146.

438.  Iagallo received a June 17, 2003, e-mail response from Town Attorney Mancuso stating: "In light of the lawsuit . . . it could possibly add more fuel to this dispute if the Town were to at this point in time yank the Church's exemption."  *See* Jt. Exh. 146.

439.  Thereafter, Town Assessor Iagallo made a determination to grant the Church's tax exempt status.

440.  Although Iagallo claimed he had considered revoking the tax exempt status on properties belonging to other religious institutions, during his deposition he was not able to identify a single other religious institution where this was considered.  *See* Dep. Tr. at 44:16-47:5 (Iagallo).

### n.   The Town's Treatment of Comparable Applicants

#### i.   Comparative Non-Religious Assemblies and Institutions

##### 1.   LOSCO Commercial Office Building

###### a.   Nature of the Application

441. The LOSCO application was submitted by a commercial entity, LDC Properties, Inc., for construction of an 18,180 square foot two-story office building at the intersection of West Hartsdale Avenue/Dobbs Ferry Road/Knollwood Road.  *See* Pl. Exh. 72; Pl. Exh. 78.

442.  The LOSCO application is relevant because (i) Town Planning Commissioner Stellato, Traffic Consultant Maris, and Deputy Town Attorney Insardi were all involved in the review and processing of both the LOSCO and Fortress Bible Church applications; (ii) the Dobbs

Ferry Road/West Hartsdale Avenue intersection was reviewed during both projects, but resulted in different treatment; (iii) the same traffic engineer, John Collins Engineering, consulted on both projects.  *See* Pl. Exh. 77; Pl. Exh. 78.

443.  Town Planning Commissioner Stellato admitted at trial that the Fortress Bible Church application was treated differently from LOSCO in several ways:

  i.  The Town met with the LOSCO applicant while the Town refused to meet with the Church's representatives;

  ii.  The Town accepted parking spaces located on the drive aisle for LOSCO but did not accept the parking spaces located on the drive aisle for Fortress;

  iii.  The Town required certain improvements to the West Hartsdale/Dobbs Ferry Road intersection to be performed by Fortress Bible Church, but did not require these improvements by the LOSCO applicant.

*See* Trial Tr. at 3200:19-24, 3201:4-7, 3203:1-10 (Stellato).

444.  The LOSCO traffic analysis assessed traffic patterns as though the Fortress Bible Church project had been completed already.  *See* Trial Tr. at 540:11-20 (Grealy); Trial Tr. at 3379:19-23 (Maris).

445.  The proposed LOSCO office building is located less than one mile from Fortress Bible Church's Pomander Drive property.  *See* Pl. Exh. 14.

### b.  Dobbs Ferry Road/West Hartsdale Avenue Intersection

446.  The intersection of Dobbs Ferry Road and West Hartsdale Avenue was studied as part of the Fortress Bible Church EIS and during the Town's review of the LOSCO project. *See* Trial Tr. at 3193:2-9 (Stellato); Trial Tr. at 3379:8-15 (Maris).  The traffic analysis for the

LOSCO project included an analysis of the West Hartsdale Avenue/Dobbs Ferry Road intersection, assuming the presence of traffic generated by the proposed Fortress Bible Church project—*i.e.* assuming that the Church's project had been completed. *See* Trial Tr. at 540:11-20 (Grealy); Trial Tr. at 3379:19-23(Maris).

447. Deputy Town Attorney Insardi observed, with regard to the LOSCO application: "Note that the traffic impacts at this intersection (one of the worst in the Town) are probably not small to moderate." *See* Pl. Exh. 77.

448. In its review of the LOSCO application, the Town of Greenburgh Police Department noted that the Police Department had a concern regarding the flow of traffic at an already heavily traveled intersection. *See* Pl. Exh. 74.

449. Yet, the Town issued a Conditioned Negative Declaration of Significance on LOSCO. *See* Pl. Exh. 78.

450. Town Traffic Consultant Maris acknowledged that the LOSCO traffic study included in its study the "no build" and the "build" conditions as though the proposed Fortress Bible Church project had been completed and was generating traffic. *See* Trial Tr. at 3379:19-23 (Maris). Town Traffic Consultant Maris and the Town required that the Fortress Bible Church, but not LOSCO, make improvements to the intersection. *See* Trial Tr. at 3379:24-3380:23 (Maris).

451. Maris further agreed that the traffic problems that he required to be mitigated by the Church, which he categorized as needing to be "eliminate[ed]" on Fortress Bible Church project, existed for both projects. *See* Trial Tr. at 3380:4-20 (Maris). However, only the Church was required to perform the remediation measures. *See* Trial Tr. at 3381:3-9 (Maris).

452.  The Town did not require any improvements to the Dobbs Ferry Road/Hartsdale Avenue intersection as part of the LOSCO project.  *See* Tr. at 3199:6-10 (Stellato).

453.  No explanation was offered by Defendants for their different treatment of Fortress Bible Church.

### c.  Drive Aisle Spaces

454.  The approved LOSCO site plan included parking spaces perpendicular to the travel aisle.  *See* Pl. Exh. 78 at p. 5.  The Town, however, had objected to Fortress Bible locating parking spaces along its drive aisle.  *See* Trial Tr. at 3179:15-3180:3, 3199:11-15 (Stellato).

### d.  The Town's Own Comparison

455.  On November 1, 2004, Deputy Town Attorney Insardi advised Town Planning Commissioner Stellato by e-mail:

> Just a reminder.  Given the traffic issues, and the comparisons that may be drawn between Fortress Bible and L[OSCO] because of their geographic proximity, please be careful and conscious of potential issues in drafting the part 2 and the determination of significance.  I do not know whether you spoke to Mike Maris about this or compared accident data but perhaps you should. Remember that they have the same traffic consultant and be wary.

*See* Pl. Exh. 76.

### e.  Conditioned Negative Declaration

456.  On December 16, 2004, the Town adopted a Conditioned Negative Declaration. *See* Pl. Exh. 78.

457.  In adopting the Conditioned Negative Declaration, the Town determined that the LOSCO project would not have a significant effect on the environment and a DEIS would not be required.  *See* Pl. Exh. 78.

458.  In the Conditioned Negative Declaration, the Town concluded that "[b]ased on the five-year accident data, it does not appear that there is an unusual condition in the area

causing accidents, since most of the accidents were due to human error.  In addition, the number

of accidents is not considered high for traffic on these roadways."  *See* Pl. Exh. 78.

459.  When it adopted the Conditioned Negative Declaration, the Planning Board did

not require any LOSCO to make any improvements to the West Hartsdale Avenue/Dobbs Ferry

Road intersection.  *See* Trial Tr. at 3199:6-10 (Stellato).

460.  For the Fortress Bible Church application, however, the Town concluded:

> Analyses of the West Hartsdale Avenue and Hartsdale Road
> intersections with Dobbs Ferry Road show that signal-timing
> changes alone would not eliminate the traffic problems and that
> roadway widening would be necessary.

*See* Jt. Exh. 163 at p. 16.

## 2.  The Hackley School

### a.  Nature of Application

461.  The Hackley School is situated on approximately 285 acres of land, which is

located mostly in the Town of Greenburgh.  *See* Pl. Exh. 49.

462.  The Hackley School site consists of a rear portion purchased from the

Rockefeller family which is improved only by a football field. The front portion of the site is the

original Hackley campus where buildings are located and around which a loop road runs.  *See*

Trial Tr. at 1035:9-15 (Saccardi).

463.  The existing school was 28,660 square feet.  *See* Pl. Exh. 49 at p. 8.

464.  The neighborhood surrounding the Hackley School is surrounded by mixed

uses, including a church, restaurant, single family residential development, condominium,

laboratory facility, and the Saw Mill River Parkway.  *See* Trial Tr. at 1007:10-18 (Saccardi).

465.  The Hackley School submitted an application for amended site plan approval on

February 13, 2001.  *See* Pl. Exh. 49 at p. 1.

466.  The proposed (and eventually approved) project provided for a net increase of more than 45,000 square feet of new buildings, more than doubling the school.  Total development in connection with the project amounted to approximately 75,000 square feet on the site.  *See* Pl. Exh. 49 at pp. 7-8.

467.  The development involved in construction of the Hackley School expansion project included new roads, parking facilities, storm water drainage infrastructures, and four new buildings.  *See* Pl. Exh. 49 at pp. 5-10.

468.  The back portion of the Hackley School property is forested and has more gently rolling terrain than the front portion (where existing buildings are located and a new building and expansion were proposed in the land use application).  *See* Trial Tr. at 1039:5-20 (Saccardi).

469.  The Hackley School application—which was approved shortly before adoption of a steep slope ordinance by the Town of Greenburgh—involved 45,000 square feet of new space.  *See* Trial Tr. at 1040:1-6 (Saccardi).  Subsequently, a second phase was approved by the Town of Greenburgh for 30,000 square feet of additional new space.  *See* Trial Tr. at 1040:6-8 (Saccardi).

470.  The Town Board acted as Lead Agency on the Hackley School application.  *See* Trial Tr. at 1006:6-7 (Saccardi).

471.  Deputy Town Attorney Insardi was involved in processing the Hackley School application.  *See* Trial Tr. at 3059:8-14 (Insardi); *Dep Tr. Vol. 2 at 34:25-36:7 (Insardi)*.  She described the application as "an expansion of an existing educational institution."  *See* id at 35:10-11.

472.  Maris was the Town's traffic consultant and Phillips was the Town's hydrology and engineering consultant on the Hackley School project.  Both also reviewed the Fortress Bible Church project.

473.  Saccardi & Schiff was the environmental planner for Hackley School on its master plan, including "generic" SEQRA review of the master plan and site specific review for the initial stages of development.  *See* Trial Tr. at 1000:17-25 (Saccardi).  Saccardi & Schiff has provided services to Hackley School from the year 2000 through at least the time of trial.  *See* Trial Tr. at 1001:10-13 (Saccardi).

### b.  Expedited Review

474.  The land use application for the Hackley School expansion project was completed—from initial application to issuance of a written Findings Statement by the Town Board—in less than two and one-half years.  *See* Trial Tr. at 1006:13-16 (Saccardi).

475.  Church Planning Consultant Saccardi testified that, in his experience handling applications in the Town of Greenburgh, the Hackley School application was processed very quickly, especially toward the end of the process.  *See* Trial Tr. at 1011:5-13 (Saccardi).

476.  In response to an e-mail from the Headmaster of the Hackley School, Supervisor Feiner asked Town Planning Commissioner Stellato and Town Attorney Mancuso to follow up on a request seeking "help in expediting Hackley's approval process."  *See* Pl. Exh. 47.

477.  Despite concerns expressed to him by Town Planning Commissioner Stellato that "it looks bad if the [T]own [B]oard approves a major decision before having a chance to digest it," Supervisor Feiner told the then-Town Attorney that he believed the decision of the Town Board would be "unanimous."  *See* Pl. Exh. 48.  Supervisor Feiner e-mailed the Headmaster of the Hackley School, and copied Town Planning Commissioner Stellato and the

then-Town Attorney, to support holding a vote on the Hackley School application only one day after receiving papers on the application. *See* Pl. Exh. 48.

478. Supervisor Feiner asked a consultant to expedite review of the Hackley School land use application. *See* Jt. Exh. 128; Dep. Tr. at 74:23-76:2 (Stellato). He obviously did not do so for the Fortress Bible Church application. In fact, he threatened to have the Church's application "take its time."

479. In contrast to the Fortress Bible Church application, during the Greenburgh Town Board SEQRA review of the Hackley School expansion project, the Hackley School's planning consultants had several meetings with Town representatives concerning the Hackley School land use application. *See* Trial Tr. at 1010:11-14 (Saccardi). These meetings included meetings with Town staff at the site. *See* id. at 1010:15-17. Meetings were held throughout the land use approval process. *See* id. at 1010:21-23.

480. There was community opposition from the Village of Tarrytown to the Hackley School application based on objections to an access road exiting to a residential neighborhood. *See* Trial Tr. at 1006:17-25 (Saccardi).

481. The Town Board, as Lead Agency, referred the Hackley School's application to the Planning Board for a report and recommendation on site plan approval. *See* Trial Tr. at 3059:11-14 (Insardi); Dep. Tr. Vol. 2 at 35:16-36:3 (Insardi).

### c. Steep Slope Ordinance

482. At the time the Hackley School submitted its application, the Town of Greenburgh did not have a steep slope ordinance. *See* Trial Tr. at 1005:13-15 (Saccardi).

483. The Hackley School application, which was approved by the Town Board, required construction on steep slopes. *See* Trial Tr. at 1005:6-9 (Saccardi).

484. The Hackley School expansion project presented issues concerning wetlands. *See* Pl. Exh. 49 at pp. 24-26.

485. One and one-half acres of land affected by the Hackley School project site is categorized as steep slopes in excess of twenty-five percent.  *See* Pl. Exh. 49 at p. 20. Approximately one-third of the project's square footage would be in the steep slope areas.  *See* Trial Tr. at 1007:8-9 (Saccardi).

486. Deputy Town Attorney Insardi described the Hackley School property as a "steeply sloped site."  *See* Dep. Tr.  Vol. 2 at 36:20 (Insardi).

487. The Town was considering a steep slope ordinance during the pendency of the Hackley School application.  *See* Trial Tr. at 1005:16-18 (Saccardi).

488. On May 6, 2003, the Hackley School was granted a waiver from the Town's moratorium in connection with development on steep slopes and wetlands.  *See* Trial Tr. at 1004:11-21 (Saccardi).

489. The Town Board expedited review of the Hackley School application, adopted a Findings Statement, and granted site plan approval to the Hackley School on June 17, 2003— eight days prior to adoption of the Town's steep slope ordinance.  *See* Stipulated Fact No. 38; Pl. Exh. 50.

490. Because the Town Board granted Hackley School approval of its application prior to enactment of the Town's steep slope ordinance, Hackley School was not required to comply with such ordinance for the first phase of its development, though it was for the second phase. *See* Trial Tr. at 1005:24-1006:5 (Saccardi).

491.  The open space preserved by the Hackley School was not for the benefit of the community; rather, it is for private use by the school, its students and faculty.  *See* Trial Tr. at 1040:19-1041:2 (Saccardi).

### d.  Retaining Walls

492.  Although both the Fortress Bible Church and the Hackley School projects include retaining walls, the Town's treatment of the proposals for both projects for the retaining walls was different.

493.  In the Hackley School Findings Statement, there is no discussion of retaining walls.  *See* Pl. Exh. 49.  In the Fortress Bible Church Findings Statement, there is extensive discussion of such walls, and the height and length of the walls are offered as reasons justifying denial.  *See* Jt. Exh. 163.

494.  At least one of the retaining walls on the Hackley School project is fifteen to twenty feet high.  *See* Trial Tr. at 1008:9-19 (Saccardi).

495.  The total linear distance of retaining walls on the Hackley School project was more than one thousand feet.  *See* Trial Tr. at 1012:1-4 (Saccardi).

496.  Despite the height and linear feet of retaining walls proposed in the Hackley School application, the Town Board did not raise any potential safety issues relating to the school's proposed retaining walls.  *See* Trial Tr. at 1009:4-7 (Saccardi).

497.  The Church's Findings Statement by the Town Board (and signed by Supervisor Feiner) cites the presence of retaining walls as a significant safety issue.  However, when confronted with the fact that the Hackley School application included significant retaining walls and yet the Town Board never raised the issue of safety of such walls, Supervisor Feiner attempted to minimize the retaining wall issue, alleging that on Fortress Bible Church, the

retaining walls raised only a minor issue that could be "solved."   *See* Trial Tr. at 2390:15-2391:13 (Feiner).   Such an assertion was in direct contravention of the Findings Statement he previously signed.

### e.   Drive Aisle Spaces

498.   Both the Fortress Bible Church and the Hackley School projects have parking spaces located on the drive aisle.   Defendants objected to the Church's use of drive aisle spaces, but did not object to the same type of parking at the Hackley School.

499.   At different locations throughout the Hackley School campus there are parking spaces that are perpendicular to the loop road such that cars must back out of the spaces onto the road.   *See* Trial Tr. at 1007:22-1008:5 (Saccardi).

### f.   Police Services

500.   Police Chief Kapica testified that the Hackley School, which is larger than Fortress Bible Church, itself has a *de minimus* impact on his department's ability to provide police services to the community.   *See* Dep. Tr. at 80:9-18 (Kapica).

### 3.   Avalon Green II

501.   Consideration of the Avalon Green II project is of assistance in evaluating the Town Board's conduct in assuming preparation of the Fortress Bible FEIS.

502.   Consultants from both the Town and the Church admitted it is unusual for a Town to take over preparation of a FEIS.   *See* Trial Tr. at 173:13-16 (Schiff); Trial Tr. at 694:13-695:5 (Grealy);   Trial Tr. at 1110:12-1111:3 (Turner);   Trial Tr. at 3383:6-23 (Maris). Defendants, however, argued that the Town had previously assumed preparation of a FEIS from an application, citing the Avalon Green II project as an example.   However, the Town's

126

assumption of preparation of the FEIS on Avalon Green did not occur until Autumn 2004, and Defendants' conduct differed dramatically.

503. Moreover, an examination of Defendants' disparate conduct actually supports Plaintiffs' claims of unequal treatment and discrimination.

### a.  Nature of the Application

504. Avalon Green is a multi-family townhouse development proposed in the Town of Greenburgh, located off of Taxter Road.  *See* Pl. Exh. 146 at p. 1.  It required preparation of an EIS and, unlike Fortress Bible Church, a special permit.  *See* id.  The Town Board was the Lead Agency and also had approval authority for issuance of the site plan and the special permit. *See* id.; Trial Tr. at 2943:22-24 (Stellato).

### b.  The Town's Role

505. Unlike when the Town assumed control of preparation of the FEIS from Fortress Bible Church, *see* Jt. Exh. 138, the Town did not adopt a resolution whereby the Town Board determined to assume preparation of the Avalon Green FEIS application.  *See* Tr. at 2944:3-7 (Stellato).

506. After the Town took over preparation of the Avalon Green FEIS, the Defendants did not eliminate all contact with, or involvement by, the applicant.  Rather, Defendants reviewed drafts of the FEIS with Avalon Green.  *See* Trial Tr. at 2951:21-2952:19 (Stellato).

507. Upon cross-examination, Town Planning Commissioner Stellato admitted the Town treated the Church differently than it had the Avalon Green applicant in several significant respects:

i.   The Town Board adopted a formal resolution to take over the FEIS on the Fortress Bible Church project, but did not do so for Avalon Green.

ii.  The Town met with the Avalon Green representatives after the Town took over the FEIS, while no such meetings were held with Fortress Bible Church.

iii. The Town reviewed drafts of the revised FEIS with the Avalon Green representatives, while it did not review drafts with the Fortress Bible Church representatives.

iv.  The Town's processing of the Avalon Green application was different than the Town's processing of the Fortress Bible Church application.

*See* Trial Tr. at 2962:15-2964:5 (Stellato).

508.  The Town's theory of the "threat of litigation" as a rationale for refusing to meet with the Church was fabricated for purposes of trial and did not exist at the time the Town considered the Church's application.  The Court notes that, even if the rationale was true, the Avalon Green project was treated differently from that of Fortress Bible Church in that the Town held meetings with the Avalon Green representatives even after actual commencement of litigation by Avalon Green.  *See* Trial Tr. at 2964:13-20 (Stellato).

### o.  The Town's Treatment of Comparable Applicants

#### 1.  Union Baptist Church

##### a.  Nature of Application

509.  Union Baptist Church in Greenburgh submitted a site plan application involving an expansion from an existing 8,000 square foot church to an approximately 40,000 square foot

facility including a 750 seat sanctuary, classrooms, library, meeting rooms and conference rooms.  *See* Pl. Exh. 67; Dep. Tr. at  27:4-28:6 (Stellato).

510.  The Union Baptist Church project required the following land use approvals: (i) determination of significance by the Lead Agency under SEQRA; (ii) site plan approval by the Town Board; and (iii) a variance for its proposed parking.  *See* Pl. Exh. 67; Dep. Tr. Vol. 2 at 63:24-64:3 (Insardi).

511.  Union Baptist Church submitted a long form EAF that included studies on visual and stormwater impacts.  *See* Pl. Exh. 67 at p. 2.

512.  The Town Board declared itself to be Lead Agency for purposes of SEQRA review of the Union Baptist Church project.  *See* Pl. Exh. 67 at p. 1.

513.  Union Baptist Church is located in the Fairview Fire District.  *See* Dep. Tr. at 106:16-18 (Weinberg).

## b.  Parking

514.  The Town Code requires one parking space for every four seats in a church. *See* Jt. Exh. 7 at §285-38E.

515.  The on-site parking associated with the application of Union Baptist Church is inadequate under the Town Code's minimum parking requirements.  *See* Trial Tr. at 2602:15-19 (Barnes); Trial Tr. at 2367:1-4 (Feiner); Dep. Tr. at 62:21-63:2 (Barnes); Dep. Tr. at 77:14-17; Dep. Tr. at 102:23-103:3 (Weinberg); Dep. Tr. at 86:21-87:7 (Juettner).

516.  Union Baptist Church required 287 on-site parking spaces under the Town Code.  *See* Pl. Exh. 67 at p. 4.  The Union Baptist Church project provided only 57 on-site parking spaces .  *See* id.; Trial Tr. at 2966:3-6 (Stellato).

517.  Police Chief Kapica testified that the expansion proposal for Union Baptist Church actually reduced the number of parking spaces on site and significantly increased the size of their facility.  *See* Trial Tr. at 1984:15-18 (Kapica); Dep. Tr. at 71:25-72:11 (Kapica).

518.  Fire Chief Mauro testified that he had concerns about the size of the proposed Union Baptist Church sanctuary and its parking.  *See* Trial Tr. at 2065:18-21 (Mauro); Dep. Tr. at 69:18-70:6 (Mauro).

519.  Deputy Town Attorney Insardi characterized the Union Baptist Church land use application as seeking a "significant" expansion.  *See* Dep. Tr. Vol. 2 at 57:22-58:2 (Insardi).

520.  The Union Baptist Church project proposed more than doubling its number of seats from approximately 300 to 750.  *See* Trial Tr. at 2965:21-23 (Stellato).  There was never a reduction in the capacity of the proposed Church, even though it did not meet the minimum parking requirements.  *See* Trial Tr. at 2965:24-2966:2 (Stellato).

521.  Additionally, the approved project does not provide any plans with respect to the availability of parking spaces for non-Sunday events that require more than 57 parking spaces.  *See* Trial Tr. at 2968:5-9 (Stellato).

522.  As Union Baptist Church was only providing 57 of the required 287 parking spaces on its property, it proposed other arrangements for the remaining 230 parking spaces.  *See* Pl. Exh. 67 at p. 4.  Union Baptist Church proposed to satisfy this concern by locating the parking off-site in four additional areas in a Town Community Center, a retail establishment's parking lot, on-street parking and over 200 spaces in a shopping center located more than one-half mile from the Union Baptist Church.  *See* Pl. Exh. 67 at p. 4; Trial Tr. at 2350:22-2351:4 (Feiner); Trial Tr. at 2967:14-21 (Stellato); Trial Tr. at 1985:1-1986:12; 1999:10-16 (Kapica).

523.  Under the Union Baptist Church land use application, pedestrian traffic would be generated across a four lane road from a commercial parking lot.  *See* Trial Tr. at 2550:14-20, 2552:1-3 (Feiner); Dep. Tr. at 135:22-136:12 (Feiner).

524.  Police Chief Kapica expressed concern that Union Baptist Church's proposal created a public safety issue by providing for off-site parking.  *See* Trial Tr. at 1984:15-25 (Kapica); Dep. Tr. at 71:25-72:23 (Kapica).

525.  Councilwoman Barnes admitted that, notwithstanding that Union Baptist Church had proposed providing a shuttle service from off-site parking to the church, it was anticipated that people would walk from such satellite parking to the church.  *See* Trial Tr. at 2603:7-2605:19 (Barnes).

526.  In comparison, Fortress Bible Church's proposed project complied with the Town Code minimum on-site parking requirements.  *See* Dep. Tr. at 63:16-64:6 (Barnes).

### c.  Supervisor Feiner's Efforts

527.  Supervisor Feiner supported the application of Union Baptist Church to increase the size of its facility, notwithstanding that on-site parking did not meet the requirements of the Greenburgh Town Code and that the Chief of Police of the Town of Greenburgh had stated that Union Baptist Church's proposed plan would "not work" from a safety standpoint.  *See* Trial Tr. at 2360:3-2361:15, 2364:23-2365:23 (Feiner).

528.  At the beginning of each year, Supervisor Feiner establishes goals he intends to accomplish during the year and places $5,000 of his salary in escrow.  *See* Trial Tr. at 2304:6-12 (Feiner).  If his goals are not accomplished, a portion of his salary is returned to the Town.  *See* id.

529.  On November 5, 2003, Supervisor Feiner advised a constituent:

> O[n] another matter. I decided that one of my goals for 2004 will
> be working with Union Baptist Church to get the expansion
> approved.  This way if the expansion is not approved not only will
> church members be impacted negatively but my salary will go
> down!  I intend to post that goal on the internet within the next few
> days.

*See* Pl. Exh. 60.

530.  Supervisor Feiner initially included "work[ing] with Union Baptist Church and Planning Department to obtain approvals for expansion of church" as one of his 2004 Supervisor's Goals, which he published on November 17, 2003.  *See* Pl. Exh. 61; Trial Tr. at 2360:3-2361:15 (Feiner); Dep. Tr. at 125-128 (Feiner).

531.  Supervisor Feiner wrote multiple letters, in his capacity as Supervisor of the Town of Greenburgh, on behalf of Union Baptist Church asking commercial entities to enter into an agreement with Union Baptist Church to facilitate off-site parking.  *See* Pl. Exh. 52; Pl. Exh. 53; Pl. Exh. 54.

532.  Supervisor Feiner admitted, in writing, that he "enthusiastically" supported Union Baptist Church's application and offered to meet with members of the congregation to discuss strategies to "make the church expansion project happen."  *See* Pl. Exh. 56; Pl. Exh. 57; Pl. Exh. 58; Pl. Exh. 59.

533.  Supervisor Feiner did not make any such offer to Fortress Bible Church.  *See* Dep. Tr. at 134:25-135:21 (Feiner).

### d.  Negative Declaration

534.  The Town Board issued a Negative Declaration to Union Baptist Church, indicating that there were no significant environmental impacts relating to increasing the size of the facility and failing to provide Town Code required parking spaces on its property.  *See* Pl. Exh. 67.

535.  In adopting its Negative Declaration, the Town permitted Union Baptist Church to mitigate its failure to provide 230 parking spaces on its property by having parishioners park (i) on Town streets; (ii) in a Town community center; and (iii) in a private shopping center located over one-half mile from the Church across a four lane road.  *See* Pl. Exh. 67 at p. 4.

536.  When adopting its Negative Declaration, the Town Board was aware that Union Baptist Church only had permission to use the over two hundred off-site satellite parking spaces "during the Sunday mid-day service period."  *See* Pl. Exh. 67 at p. 4; *see also* Trial Tr. at 2967:14-2968:13 (Stellato).

537.  The Union Baptist Church project, as approved by the Town Board, provides more than two hundred required parking spaces by use of satellite parking spaces pursuant to a one year lease that could be terminated at any point in time.  *See* Trial Tr. at 2967:14-24. (Stellato).

### e.   Adequacy of the Parking Proposal

538.  The Court notes— for purposes of comparing the manner in which Defendants treated the Fortress Bible Church application compared with other land use applicants , and without engaging in a review of the Union Baptist Church application or questioning whether the off-site satellite parking is acceptable—that Defendants' traffic consultant and the Commissioner of Planning (both of whom reviewed the Fortress Bible Church application), as well as the Police Chief, were not satisfied with Union Baptist Church's off-site satellite parking proposal.  *See* Trial Tr. at 2970:17-21 (Stellato); Trial Tr. at 3317:7-16 (Maris); Trial Tr. at 1984:12-1986:25 (Kapica).

### f.   The Town's Disparate Treatment of Fortress Bible Church and Union Baptist Church

539.  Defendants' treatment and manner of application of land use regulations to Fortress Bible Church's application differed from its treatment of Union Baptist Church's application, without any justification.

540.  During Defendants' review of the Union Baptist Church application, the Town met with the applicant and the applicant's consultants.  *See* Trial Tr. at 2968:10-13 (Stellato).  Defendants, in contrast, prohibited meetings with Plaintiffs.

541.  Police Chief Kapica met at least twice with individuals from both the Union Baptist Church and the Town with respect to the satellite parking issue.  *See* Trial Tr. at 1987:16-22 (Kapica).  The Town's consultants were directed to refrain from speaking with Police Chief Kapica about the Fortress Bible Church application.

542.  There is no evidence that the Town demanded a fire truck or other financial donation from Union Baptist Church.

543.  Despite alleging that the Town had "concerns" about Fortress Bible Church parking—even though it met or exceeded the number of spaces required by the Town Code—the Town never suggested or examined the feasibility of Fortress Bible Church using off-site satellite parking, even after it took over preparation of the FEIS.  *See* Trial Tr. at 3384:12-16 (Maris).

544.  Town Traffic Consultant Maris acknowledged that off-site parking might have mitigated some of his concerns about Fortress Bible Church's proposed parking.  *See* Trial Tr. at 3384:17-21 (Maris).

545.  There is a commercial shopping center with a parking lot located within approximately one-half mile of the Pomander Drive property.  *See* Trial Tr. at 2003:13-19 (Kapica).

546. The Town Board held closed sessions comparing the Fortress Bible Church application with that of Union Baptist Church's application.  *See* Trial Tr. at 2968:14-22 (Stellato).

547.  Town Planning Commissioner Stellato had conversations with Town Attorneys Mancuso and Insardi comparing Fortress Bible Church's application with Union Baptist Church's application regarding the SEQRA process, the management of the SEQRA process, and the sum and substance of each application.  *See* Trial Tr. at 2968:23-2969:15 (Stellato).

548.  Town Planning Commissioner Stellato initially refused, at trial, to acknowledge that the Town did not treat Fortress Bible Church's and Union Baptist Church's applications in the same way.  *See* Trial Tr. at 2969:16-25 (Stellato).  However, upon cross-examination, he conceded that the projects were treated differently as follows:

      i.  The Town met with Union Baptist Church representatives throughout the process, though it refused to meet with Fortress Bible Church's representatives.

      ii.  The Town Board approved Union Baptist Church's application even though Town Planning Commissioner Stellato was not satisfied with the parking arrangement.

*See* Trial Tr. at 2970:1-21 (Stellato).

549.  Police Chief Kapica agreed that he would introduce legislation to waive the prohibited parking restrictions on Manhattan Avenue to create additional on-street parking for Union Baptist Church.  *See* Trial Tr. at 1986:9-12 (Kapica).

550.  Town of Greenburgh auxiliary police officers are assigned to the Union Baptist Church area on Sundays.  *See* Trial Tr. at 1998:3-5 (Kapica).

## 2.  Solomon Schechter School

### a.  Nature of Application

551.  Solomon Schechter School, a Jewish Day School, submitted an application for site plan approval on October 19, 1998.  *See* Pl. Exh. 51 at p. 1.

552.  The proposed, and eventually approved, project provided for the construction of a 129,324 square foot middle/high school to accommodate a maximum of 675 students in Grades 6 through 12.  *See* Pl. Exh. 50 at p. 5.  The proposed construction consisted of four, building wings of one and two stories, surrounding a central courtyard fronting on West Hartsdale Avenue, outdoor recreation facilities (including an athletic field, softball field, four tennis courts, and a basketball court) located in the southeast portion of the site to the rear of the school, and one 189 parking spaces in surface parking.  *See* id.  Access to the site is from West Hartsdale Avenue.  *See* id.

553.  Roadway improvements to facilitate traffic flow, including road widening and an exclusive left turn lane were proposed for West Hartsdale Avenue.  *See* Pl. Exh. 51 at p. 26.

554.  The construction resulted in the loss of fifteen acres of predominately vacant land.  *See* Pl. Exh. 51 at p. 6; Trial Tr. at 988:18-19 (Saccardi).

555.  The Solomon Schechter School is located within one-half mile from Fortress Bible Church's property.  *See* Pl. Exh. 14.  It is located in a mixed used area.  *See* Trial Tr. at 988:20-989:6 (Saccardi).

### b.  The Town's Processing of the Solomon Schecter Application

556.  Saccardi & Schiff, the same planning firm that represented Fortress Bible Church, represented Solomon Schechter School as planners on its land use application in the

Town of Greenburgh.  *See* Trial Tr. at 987:1-5 (Saccardi).  Saccardi was the lead planner on the Solomon Schechter School land use application.  *See* id. at 987:25-988:5.  As such, he attended all meetings in Town Hall and oversaw preparation of the EIS.  *See* Trial Tr. at 987:25-988:5 (Saccardi).

557. John Collins Engineers, the same traffic engineering firm that represented Fortress Bible Church, represented Solomon Schechter School as traffic engineers on its land use application.  *See* Trial Tr. at 534:13-16 (Grealy).

558. The Town Board was the Lead Agency for purposes of SEQRA review of the Solomon Schechter School application.  *See* Pl. Exh. 51 at p. 21.

559. The Town met with the Solomon Schechter School applicant during the Town's processing of its application.  *See* Trial Tr. at 892:1-10 (Russo).

560. At no time in reviewing the Solomon Schechter School application was the Town's Planning Commissioner ever directed by anyone in the Town to refrain from meeting with the applicant or its consultants.  *See* Trial Tr. at 894:9-12 (Russo).

561. At no time with respect to any land use projects pending before the Town of Greenburgh during AKRF's tenure as Planning Commissioner for the Town of Greenburgh was Russo ever directed to refrain from meeting with an applicant or an applicant's consultants.  *See* Trial Tr. at 894:13-16 (Russo).

562. On January 12, 2000, the Solomon Schechter School DEIS and site plan were referred to the Planning Board for a report and recommendation.  *See* Pl. Exh. 51 at p. 2.  The Town Board refused to make such a referral in the Fortress Bible Church application, despite multiple requests.  *See, e.g.* Jt. Exh. 13; Jt. Exh. 14; Jt. Exh. 47.

563.  The Solomon Schechter Scool FEIS was submitted to the Town on March 10, 2000.  *See* Pl. Exh. 51 at p. 3.

564.  On June 28, 2000, the Town Board issued a Findings Statement and granted site plan approval following concurrent environmental and site plan review and a public hearing on the site plan.  Pl. Exh. 51.  The Town Board refused to conduct such a public hearing on Fortress Bible Church's site plan, despite multiple demands for them to do so.  *See, e.g.*, Jt. Exh. 68; Jt. Exh. 69(a); Jt. Exh. 112; Jt. Exh. 129; Jt. Exh. 130.

565.  The full SEQRA process, including an EIS, was completed by the Town Board on the Solomon Schechter School application in less than two years, *i.e.* October 1988-June 2000.

### c.   Instructions to "Broker a Deal"

566.  During the same time that the Solomon Schechter application was pending, Russo was involved in the Fortress Bible Church application on behalf of AKRF as Planning Commissioner of the Town of Greenburgh.  *See* Trial Tr. 890:21-891:9 (Russo).

567.  Russo, in his capacity as Planning Commissioner, had multiple meetings about the Solomon Schechter School application with the applicant and applicant's consultants, as well as with representatives of the Poet's Corner Civic Association, which consisted of residents living in proximity to the Solomon Schechter School.  *See* Trial Tr. at 892:1-10 (Russo).

568.  During AKRF's tenure as Planning Commissioner for the Town of Greenburgh, Russo was instructed to attempt to "broker a deal" between Solomon Schechter School and the Poet's Corner Civic Association.  *See* Trial Tr. at 890:5-15 (Russo).

569. Supervisor Feiner requested that Town Planning Commissioner Russo meet with the Poet's Corner Civic Association regarding the Solomon Schechter School application. *See* Trial Tr. at 892:11-13 (Russo).

570. Town Planning Commissioner Russo was told that it was "very important" that the Poet's Corner Civic Association "get…on board" with the Solomon Schechter School application. *See* Trial Tr. at 892:17-893:9 (Russo).

571. Unlike his request to Russo regarding the Solomon Schechter School application, Supervisor Feiner did not request that Russo broker a deal between neighbors and the applicant on the Fortress Bible Church project. *See* Trial Tr. at 980:6-8 (Russo).

572. On the Solomon Schechter School project, Supervisor Feiner asked Town Planning Commissioner Russo to move the project forward. *See* Trial Tr. at 966:13-967:1 (Russo). Supervisor Feiner did not do so on the Fortress Bible Church project.

573. As a result of Russo's meetings with the Solomon Schechter School applicant and neighbors, the traffic circulation plan and landscaping plan were developed to appease the civic association, such that they "dropp[ed]" their opposition to the project and it "was able to go forward." *See* Trial Tr. at 892:1-10 (Russo).

574. During the review of the Solomon Schechter School project, the Town and the applicant agreed that: (i) during special events, such as Parent/Teacher Nights, parking would be accommodated on either the Solomon Schechter School property or across the street at the Maria Regina School; and (ii) Solomon Schechter School would refrain from holding its events at the same time that the Maria Regina School held special events. *See* Trial Tr. at 893:10-21 (Russo).

### d. Site Plan Review

575.  In the Town of Greenburgh, typically, the site plan is reviewed at the same time that the environmental reviews are performed, such that the site plan is reviewed and a public hearing on the site plan is held prior to issuance of a findings statement on the environmental review.  *See* Trial Tr. at 992:22-993:4 (Saccardi); Trial Tr. at 144:11-15 (Schiff).

576.  When the Greenburgh Town Board is the approving authority/Lead Agency under SEQRA, the Planning Board has an advisory role.  *See* Trial Tr. at 994:25-995:2 (Saccardi).

577.  Church Planning Consultant Saccardi testified that, in his experience, applications pending before the Town Board were referred to the Planning Board for review and recommendation during the Town Board's environmental review.  *See* Trial Tr. at 992:14-18, 994:17-995:11 (Saccardi).

578.  Fortress Bible Church's site plan was never referred to the Planning Board, the Planning Board never issued a report and recommendation, and the Town Board never reviewed or held a public hearing on the Fortress Bible Church site plan. *See* Trial Tr. at 144:2-18 (Schiff).

579.  On the Solomon Schechter School project, the site plan was reviewed by the Planning Board prior to submission of the FEIS to the Town Board as lead agency under SEQRA.  *See* Trial Tr. at 993:5-8 (Saccardi).

### e.  Dobbs Ferry Road/West Hartsdale Road Intersection

580.  The Solomon Schechter School land use application involved the development of a middle school and high school on Hartsdale Avenue near the intersection of West Hartsdale Avenue/Dobbs Ferry Road/Knollwood Road.  *See* Trial Tr. at 988:8-13 (Saccardi).

581.  The traffic study for Solomon Schechter School included the traffic to be generated by Fortress Bible Church, as though the Church's facility had been built.  *See* Trial Tr.

at 538:20-539:15 (Grealy).  Defendants never informed its new traffic consultant, Maris, that the study was premised on the assumption that the Fortress Bible Church construction had been completed.  *See* Trial Tr. at 3407:5-18 (Maris).

582.  The Town Board did not require Solomon Schechter School to construct any of the improvements at the Dobbs Ferry Road/West Hartsdale intersection that the Town Board required of Fortress Bible Church in its Findings Statement, even though review and approval of Solomon Schechter assumed traffic volumes as though Fortress Bible Church had been constructed.  *See* Jt. Exh. 163; Pl. Exh. 145 (Appendix D at pp. 5-6).  The Town offered no explanation at trial for the difference in this treatment of the two projects.

583.  On the Solomon Schechter School project, the Town Board acknowledged that NYSDOT approval would follow SEQRA review.  *See* Pl. Exh. 51 at pp. 26-27.  It imposed several conditions related to traffic and noted the conditions were "subject to NYSDOT approval."  *See* id.

### f.   Findings Statement

584.  There Solomon Schechter School Findings Statement does not discuss the impacts to fire and police services caused by the school, notwithstanding that it is four times larger than the proposed Fortress Bible Church school.  *See* Pl. Exh. 51.

585.  Police Chief Kapica testified at his deposition that the Solomon Schechter School had a *de minimus* impact on his department providing police services to the community.  *See* Dep. Tr. at 79:4-8 (Kapica).  Before the project was approved, the Police Department estimated that Solomon Schechter School would require less than fifty service calls per year.  *See* Def. Exh. AAA at p. 2.  In fact, Solomon Schechter School, larger than the proposed Fortress

Bible Church project, fifty-two calls for police service per year for its four years of existence, which Police Chief Kapica believes is "not a lot."  *See* Dep. Tr. at 78 (Kapica).

586.  In adopting their Findings Statement on the Solomon Schechter School application, the Defendants noted:

> The proposed school is consistent with the existing pattern of institutional, open-space and residential land uses which primarily define the area.  Specifically, the proposed Solomon Schechter Middle School/High School will be compatible with Maria Regina High School directly to the west and the Woodlands Junior and Senior High School campus directly to the east.  In addition, the open-space character of the Site will be maintained and will provide a strong link between the open-space and institutional uses located to the west and east of West Hartsdale Avenue.

*See* Pl. Exh. 51 at p. 7.

587.  In its Findings Statement on the Solomon Schechter School application, the Town Board noted that while proposed parking meets Greenburgh's zoning requirement, there would be a few times during the year when extra parking would be needed.  *See* Pl. Exh. 51at p. 3.  In an effort to accommodate the school, the Town permitted Solomon Schechter School to place overflow parking off-site at an adjacent school.  *See* id.  No such accommodation was made for Fortress Bible Church.

588.  The Solomon Schechter School has a Greenburgh police officer stationed at the driveway to the school to assist with traffic control.  *See* Trial Tr. at 997:24-998:13 (Saccardi).  Fortress Bible Church also offered to provide this mitigation measure.  *See* Jt. Exh. 114 at p. II-I-1 (Response I1).

**p.  Substantial Burdens to the Church's Religious Exercise**

589.  Defendants' wrongful conduct has substantially burdened the religious exercise of Fortress Bible Church and Reverend Karaman.

590.  The inadequacy of the Church's current facilities burdens Plaintiffs' religious practice by preventing the Church from growing, discipling to more members, and bringing new members into the Church--activities Plaintiffs believe they are mandated to do by God.  *See* Trial Tr. at 1603:3-10 (Karaman).

591.  The Church has necessarily experienced overcrowding for various Church services.  *See* Trial Tr. at 1675:18-1676:5 (Karaman).  Reverend Karaman testified, for example, that at Chrristmas services one year, the Church was so overcrowded that congregants sat in folding chairs in the aisles and stood.  *See* id.

592.  Plaintiffs wish to proceed with construction of their new building on the Pomander Drive property in order to expand their membership and to comply with a mandate which they believe God has given to them: "[T]o go into all the world, preach the Gospel to every creature, and to disciple all men."  *See* Trial Tr. at 1624:6-10 (Karaman).  The inadequacy of the Church's current facilities prevent them from fulfilling that mandate."  *See* id. at 1624:10-11.

593.  Defendants' conduct has prevented members of the Church from fulfilling their God-given mission and has created a financial drain on the Church.  *See* Trial Tr. at 1624:20-1625:2 (Karaman).   Reverend Karaman testified that it has affected him personally by interfereing with his calling "to study, to lead and to feed [his] congregation," as well as a drain on his time.  *See* id. at 1625:2-14.

594.  Plaintiffs provided numerous examples of the substantial burdens to their ability to practice their religious beliefs, as a result of the inadequacies of their current facilities:

> i.  Space limitations have forced the Church to store items in locations that
> impede Church services.  For example, sound equipment must be stored in

the balcony, thereby causing the Church to lose valuable seating.  *See* Trial Tr. at 1603:3-15 (Karaman).  The Church has also needed to place instruments on the floor in front of the Church, with the communion table, thereby severely limiting space for functions such as "altar calls."  *See* Trial Tr. at 1603:17-22 (Karaman).  Music is an integral part of the Plaintiffs' manner of worship.  *See* Trial Tr. at 1603:16-17 (Karaman) (singing and worship are an "integral part" of worship).

ii. Plaintiffs cannot conduct winter Baptisms during the winter, which they do by full immersion.  Reverend Karaman is prevented from conducting and members of the Church are prevented from participating in winter Baptisms due to the lack of heat in the current facilities.  *See* Trial Tr. at 1604:13-19 (Karaman).  Also, there are inadequate changing rooms for Baptisms.  *See* id. at 1604:19-22.  In addition, due to the space limitations in the current inadequate facilities, not all attendees can witness Baptisms.  *See* Trial Tr. at 1604:24-1605:3 (Karaman).  Plaintiffs believe that Baptism is a testimony to the entire congregation and, therefore, that it is important for members of the congregation to serve as witness to the testimony.  *See* id. at 1604:22-24.  In Plaintiffs' proposed new facility, the design of the sanctuary would allow the congregation full participation in the practice of Baptism.  *See* Trial Tr. at 1605:6-21 (Karaman).

iii. Plaintiffs are prevented from participating fully in "altar calls."  During an altar call, Reverend Karaman prays individually with members of the congregation who come to him at the altar.  *See* Trial Tr. at 1606:21-22

144

(Karaman).  This practice is conducted by the laying on of hands and audible prayer by Reverend Karaman with members of the congregation joining in prayer at their seats.  *See* id. at 1606:19-1607:3.  Revered Karaman identified this practice as an "integral part" of the worship and a "very sacred part of the service."  *See* id. at 1604:7-8, 1606:6-7.  However, due to the current space constraints, not everyone who wishes to approach the altar may do so and Reverend Karaman cannot reach all of those who seek individual prayer with him.  *See* id. at 1603:19-1604:9.

iv.  The current facilities do not include a gymnasium, so the Church lacks space for children and students to play and to host activities including evening youth group sessions.  *See* Trial Tr. at 1609:3-10, 1677:7-23 (Karaman).  The gymnasium proposed in the new Fortress Bible Church facility would be used not only for physical education, but also to hose various other activities,  including youth meetings, women's fellowship, men's fellowship, and Christian puppet theaters for children.  *See* Trial Tr. at 1678:5-10 (Karaman).

v.  Fortress Christian Academy's current facilities are inadequate to enable the Church to offer certain classes, limit the grades for which certain classes can be offered, and do not provide any handicapped facilities whatsoever.  *See* Trial Tr. at 1609:16-25 (Karaman).  Because of space limitations, the Church has been unable to accommodate students in its school who wish to continue in the study of art, math, and higher sciences.  *See* id. at 1609:16-25, 1610:6-9.  Also, the school has had students

withdraw due to the lack of handicapped facilities.  *See* Trial Tr. at 1609:25-1610:5 (Karaman).

vi.  The current facilities are inadequate to support "itinerations."  Itineration is a practice in which missions supported by the Church send missionaries to visit the Church.  *See* Trial Tr. at 1610:10-19.  At one time, missionaries visiting Fortress Bible Church for itineration were housed in an apartment on the top floor of the house owned by the Church.  *See* id. at 1610:24-1611:2.  However, due to space constraints, it was necessary to convert that apartment for visiting missionaries into a classroom and office space for Fortress Christian Academy.  *See* Trial Tr. at 1611:3-7 (Karaman).

595. Plaintiff commenced the present litigation as a last resort, after having attempted to "fulfill everything that we were asked to do, even multiples of work sometimes, redoing things over and over again."  *See* Trial Tr. at 1625:15-24; (Karaman).  In Reverend Karaman's words: "We had come to a place where we just couldn't go any further . . . so we had to bring it to court."  *See* id.

### i.  Fortress Christian Academy

596. Fortress Bible Church, Fortress Christian Academy, and Reverend Karaman ascribe to a "Biblical worldview."  *See* Pl. Exh. 2; Trial Tr. at 1588:22-1589:11 (Karaman).

597.  The mission of Fortress Bible Church is integrated throughout the curriculum of its Fortress Christian Academy.  *See* Trial Tr. at 1652:25-1653:3 (Karaman).

598.  The mission of the Fortress Christian Academy as a ministry of Fortress Bible Church is consistency in teaching a biblical world view to avoid confusion and influence by

being taught something that differs from that which is learned in the home and at Church.  *See* Trial Tr. at 1589:3-11 (Karaman).

599.  The Christian education ministry conducted by Fortress Bible Church is "biblically integrated," meaning that the Bible is integrated into "everything" taught at the school.  *See* Trial Tr. at 1583:19-1584:16, 1653:14-23 (Karaman).

600.  Reverend Karaman testified as to specific examples of how the Bible is integrated into Fortress Christian Academy's curriculum, including kindergarten math courses, elementary math, science, history, social studies, government, art, and physical education.  *See* Trial Tr. at 1584:6-1587:2 (Karaman).  Specific examples included using Psalm 90:12 to teach kindergarten math, The Parable Of Fishes and Loaves to teach elementary math, the Book of Job to teach science, the Book of Amos to teach earth science, the Book of Isaiah to teach government and history, the Book of Genesis, Philippians, and Proverbs 16:3 to teach art, the story of the Prophet Elijah to teach music, and integration of scripture to teach physical education.  *See* Trial Tr. at 1584:6-1587:2, 1595:8-1597 (Karaman); *see also* Pl. Exh. 2.

601.   All textbooks used in Fortress Christian Academy are purchased from A Beka book company, which is affiliated with a Christian college in Pensacola, Florida.  *See* Trial Tr. at 1654:13-24 (Karaman).

602.  Fortress Bible Church's Articles of Faith o are included in the Fortress Christian Academy Student–Parent Handbook.  *See* Pl. Exh. 3 at pp. 4-8.

603.  The Articles of Faith are included in the Student–Parent Handbook because the Church wants parents of all prospective students to know and understand the beliefs of Fortress Bible Church to ensure that there is no contradiction between those beliefs and the beliefs of the parents.  *See* Trial Tr. at 1598:3-8 (Karaman).

604. Each day the students in the Fortress Christian Academy not only pledge allegiance to the flag of the United States, but also to the Christian flag and to the Bible.  *See* Pl. Exh. 3 at p. 9; Trial Tr. at 1598:9-23 (Karaman).

605.  Students at Fortress Christian Academy are required to comply with "standards of Christian conduct."  *See* Pl. Exh. 3 at pp. 12-15; Trial Tr. at 1599:16-21 (Karaman).

606.  Students enrolled at Fortress Christian Academy must have at least one parent who is a Born Again Christian.  *See* Trial Tr. at 1589:23-1590:6 (Karaman).

607.  Students at the Fortress Christian Academy are required to perform community service.  *See* Trial Tr. at 1589:17-22 (Karaman).

608.  Reverend Karaman testified that the Fortress Christian Academy differs from public schools.  He provided several examples of the differences:

> i.   Fortress Christian Academy teaches creationism—evolution is taught as a theory only;
>
> ii.  Halloween is not celebrated in the school;
>
> iii. Thanksgiving is emphasized in terms of gratefulness to God;
>
> iv.  Christmas is celebrated emphasizing the birth of Christ, not Santa Claus;
>
> v.   Easter is celebrated as the holiest day of the year—Easter bunnies and Easter eggs are not part of the celebration and not included in any decorations.
>
> vi.  Social dancing is not permitted at any school function

*See* Trial Tr. at 1592:25-1594:1, 1599:22-1600:13 (Karaman); see also Pl. Exh. 3 at p. 13.

**q.  Credibility of the Town's Witnesses**

609. The majority of Town employees and consultants called to testify at trial had significant credibility issues.  Such witnesses changed their testimony from prior testimony given at depositions, suddenly "remembered" facts not recalled during depositions, and/or gave explanations to the Court that were not believable.  Yet other witnesses gave testimony that was either itself untrue or that rendered untrue the testimony of other Defense witnesses.

610. The following are a mere sampling of the numerous examples of non-credible testimony offered by Town witnesses:

  i. Police Chief Kapica—whom this Court finds to be a credible witness—testified unequivocally that he never spoke with Supervisor Feiner regarding the Fortress Bible Church project.  *See* Trial Tr. at 1973:20-1974:2 (Kapica).  Supervisor Feiner, in contrast, asserted that he had numerous conversations with Police Chief Kapica about the Church's project.  *See* Trial Tr. at 2339:1-2348:23 (Feiner).  Moreover, Supevisor Feiner stated that the subject matter of his alleged conversations with Police Chief Kapica were the bases for certain statements included in Defendants' Findings Statement and formed the basis of Supervisor Feiner's beliefs as to those statements. *See* Trial Tr. at 2331:1-2348:24 (Kapica).  Such testimony by Supervisor Feiner is not credible in light of the testimony of other witnesses, particularly that of Police Chief Kapica, concerning those statements and conclusions.

  ii. Supervisor Feiner attempted to explain his statement in a December 2001 e-mail exchange in which he conveyed that—before the DEIS phase of SEQRA review was even complete—he anticipated that the Town Board

would deny the Church's project, purportedly based on his significant traffic concerns. *See* Trial Tr. at 2445:25-2447:6, 2448:1-2448:1-2456:22 (Feiner). However, when asked how he became aware of such traffic concerns, he asserted that he was informed of traffic issues by the Chief of Police and by Town Traffic Consultant Maris. *See* id. at 2447:14-18 (Feiner). Again, his explanation is not tenable. As indicated above, Police Chief Kapica testified that he never discussed the Church's proposed project with Supervisor Feiner. *See* Trial Tr. at 1973:20-1974:2 (Kapica). Further, Maris was not hired by the Town until March 2002, three months after Supervisor Feiner made the statement. *See* Stipulated Fact No. 31; Stipulated Fact No. 32; Trial Tr. at 2445:25-2447:25 (Feiner). When confronted with the fact that Maris was not hired until after his December 2001 statement, Supervisor Feiner fell back to rely again upon a conversation with Police Chief Kapica. *See* Trial Tr. at 2447:19-25 (Feiner).

iii. Deputy Town Attorney Insardi was not credible in her assertion that she reviewed the Town's FEIS and Findings Statement in her capacity as the Town's attorney and merely for legal sufficiency. *See* Trial Tr. at 3117:25-3118:15 (Insardi). In fact, Insardi admitted that, notwithstanding such assertion, she did not even review references to the Town Code set forth in the Findings Statement to ensure their accuracy. *See* Trial Tr. at 3118:16-3119:24 (Insardi). Moreover, she made changes and substantive edits to comment letters from the Town's consultants. The Town's own

consultants were concerned that Insardi's role in the environmental review of the Church's project went beyond that of an attorney and into substantive land use planning.   *See e.g.*, Trial Tr. at 2254:3-2255:1 (Doneit).

iv.   Councilwoman Weinberg testified that she read both the DEIS and the FEIS on the Church's project "cover to cover."   *See* Trial Tr. at 1926:12-16 (Weinberg).   However, she claims that she never made any notes on her copies of the documents.   *See* Trial Tr. at 1926:17-19 (Weinberg). This claim is not plausible.   Similarly, although Deputy Town Attorney Insardi acknowledges attending numerous meetings concerning the Church's project, she claims to never have taken notes.   *See* Trial Tr. at 3115:9-3115:12 (Insardi).   Her claim is equally dubious.

v.   Councilwoman Weinberg was present at the December 15, 2003, Town Board public hearing on the adopted FEIS at which various errors and inaccuracies in the FEIS were brought to the Town Board's attention and received the voluminous submission by Plaintiffs concerning the FEIS which enumerated multiple errors in that document.   *See* Pl. Exh. 116. Councilwoman Weinberg testified that as of the date of her deposition, she had "no reason to doubt" the accuracy of that document.   *See* Dep. Tr. at 48:7-13; 56:11-13 (Weinberg).

vi.   Town Board Members claimed that they were not aware of the Church's repeated requests for a meeting which were ignored by the Town, notwithstanding multiple letters from the Church's representatives which

were copied to the Town Board members.  *See* Jt. Exh. 112; Jt. Exh. 116; Jt. Exh. 121; Jt. Exh. 122; Jt. Exh. 129.   Those Town Board members generally admitted that they had no reason to believe they did not receive copies of correspondence from the Church which were carbon copied to them.  *See* Trial Tr. at 2609:22-2614:13 (Barnes) (did not recall seeing correspondence, though knew of no reason she would not have received it); Trial Tr. at 2122:15-2225:10 (Juettner) (did not recall whether she knew of requests for meetings which were ignored, then when confronted with exhibits, admitted that she "perhaps" was aware of such requests). The claims of Town Board members are not plausible.

vii.   Councilman Bass stated that he cast his vote on the resolution by which the Town Board took over preparation of the FEIS "based on the recommendation of Town staff."  *See* Trial Tr. at 2148:20-2149:3 (Bass). He stated that all Town staff recommended that the Board take over such preparation.  *See id.* at 2149:2-5.   However, he voted against taking over the preparation of the FEIS.  *See id.* at 2149:6-18.   Thus, his testimony is inconsistent.

viii.   Councilwoman Barnes testified that she did not recall the Town studying the use of Pomander Drive as a way to mitigate concerns about ingress and egress on Dobbs Ferry.  *See* Trial Tr. at 2600:22-2601:4 (Barnes). Upon being shown by Defense counsel a letter relating to the use of Pomander Drive—one that she did not even have a recollection of receiving—Councilwoman Barnes claimed that her recollection was

refreshed that the Plaintiffs had committed not to use the second access to Pomander. *See* Trial Tr. at 2617:24-2618:4 (Barnes). Thereafter, Barnes claimed to have an independent recollection of the Church, as applicant, withdrawing the use of Pomander Drive as a potential traffic mitigation measure. *See* Trial Tr. at 2619:24-2620:3 (Barnes). However, she could not explain from whence her recollection came—a conversation, a document, etc. *See* Trial Tr. at 2620:7-2621:4 (Barnes).

ix. Councilwoman Barnes' testimony that the Town did not consider Pomander Drive as an alternative means of access and egress to the Church's property because the Church withdrew that alternative or refused to utilize that access point contradicts the bulk of the evidence adduced at trial. Such evidence includes the admission by Councilman Bass that Councilwoman Weinberg told him that she did not want Pomander Drive used. *See* Trial Tr. at 2159:17-23 (Bass).

x. Councilwoman Barnes testified during her deposition that she was not aware of any factual errors within the FEIS. *See* Dep. Tr. at 38:2-6 (Barnes). She testified as such, notwithstanding that she was present during a Town Board public meeting on December 15, 2003, at which factual errors in the FEIS were brought to the attention of the Board and that Plaintiffs provided to the Town extensive submissions enumerating errors and inaccuracies in the FEIS. *See* Jt. Exhs. 161(a)-(d).

611. Moreover, several witnesses called by Defendants testified that they were presented with a binder of selected documents in preparation for trial, many of which were

documents that they saw for the first time while preparing for trial. *See* Trial Tr. at 3122:17-22 (Insardi).

612. At trial, Town Commissioner Stellato, for the first time, identified a threat of litigation as a rationale for refusing the Church's multiple requests for a meeting with Town representatives. *See* Trial Tr. at 2975:8-12 (Stellato). However, when asked during his deposition why the Town refused such meetings, he never identified a threat of litigation as such a basis, despite being asked a pointed question to direct such information. *See id.* at 2975:22-2979:20, 2984:14-2985:23. Further, in response to questions from this Court regarding why he would have chosen to withhold facts during his deposition that he felt compelled to provide at trial, Town Planning Commissioner Stellato admitted that he chose to identify a threat of litigation as a basis for refusal to meet after numerous conversations with counsel in preparation for his trial testimony wherein counsel "indicated to [him] it was important." *See* Trial Tr. at 2986:7-2988:13 (Stellato). Later, when pressed on another inconsistency between trial testimony and testimony he gave at his deposition, Stellato replied only, "I'll stick with the deposition since I said that initially." *See* Trial Tr. 2989:14-17 (Stellato).

### r. The Town's Failure to Comply with Discovery Obligations

613. Before trial testimony began, this Court entertained oral argument on Plaintiffs' motion seeking an adverse inference and sanctions based upon Defendants' failure to comply with discovery obligations to preserve evidence and knowingly destroying evidence. This Court reserved judgment on Plaintiffs' motion, providing the parties with the opportunity at trial to present additional evidence on these issues.

614. Evidence submitted at trial confirms that the Town Board and Councilwoman Weinberg destroyed evidence and that Defendants completely disregarded discovery obligations.

Testimony at trial established that Defendants both withheld from Plaintiffs and destroyed documents that would have been probative and relevant to the issues at trial.

615.  Testimony by Councilwoman Weinberg confirmed that she intentionally discarded documents subject to discovery in this matter.  *See* Trial Tr. at 1916:24-1917:9 (Weinberg).  Initially, Weinberg claimed at trial that she was never advised to refrain from destroying and discarding documents.  *See* Trial Tr. at 1913:23-1914:4 (Weinberg).  However, when confronted with her deposition transcript, she recanted and admitted that not only was she advised by Plaintiffs' counsel at her deposition to refrain from destroying documents then in her possession, but that, following the deposition, she discarded such documents.  *See* id. at 1921:17-1922:13, 1924:25-1925:2.  She attempted to explain her disregard for the explicit instruction to preserve evidence by telling this Court that she destroyed the documents after she was "off the [T]own Board."  *See* id. at 1918:15-22.  Upon cross-examination, however, she admitted that at the time of her deposition, the instruction to preserve evidence, and her disposal of the evidence, she in fact was still a member of the Town Board.  *See* id. at 1921:13-15.  Upon questioning from this Court, Councilwoman Weinberg also testified that prior to the date of her deposition, she had "gotten rid of" "documents that would concern Fortress Bible." *See* Trial Tr. at 1920:3-6 (Weinberg).

616.  Town Planning Commissioner Stellato admitted during testimony that it was his practice to maintain a legal pad on which he took notes of meetings he attended and that his general practice was to retain such legal pads for approximately one year.  *See* Trial Tr. at 3189:21-3190:7 (Stellato).  Stellato also admitted that not only did he attend Town meetings concerning Fortress Bible Church in 2002 and 2003, but that he discarded all notes he took during such meetings concerning the Church and its application.  *See* Trial Tr. at 3190:8-21

(Stellato).  Stellato also stated that he discussed with the Town's legal staff his belief that there had been a threat of litigation by a representative of the Church in May 2002.  *See* id. at 2861:15-21.  He claims he was advised that due to the "threat of litigation," the Town's legal staff directed him that all documents should be filtered through the Town Attorney's office and that Town consultants should refrain from having any direct contact with the Church's consultants.  *See* id. at 2861:15-21.  However, he claims that he was never directed to preserve documents.  *See* Trial Tr. at 2974:16-24.

617.  Supervisor Feiner testified that, at the time he engaged in the e-mail exchange with constituent Sapan in December 2001wherein he advised Sapan that he believed that the Town Board would deny the Fortress Bible Church application, Feiner had read the RLUIPA statute and believed that the Church might sue under that statute.  *See* Trial Tr. at 2462:1-21 (Feiner).[11]

618.  Moreover, Supervisor Feiner testified that he discussed with staff and the Town Attorney his concern regarding the RLUIPA statute and in fact, directed Town staff, consultants and the Town Attorney to "work on" ideas about ways in which the Church's application could be denied given the new federal law.  *See* Trial Tr. at 2460:5-20 (Feiner).  Yet at no time did Mr. Feiner refrain from destroying documents, including electronic documents such as e-mail.  *See* Feiner Tr. at 10-34.

619. Town Traffic Consultant Maris testified at trial that he prepared conceptual plans on the Church's project that were reviewed by the Town, including the Town Attorney's office and the Commissioner of Planning, but not shared with the Church during the SEQRA process.  *See* Trial Tr. at 3356:5-13 (Maris).  Several of the plans were prepared using Computer

---

[11] Supervisor Feiner confirmed, however, that his belief was not based on any alleged statement by anyone on behalf of the Church "threatening" litigation.  *See* Trial Tr. at 2462:22-2463:5 (Feiner).

Assisted Design.  *See* id. at 3356:14-16.  Maris confirmed that the usual practice in his office is

to "write over" previous CAD drafts.  *See* id. at 3356:24-3357:7.  He did not save drafts or prior

versions of any CAD drawings on the Fortress Bible Church matter.  *See* id. at 3357:6-7.

Therefore, as a result of Defendants' failure to place a "litigation hold" instructing employees

and consultants to preserve evidence related to the Fortress Bible Church matter, alternatives and

draft alternatives prepared by the Town's consultants were destroyed.  Such drafts may have

been probative to issues before this Court.

620. Deputy Town Attorney Insardi, the only member of the Town's legal staff to

testify at trial, testified that she did not place a litigation hold or in any way advise Town staff

and consultants to retain documents related to Fortress Bible Church, despite her claims that she

believed the Church had threatened litigation as early as May 2002.[12]  *See* Trial Tr. at 3115:15-

3116:1 (Insardi).  Deputy Town Attorney Insardi was first deposed pursuant to an Order of this

Court on the specific topic of Defendants' failure to produce certain electronic documents.  *See*

Trial Tr. at 3116:2-5 (Insardi).  That deposition was conducted in January 2005, well after

commencement of this litigation.  *See* id.  Incredibly, even after the deposition, Insardi did not

advise anyone at the Town that Defendants were required to preserve evidence.  *See* id. at

3116:10-13.  She cannot claim ignorance of discovery obligations, nor inexperience as she

testified that she is an attorney with extensive litigation experience in both civil and criminal

matters.  *See* id. at 2995:8-25.  In fact her litigation experience at the time of trial spanned almost

twenty years.  She described her private practice litigation experience in a land use firm as the

---

[12] This Court finds that Defendants claim that a "threat of litigation" caused them to engage in
the conduct described in these Findings of Fact is not credible and is merely a theory developed
for litigation.  However, if such claim were true, it would render even more egregious
Defendants' wholesale disregard for their obligations under the Federal Rules of Civil Procedure.

"quarterback" who "make[s] sure everything is done properly." *See* id. at 2997:12-19. Thus, she

is or should be well aware of proper discovery practices and obligations to preserve evidence.

621. Finally, this Court notes not only the admitted destruction of probative

evidence, but the existence of evidence relevant to the issues before this Court that Defendants

never produced to Plaintiffs. Outrageously, Defendants attempted to enter such previously

undisclosed documents into evidence during trial. *See* Trial Tr. at 3292:6-3295:10 (Mauro).

Such documents were transmitted by facsimile to Plaintiffs' counsel on the night before they

were offered at trial. *See* id. at 3292:6-3293:17. As this Court noted at trial, one of the

documents in question was correspondence transmitted between Deputy Town Attorney Insardi

and Town Traffic Consultant Maris, which, as such, should have been produced from two

separate sources. *See* id. at 3294:21-3295:1. As this Court noted during the proceedings, the

existence of such a document raises concerns that there exist probative internal Town documents

that Defendants have never produced, in contravention of their discovery obligations. *See* id. at

3296:6-14.

622. Based on the foregoing, as well as the submissions by the parties on Plaintiffs'

Motion in Limine, this Court finds that the conduct of Defendants warrants both an adverse

inference based on spoliation of evidence and sanctions.


IV.    **CONCLUSIONS OF LAW**

a.    **Religious Land Use and Institutionalized Persons Act**

When it enacted RLUIPA, "Congress endeavored to codify existing Free Exercise

jurisprudence." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 350 (2d Cir. 2005)

(citations omitted). RLUIPA was not intended to "relieve religious institutions from applying for

variances, special permits or exceptions, . . . where available without discrimination or unfair delay." 146 CONG. REC. S7774-01, S7776 (daily ed. July 27, 2000) (Joint Statement of Sen. Orrin Hatch and Sen. Edward Kennedy). Thus, RLUIPA has not elevated federal courts into appellate zoning boards. *See Murphy*, 402 F.3d at 348-49. Instead, RLUIPA protects against, *inter alia*, "subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards." *Sts. Constantine and Helen Greek Orthodox Church*, *Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005) (Posner, J.) (citations omitted).

### i.  Substantial Burden Claims

Section 2(a)(1) of RLUIPA, the Substantial Burden Claims provision, provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution (A) is in furtherance of a compelling interest; and (B) is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000cc(a)(1). To establish a violation of Section 2(a)(1), the plaintiff must demonstrate that the defendant's conduct satisfies at least one of RLUIPA's jurisdictional prerequisites and that the conduct imposes a "substantial burden" on the plaintiff's "religious exercise." *See id.*; 42 U.S.C. § 2000cc-1(b). If the plaintiff satisfies its burden, the burden shifts to the defendant to provide that imposition of a substantial burden on the plaintiff's religious exercise is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b).

### 1.  Jurisdictional Prerequisite

The protections afforded under Section 2(a)(1) apply in any case in which:

>   (A) the substantial burden is imposed in a program or activity that
>   receives Federal financial assistance, even if the burden results
>   from a rule of general applicability;
>   (B) the substantial burden affects, or removal of that substantial
>   burden would affect, commerce with foreign nations, among the
>   several States, or with Indian tribes, even if the burden results from
>   a rule of general applicability; or
>   (C) the substantial burden is imposed in the implementation of a
>   land use regulation or system of land use regulations, under which
>   a government makes, or has in place formal or informal procedures
>   or practices that permit the government to make, individualized
>   assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2).

Plaintiffs contend that they have established jurisdictional prerequisites pursuant to 42 U.S.C. §§ 2000cc(a)(2)(B) and (C).  Defendants argue that Plaintiffs have not established either prerequisite because the evidence adduced at trial does not demonstrate that interstate commerce would be affected and because the SEQRA review was not conducted pursuant to a land use regulation within the meaning of RLUIPA.  *See* Def. Post-Trial Mem. at Proposed Conclusion of Law ¶¶ 1-18, 171-75.  The Court finds that Plaintiffs have established both prerequisites.

Plaintiffs have proven that the development of, eventual operation of, and eventual activities to be performed at the Pomander Drive property will affect interstate commerce.  *See* 42 U.S.C. § 2000cc(a)(2)(B).  For example, Plaintiffs have demonstrated that construction of the Fortress Bible Church project will affect interstate commerce, such as through use of architects located in North Dakota.  Numerous courts, as well as Congress, have recognized that construction projects often impact interstate commerce.  *See Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 181 (2d Cir. 1996) ("construction efforts . . . have a direct effect on interstate commerce"); *Westchester Day School v. Village of Mamaroneck* ("*Westchester Day School VI*"), 417 F.Supp.2d 477, 541 (S.D.N.Y. 2006); *Cottonwood Christian Center v. Cypress*

*Redevelopment Agency*, 218 F.Supp.2d 1203, 1221 (C.D.Cal. 2002) ("construction of the church will affect a large quantity of construction workers, construction materials, transportation vehicles and commercial financial transactions, all of which affect commerce"); 146 CONG. REC. S7774-01, S7775 (July 27, 2000) (impact on interstate commerce "will most commonly be proved by showing that the burden prevents a specific economic transaction in commerce, such as a construction project."). In addition, Plaintiffs have established that the activities at the Pomander Drive property will include the Church's continued support of missionary efforts both in the United States and abroad, thereby affecting interstate and international commerce.

Plaintiffs have also demonstrated that the Town Board's SEQRA review and determination involved "a land use regulation or system of land use regulations . . . that permit the government to make[] individualized assessments." 42 U.S.C. § 2000cc(a)(2)(C). Defendants argue that SEQRA is not a land use regulation as contemplated under RLUIPA, but rather a statewide regulatory framework that includes procedural requirements and criteria to determine whether a proposed action may have a significant adverse environmental impact. *See* Def. Post-Trial Mem. at Proposed Conclusion of Law ¶ 5 (*citing* 6 N.Y.C.R.R. § 617.1(e)). According to Defendants, their actions in reviewing the environmental impacts associated with the Fortress Bible Church project, accepting the December 2003 FEIS as complete, and adopting the SEQRA resolution, were not made pursuant to any land use regulation. *See id.* ¶¶ 6-10. This Court disagrees. RLUIPA defines land use regulation as a zoning or landmarking law, or the application of such law that limits or restricts a claimant's use or development of land. *See* 42 U.S.C. § 2000cc-5(5). It is beyond cavil that the application of SEQRA can limit or restrict a claimant's use or development of land—indeed, it is exactly because application of SEQRA restricted Plaintiffs' use and development of the Pomander Drive property that the instant

litigation arose.  That SEQRA is drafted in terms of providing a "framework" does not negate its ultimate consequences.

Defendants further argue that the SEQRA review did not constitute an individualized assessment.  *See* Def. Post-Trial Mem. at Proposed Conclusion of Law ¶¶ 147 n. 61.  Again, the Court disagrees.  "[T]he determination of whether the governmental action is an individualized assessment depends on whether the decision was subjective in nature."  *Westchester Day School VI*, 417 F.Supp.2d at 541-42 (internal quotations and citations omitted).  Where the law at issue is a neutral one of general applicability, its application to particular facts can constitute an individualized assessment, particularly where "the application does not involve a mere numerical or mechanistic assessment, but one involving criteria that are at least partially subjective."  *Id.*  In evaluating RLUIPA claims, courts have repeatedly found that special use permit and variance applications depend on individualized assessments.  *See, e.g.*, *Living Water Church of God v. Charter Township of Meridian*, 384 F.Supp.2d 1123, 1130-31 (W.D. Mich. 2005), *rev'd on other grounds*, 258 Fed App'x 729 (6th Cir. 2007) (denial of special use permit where determination based on criteria that were, in part, subjective considered an "individualized assessment"); *Castle Hills First Baptist Church v. City of Castle Hills*, 2004 WL 546792, at *15 (W.D. Tex. Mar. 17, 2004) ("Zoning, and the special use permit application process specifically, inherently depend upon a system of individualized assessment."); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1140, 1160 n. 10 (E.D. Cal. 2003), *aff'd*, 456 F.3d 978 (9th Cir. 2006) ("It is . . . beyond cavil that zoning decisions such as the [conditional use permit application] at issue in this case are properly described as 'individualized assessments.'"); *Cottonwood*, 218 F.Supp.2d at 1222 (denial of conditional use permit constitutes "individualized assessment").  The application process at issue was similarly individualized.  The Town had no mechanistic

assessments in place for evaluating the Church's application, but rather relied on the subjective opinions of nonprofessional Town Board members and a multitude of consultants—many of whom offered opinions inconsistent with those that they had previously provided to the Town—regarding whether they considered the Church's proposed plan and mitigation measures to be adequate.  Further, the significant evidence indicating that the Church's application was treated differently from other comparable applications itself demonstrates that the Town's assessment was individualized.

### 2.  Religious Exercise

RLUIPA broadly defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," including "[t]he use, building, or conversion of real property for the purpose of religious exercise."  42 U.S.C. § 2000cc-5(7)(A).  That is, RLUIPA does not protect buildings or structures *per se*, but rather protects their use *for the purpose of religious exercise*.  *See* 42 U.S.C. § 2000cc-5(7)(B); *see also Guru Nanak*, 326 F.Supp.2d at 1151.  Thus, the Second Circuit has observed that "not every activity carried out by a religious entity or individual constitutes a 'religious exercise.'"  *Westchester Day School v. Village of Mamaroneck* ("*Westchester Day School III*"), 386 F.3d 183, 190 n. 4 (2d Cir. 2004) (*quoting* 146 CONG. REC. S7774-01, S7776 (July 27, 2000)).  Instead, RLUIPA requires inquiring "whether the facilities to be constructed [are] to be devoted to a religious purpose."  *Id.* at 189.  Such religious purpose need not implicate "core religious practice," *Guru Nanak*, 326 F.Supp.2d at 1151, or "an integral part of one's faith," *Living Water*, 384 F.Supp.2d at 1129.

While the Second Circuit has not clarified the meaning of "devoted," courts within the Circuit have interpreted it to require a "careful, fact-sensitive balancing of secular purposes and religious purposes in relation to the spaces being constructed, as opposed to a strict requirement

of exclusive use for religious purposes, which would be inconsistent with the text and legislative history of RLUIPA." *Westchester Day School VI*, 417 F.Supp.2d at 544. Accordingly, courts have held that "[w]here a building is to be used for the purpose of 'religious exercise,' the building is not denied protection under RLUIPA merely because it includes certain facilities that are not at all times themselves devoted to, but are inextricably integrated with and reasonably necessary to facilitate, such 'religious exercise.'" *Id.*; *see also Living Water*, 384 F.Supp.2d at 1133 (holding, after bench trial, that the plaintiff's proposed use of building including classrooms, sanctuary, gymnasium, offices and meeting rooms for a religiously oriented school and other ministries of the church constituted religious exercise). At the same time, RLUIPA "cannot be so broad as to protect any construction plan merely because an institution pursues a religious mission." *Westchester Day School VI*, 417 F.Supp.2d at 543.

The evidence presented at trial established that Plaintiffs' proposed use of the Pomander Drive property, including the operation of the school, will be devoted to religious purposes. Plaintiffs' proposed facility is a single structure that will house both the church and school and will include a sanctuary, offices, library, kitchen, classrooms, and a gymnasium. The proposed facility will host prayer, religious ceremonies, fellowships, visiting ministries, religious education, and other religious activities. For example, the sanctuary will be used for, *inter alia*, performing Baptisms and alter calls. Reverend Karaman testified regarding the religious significance of these activities to the Church and its congregants. Also, a pre-existing single-family house on the Pomander Drive property will be used as the parsonage for the Church.

The school, Fortress Christian Academy, likewise will be devoted to religious purposes. The school is dedicated to teaching the Bible and Christian values. Students pledge allegiance not only to the flag of the United States, but also to the Christian flag and to the Bible. The Bible

is fully integrated into the school's curriculum, including both academic and physical education. Defendants contend that the teaching of religious education in classrooms and auxiliary rooms that are also used for the education of students in wholly secular subjects does not rise to the level of devotion required to establish religious exercise.  This Court, however, credits Reverend Karaman's testimony that the Bible is integrated into all secular subjects taught at the school, including mathematics, history, science, and art.  Reverend Karaman also testified that the proposed gymnasium will be used, in addition to teaching physical education, among other purposes, to host youth meetings and fellowships.  Further, religious education and discipling are important aspects of the Church's religious principles.

Mindful that the Second Circuit has cautioned district courts to "consider whether the proposed facilities [are] for a religious purpose rather than simply whether the school [is] religiously-affiliated," the Court has no hesitation finding that the proposed facility has religious purpose and will enable Church members to engage in religious exercise.  *See Westchester Day School v. Village of Mamaroneck* ("*Westchester Day School VII*"), 504 F.3d 338, 348 (2d Cir. 2007) (The line where a school construction project implicates RLUIPA "exists somewhere between this case, where every classroom being constructed will be used at some time for religious education, and a case like the building of a headmaster's residence, where religious education will not occur in the proposed expansion.); *see also Living Water*, 384 F.Supp.2d at 1129-30 (holding, after bench trial, that "Plaintiff's use of the proposed facility for a religious oriented school and for other ministries of the church constitutes religious exercise."); *Castle Hills*, 2004 WL 546792, at *8 (denial of special use permit application "to allow the use of existing fourth floor space for classrooms" for private Christian school constituted RLUIPA violation).  Even if certain of the school's activities are considered to be secular, as Defendants

argue they are, given the substantial evidence regarding the intended religious uses for the facility, this Court does not believe that such limited secular activities would be sufficient to bar a finding of religious exercise. *See Westchester Day School VI*, 417 F.Supp.2d at 544 ("We do not read the Second Circuit's expressed concerns to bar a finding of religious exercise where facilities are used for both religious and secular purposes."). A significant portion of Plaintiffs' proposed facilities will be devoted to religious practice and education or are inextricably integrated with the Church's ability to provide religious education and practice—*i.e.* to engage in religious exercise. *See Westchester Day School VI*, 417 F.Supp.2d at 545-46 (where certain aspects of the religious school facility would not be devoted exclusively to religious education and practice, the plaintiff had nonetheless demonstrated religious exercise because the "major portion of the proposed facilities will be used for religious education and practice or are inextricably integrated with, and necessary for [the school's] ability to provide, religious education and practice"). Accordingly, this Court concludes that Plaintiffs' use of the proposed facility constitutes religious exercise within the meaning of RLUIPA.

### 3.  Substantial Burden

RLUIPA purposely does not define "substantial burden." Rather, the legislative history indicates that Congress intended the term substantial burden to be interpreted "by reference to Supreme Court jurisprudence." *Westchester Day School VII*, 504 F.3d at 348 (*citing* 146 Cong. Rec. S7774, S7776 (2000)). Under Supreme Court precedents, "a substantial burden on religious exercise exists when an individual is required to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *Id.* (*citing Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). In the context of land use applications, however, "when there has been a denial of a religious

institution's building application, courts appropriately speak of government action that directly

*coerces* the religious institution to change its behavior, rather than government action that forces

the religious entity to choose between religious precepts and governmental benefits." *Id.* at 349

In evaluating whether Plaintiffs' religious exercise has been substantially burdened, the Court

must evaluate both the nature of the denial and the effect of the denial on the religious institution.

*Id.*   The Second Circuit has also considered relevant when a court finds that denial of an

application was "arbitrary and capricious under New York law." *Id.* at 351.

Here, Plaintiffs claim that the denial of their application in effect coerced the Church and

Reverend Karaman to continue their religious practice in inadequate facilities, thereby impeding

its religious exercise.

### a.   Nature of the Denial

In evaluating the nature of the denial, the Second Circuit has explained that:

> [R]ejection of a submitted plan, while leaving open the possibility
> of approval of a resubmission with modifications designed to
> address the cited problems, is less likely to constitute a substantial
> burden than definitive rejection of the same plan, ruling out the
> possibility of approval of a modified proposal.  Of course, a
> conditional denial may represent a substantial burden if the
> condition itself is a burden on free exercise, the required
> modifications are economically unfeasible, or where a zoning
> board's stated willingness to consider a modified plan is
> disingenuous.  However, in most cases, whether the denial of the
> application was absolute is important; if there is a reasonable
> opportunity for the institution to submit a modified application, the
> denial does not place substantial pressure on it to change its
> behavior and thus does not constitute a substantial burden on the
> free exercise of religion.

*Westchester Day School VII*, 504 F.3d at 349 (quotations and citations omitted).

Defendants contend that their denial of the Fortress Bible Church application was not

complete because Plaintiffs could have submitted a modified proposal that mitigated the

environmental impacts of the project delineated in the December 2003 FEIS and SEQRA Resolution.  Defendants argue that the evidence at trial indicated that they were willing to consider and encouraged the Church to submit a modified plan addressing the Town's concerns regarding safety and traffic, specifically, a scaled down proposal.  Defendants further claim that because a modified plan, such as a scaled down proposal, could be approved by the Town Board and satisfy the Church's needs, Plaintiffs cannot demonstrate a substantial burden.

This Court finds Defendants' purported willingness to consider a modified plan to be wholly disingenuous.  As more fully described in the Findings of Fact, Plaintiffs submitted revised proposals and additional information to Defendants on numerous occasions.  Defendants' response on each occasion was to request more information, often requesting information that they already possessed.  The evidence at trial establishes that Plaintiffs agreed to implement, at their own expense, every mitigation measure requested by Defendants.  Such measures included widening Dobbs Ferry Road near the location of the Church's proposed access driveway, creating a left turn lane into the Pomander Drive property, installing a traffic signal at the driveway entrance, and coordinating the proposed traffic signal with existing traffic signals to facilitate the flow of traffic.  Notwithstanding these proposed measures, Defendants' Findings Statement—which contains numerous errors of which Town Board members were aware, but failed to correct—states that no mitigation is possible.  In making such a finding, Defendants ignored feedback from their own consultants that the project's potential environmental impacts could be mitigated.

While the Town's past treatment of the Church's application strongly suggests that the Town would not act in good faith in considering a modified proposal, the Court need look no further than the admissions of Town Board members themselves to be certain that the Town

would not act in good faith.  First, Supervisor Feiner admitted that he instructed Town staff, including the Town Attorney and the Town's consultants, to identify ways in which the Town Board could vote against the Church's proposal in light of RLUIPA.  Second, Councilwoman Weinberg instructed Town Planning Commissioner Russo to "kill the project" on more than one occasion, with the first time dating back to as early as 2000.  Councilwoman Juettner expressed her emphatic agreement with that directive.  Third, Deputy Town Attorney Insardi admitted that Defendants had identified the outcome that they wished to achieve and prepared the FEIS in a manner to support that outcome.

The evidence at trial established that the Town, in fact, did act to "kill the project."  For example, Defendants deleted from the FEIS specific mitigation measures offered by the Church, such as the use of traffic monitors, traffic cones, valet parking, use of Pomander Drive as an alternative point of access/egress, and coordinating services with surrounding religious and educational entities to reduce traffic impacts.  Defendants also omitted from the FEIS Plaintiffs' proposed installation of a fence upon certain retaining walls, a safety measure which was suggested by the Town's engineering consultant and approved by the Town's building inspector. In addition, in a draft memorandum dated October 17, 2002, from Turner to the Town, Deputy Town Attorney Insardi eliminated language by which Town Planning Consultant Turner stated his willingness to meet with the Church.

Given the overwhelming evidence of Defendants' intentional delay, hostility, and bias toward the Church's application, the Court finds that any purported willingness by the Town Board to consider a modified proposal is insincere.  Under such circumstances, the Church is not required to file a modified application and the Court finds that the Church's religious exercise

was substantially burdened by the Town's arbitrary and unlawful denial of its application.  *See Westchester Day School VII*, 504 F.3d at 352-53.

### b.  Effect of the Denial

Even if the denial is definitive, "[t]here must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise."  *Westchester Day School VII*, 504 F.3d at 349.  However, because "the Supreme Court's free exercise jurisprudence signals caution in using effect alone to determine substantial burden," it typically is not sufficient to show that a religious institution has been prevented from building a church on its own land.  *Id.* at 349.  A substantial burden claim may be established, though, "where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully."  *Id.* at 350*; see also Sts. Constantine and Helen*, 396 F.3d at 899-901 (substantial burden was demonstrated in circumstances where the "decision maker cannot justify" the challenged ruling); *Guru Nanak Sikh*, 456 F.3d 978, 989-91 (9th Cir. 2006) (substantial burden was demonstrated where government officials "inconsistently applied" specific policies and disregarded relevant findings "without explanation").  Where such a claim is established, the Second Circuit has directed courts to also consider "(1) whether there are quick, reliable, and financially feasible alternatives [that the religious institution] may utilize to meet its religious needs absent its obtaining the construction permit; and (2) whether the denial was conditional."  *Westchester Day School VII*, 504 F.3d at 352.  The Second Circuit explained that "when an institution has a ready alternative—be it an entirely different plan to meet the same needs or the opportunity to try again in line with a zoning board's recommendations—its religious exercise has not been substantially burdened."  *Id.*  The plaintiff has the burden of persuasion with respect to all of these factors.  *See* 42 U.S.C. § 2000cc-2.

A close nexus exists between the Town denying the Church's application to construct its new facility and the Church's religious exercise.  This Court credits Reverend Karaman's testimony regarding the ways in which the limitations of the Church's current facility have impeded his and his congregants' religious practice.  Reverend Karaman testified that the inadequacies of the current facility have prevented the Church from performing tasks that it believes are mandated by God, including expanding the Church's membership and discipling to more members.  Reverend Karaman also testified that the size limitations of the current facility have impeded the Church's ability to perform certain religious practices, to host visiting missionaries, and to teach certain subjects and accommodate handicapped students in its school. Thus, the Church's lack of adequate space is significantly curtailing its religious activities and preventing Plaintiffs from fulfilling their religious mandate.  By precluding the construction of a much needed facility, Defendants significantly interfered with the Church's ability to exercise its religion.  *See, e.g.*, *Cottonwood*, 218 F.Supp.2d at 1212 (substantial burden may exist where, *inter alia*, the "physical constraints of its current facility also limit [plaintiff's] ability to conduct many of its different programs" and "to conduct outreach to potential new members").

That the Church was prevented from building a new facility on the Pomander Drive property does not itself establish a substantial burden under RLUIPA.  Nor does this Court's finding, set forth below at Part IV.d.ii, that Defendants imposed land use restrictions unlawfully, in violation of New York law.  Such a finding does, however, lend support to Plaintiffs' substantial burden claim.  *See Westchester Day School VII*, 504 F.3d at 351.

Having found a close nexus and that the land use restriction was imposed arbitrarily, capriciously, or unlawfully, the Court next considers whether there are "quick, reliable, and financially feasible alternatives" that the Church may use and whether the Town's denial was

conditional.   Defendants have conceded that the current Church facility is inadequate. Nevertheless, Defendants argue that Fortress Bible Church's students, faculty, and congregants are able to practice their religious beliefs at their current facility in Mount Vernon or in a smaller facility on the Pomander Drive property.   Defendants claim that the size of the congregation and the student enrollment are accommodated in the Church's current facility and could likewise be accommodated in a smaller facility on the Pomander Drive property.   They further argue that limitations in the current facility can be alleviated through means other than construction of the Church's proposed facility.   For example, Defendants claim that the inability to perform baptisms in the winter can be alleviated through means other than construction of the Church's proposed facility, even if it is "inconvenient."

This Court rejects Defendants' argument that alternatives exist such that the Town's denial of the application does not constitute a substantial burden.  As discussed above, this Court has already found that the Church's current facility is inadequate to enable the Church to engage in religious exercise.   Given the nature of the inadequacies, this Court does not find that remaining in the Church's current facility constitutes a satisfactory alternative.   The current facility's limitations are more than mere "inconvenienc[es]," as Defendants have characterized them.   Nor does the possibility of the Church submitting a proposal for a smaller facility on the Pomander Drive property constitute a satisfactory alternative.  As discussed above, the Court has already found that any purported willingness by the Town to consider a proposal by the Church for a smaller facility is disingenuous.  However, even if the Court had any confidence that the Town would fairly consider such an application, the application would be subject to the Town's lengthy review process and all of the economic hardships the process entails.  Such a process cannot be considered "quick, reliable, and financially feasible."  *See Westchester Day School*

*VII*, 504 F.3d at 352 ("[W]ere WDS to prepare a modified proposal, it would have to begin the application process anew.). For the same reason that submitting a scaled down proposal does not constitute a satisfactory alternative—*i.e.* that the Town's purported willingness to consider such an application is disingenuous—the Court does not consider the Town's denial to be conditional. *See Westchester Day School VII*, 504 F.3d at 352 (one factor courts should consider in examining whether denial of an application was conditional is whether the Town's "stated willingness to consider a modified proposal was disingenuous").

Thus, Plaintiffs have satisfied their burden of demonstrating that Defendants' denial of Fortress Bible Church's land use application imposes a substantial burden on Plaintiffs' religious exercise. Because this Court finds that Defendants' denial of Fortress Bible Church's land use application imposes a substantial burden on Plaintiffs' religious exercise, the burden shifts to Defendants to prove that denial of the application was (i) necessary to further a compelling governmental interest, and (ii) the least restrictive means of furthering that compelling interest. *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b); *Westchester Day School III*, 386 F.3d at 186, 190; *Murphy*, 148 F.Supp.2d at 187; *Guru Nanak*, 326 F.Supp.2d at 1154.

### 4.   Compelling Government Interest

The Second Circuit has not previously considered what constitutes a compelling governmental interest under RLUIPA, and has held only that such interests are "interests of the highest order. *See Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009). The Supreme Court, however, has observed that compelling governmental interests are those that protect public health, safety, or welfare. *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."); *Sherbert*, 374 U.S. at 406 ("[I]n this highly sensitive

constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'").  The compelling interest standard is the "most demanding test known to constitutional law."  *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Defendants contend that, in denying the SEQRA application, the Town acted to protect the health, safety, and welfare of Town residents because the plan: (i) creates unsafe traffic conditions in and around the property; (ii) contains inadequate parking; (iii) fails to comply with Town Code steep slope requirements; (iv) creates a public nuisance which endangers the safety of children; (v) poses adverse impacts to the Town's police and fire resources; (vi) created concerns among the project's neighbors.  Plaintiffs argue that Defendants have not established that these were "compelling governmental interests" sufficient to justify the Town's denial of the application.

As described below, this Court finds that Defendants have not demonstrated any compelling governmental interests sufficient to justify the Town's denial of the Church's SEQRA application.  To the contrary, the evidence presented at trial established that Defendants' purported concerns were contrived for the sole purpose of rationalizing the Town's denial of the SEQRA application.

### a.  Traffic

The Findings Statement adopted by the Town states that "The Lead Agency Finds that presently there is no means to mitigate the adverse traffic impacts associated with the proposed project."  Evidence at trial indicated that this statement was wholly unsupported.  First, the Town's Findings Statement attributes a number of concerns to Police Chief Kapica and Fire Fire Chief Mauro.  However, neither Chief Kapica nor Chief Mauro were provided with an opportunity to review or to comment upon the conclusions attributed to them in the Findings

Statement.  In fact, both reached conclusions that contradicted those attributed to them.  At trial, Police Chief Kapica testified that he disagreed with the Town's conclusion that it was impossible to adequately mitigate traffic impacts associated with the Fortress Bible Church project.  Fire Chief Mauro testified he had some concerns about traffic generated by the school during weekdays, however, he admitted that he had not reviewed any of the traffic impact studies regarding that traffic or the mitigation measures proposed by the Church, and therefore could not accurately assess the impacts of the project.  Second, the Town approved two other land use projects in close geographic proximity to the Church, thereby belying the Town's purported traffic concerns.   That the Town's traffic concerns were exaggerated—if not completely fabricated—is indicated by the Town's approval of the LOSCO project without requiring LOSCO to perform any of the traffic mitigation measures that it had required of the Church.  Notably, the LOSCO application contained traffic analyses that assumed that the Fortress Bible Church project had already been constructed.  That is, the Town approved the LOSCO project assuming that additional traffic would be generated by both LOSCO and the Church, but not requiring LOSCO to perform any traffic mitigation.   Third, the Town's own planning commissioner, Russo, believed, as early as October 2001, that the Church "had a good traffic mitigation plan" and was "going to provide the proper mitigation to offset their impact."  Fourth, Town Traffic Consultant Maris manipulated the traffic analysis included in the Town's FEIS, such that it reflected longer traffic queues and delays at the intersection of the project site than would otherwise be expected.  In fact, the Church's traffic consultant performed a traffic analysis indicating that, under the Church's proposal for an actuated traffic light, delays would not increase following construction of the Church's proposed facility.  At trial, Maris admitted that he had changed the Town's proposal, even though he believed that a pre-timed light would not

be acceptable to NYSDOT.  He did not offer any explanation for the change.  This Court cannot fathom any reason for making such a change, particularly knowing that NYSDOT would not approve, except to create queuing and delay problems.

Thus, this Court finds that the evidence presented at trial indicates that Defendants' concerns regarding traffic safety were manufactured to justify denying Plaintiffs' SEQRA application.  Even if Defendants' concerns are considered reasonable, however, Plaintiffs have offered adequate mitigation for potential adverse traffic impacts resulting from construction of its proposed facility.  Indeed, the Town's own witnesses conceded as much.  Thus, this Court finds that the Town's purported concerns about traffic safety do not constitute compelling governmental interests.

### b.  Parking

Defendants also claim that parking concerns justified denying the Church's SEQRA application.   As with the Town's expressed concerns about traffic, the evidence at trial demonstrated that the Town's concerns were contrived.  First, the Greenburgh Town Code specifies the number of parking spaces required for churches.  The Church's proposal complies with the Town Code requirements—in fact, it provides more than the required number of parking spaces.   Nevertheless, the Church responded to the Town's purported parking concerns by proposing alternatives with additional parking spaces.  Second, Town Traffic Consultant Maris raised concerns about the types of parking on which the Church's proposal relied.  He objected to the use of both "dead end" and "drive aisle" parking.  However, many other locations within the Town of Greenburgh have both dead end and drive aisle parking areas, many with heavier daily use than is expected at the proposed Church facility.  Also, Maris himself has submitted at least one application to the Town that included the use of dead end parking.  He has also served

as the Town's traffic consultant on a project, the LOSCO project, on which the Town approved the use of drive aisle parking.  Third, the Church proposed various mitigation measures to alleviate potential adverse impacts of their parking proposal, including the use of parking monitors, cones, and valet parking.  The Town, without justification, removed references from its FEIS to these proposed measures.

In light of the evidence, this Court does not consider the Town's purported concerns about parking to constitute compelling governmental interests.

### c.  Steep Slopes

The Findings Statement states that "a significant variance" would be required for the Church's project because it did not comply with the Town's Steep Slope Ordinance, codified at Section 285-39 of the Zoning Ordinance of the Town of Greenburgh.  Once again, the evidence indicates that the Town's purported concerns were manufactured.  First, at trial, Town Planning Consultant Turner could not identify who made the determination that a variance was required, nor could he identify any portion of the Town Code requiring such a variance.  He nevertheless insisted that the conclusion that a variance was required was accurate.  The Court granted him time to find support for the conclusion and granted him permission to speak with any person and/or to review any document that might assist him.  After four and one-half days, Turner still was unable to provide any legal justification for the Town's determination that a variance was required.  Second, Town Planning Consultant Doneit admitted that the statement of law, calculations, and conclusions in the Findings Statement regarding impervious surface area were inaccurate.  Third, Russo testified that he recalled a conversation with Feingold of AKRF regarding using the Steep Slopes Ordinance as "one way to stop the Fortress Bible project."

This Court does not consider the Town's expressed concerns about steep slopes to constitute compelling governmental interests.

### d.   Retaining Walls

The Findings Statement states that "The Lead Agency finds that the proposed retaining walls are an attractive nuisance and are not safe.  If children or pets wander into the property they may easily fall and seriously injure themselves, or worse."  The concern about retaining walls was not a genuine concern, as admitted by the Town's own witnesses.  The Church proposed installing a six-foot high chain link fence along the top of the retailing wall as a safety measure.  Town Building Inspector Lucido testified that he was familiar with other sites in Greenburgh where fences were placed on retaining walls to ensure safety and considered the Church's proposal to install such a fence to be a satisfactory mitigation measure.  Deputy Town Attorney Insardi also admitted that, by the time the Findings Statement was prepared, there was no longer a safety concern regarding the retaining walls.  Nevertheless, she reviewed the contrary conclusion in the Findings Statement and did not object to its inclusion.

Given the Church's proposed fence and the views of the Town's own witnesses, the Town's concern that the retaining walls posed a safety hazard are not compelling.

### e.   Police and Fire Resources

The Findings Statement concludes that the Church's proposed facility would burden police and fire resources.  This conclusion, however, is not supported by the evidence offered at trial.  Police Chief Kapica testified he believed that the presence of the Church on the Pomander Drive property would have a *de minimus* effect on the police department's resources.  As early as 1998, Fire Chief Mauro indicated that he had "no exceptions" to the Church's proposed plan.  He later expressed some concerns about the traffic generated by the site but, as discussed above, he

had not reviewed any of the traffic impact studies and was not familiar with any of the Church's proposed traffic mitigation measures.  Upon learning of certain of these mitigation measures, Fire Chief Mauro agreed that they would help alleviate his concerns.  Fire Chief Mauro also testified that he believed the construction of the Church's proposed facility would require that four additional firefighters be added to the Fairview Fire District.  He could not identify any other land use development within the district that would require the addition of four firefighters.

In light of Chief Kapica's and Chief Mauro's testimony, this Court finds that any burdens to police and fire resources resulting from the Church's proposed project would be minimal.  As such, the Town's concerns about the burdens to police and fire resources do not constitute compelling governmental interests.

### f.   Residents' Concerns

Defendants contend that Greenburgh residents questioned the proposed project's size, impacts to traffic and safety, impacts to police and fire resources, aesthetic impacts, and impacts to steep slopes.  Defendants claim that they relied upon these concerns, as well as the recommendations of their professional consultants, during the Town's evaluation process.  Even if residents genuinely were concerned about these issues, the evidence at trial demonstrates that none of them created actual problems.  The complaints of residents who are not fully informed do not themselves constitute compelling governmental interests.

### 5.   Least Restrictive Means

Because this Court finds that Defendants have not demonstrated a compelling governmental interest for the denial of the Church's SEQRA application, the Court need not address whether Defendants utilized the least restrictive means to address those interests.

### 6.   Conclusion

Plaintiffs established that the denial of its application substantially burdened its religious exercise and that Defendants failed to demonstrate a compelling governmental interest for that denial, therefore, this Court holds that Defendants' denial violates Section 2(a)(1) of RLUIPA.

### ii.  Equal Terms Claims

Section 2(b)(1) of RLUIPA, the Equal Terms provision, provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *See* 42 U.S.C. § 2000cc(b)(1).

Having found a clear violation of Section 2(a)(1), as a result of which Plaintiffs are entitled to relief under RLUIPA, this Court need not address whether Plaintiffs are also entitled to relief under Section 2(b)(1).

### iii.  Nondiscrimination Claims

Section 2(b)(2) of RLUIPA, the Nondiscrimination provision, provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." *See* 42 U.S.C. § 2000cc(b)(2).

Having found a clear violation of Section 2(a)(1), as a result of which Plaintiffs are entitled to relief under RLUIPA, this Court need not address whether Plaintiffs are also entitled to relief under Section 2(b)(2).

### iv.  Constitutionality of RLUIPA

Defendants challenge the facial constitutionality of RLUIPA, arguing that Congress exceeded its power in enacting the statute and that the statute violates the Tenth Amendment and the First Amendment Establishment Clause.

### 1.   Congress's Power to Enact RLUIPA

As discussed above, RLUIPA only applies when certain jurisdictional bases are satisfied:

> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
> (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or
> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2).   By limiting RLUIPA's scope to cases that present one of these jurisdictional nexuses, Congress alternatively grounded RLUIPA, depending on the facts of a particular case, in the Spending Clause, the Commerce Clause, and § 5 of the Fourteenth Amendment.   *See Westchester Day School VII*, 504 F.3d at 353.

This Court has found that Plaintiffs established both that the substantial burden on its religious exercise affects interstate commerce and that the substantial burden is imposed through formal procedures that permit the government to make individualized assessments of the proposed uses for the property involved.   *See* Part IV.a.i.3.   Therefore, the Court must examine whether RLUIPA is constitutionally applied under either Congress's Commerce Clause power or Congress's enforcement power under § 5 of the Fourteenth Amendment.   *See Westchester Day School VII*, 504 F.3d at 353.

### a.   Congress's Power Under the Commerce Clause

The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States."   U.S. CONST. art I., § 8, cl. 3.   Congress explicitly referenced this grant by limiting the application of RLUIPA to cases in which, *inter alia*, "the substantial burden affects,

or removal of that substantial burden would affect, commerce . . . among the several States." 42

U.S.C. § 2000cc(a)(2)(B).

As the Supreme Court has made clear, because an interstate commerce nexus must be demonstrated in each case for the statute at issue to operate, satisfaction of such a jurisdictional element is sufficient to validate the exercise of congressional power.  *See Westchester Day School VII*, 504 F.3d at 354  (*citing United States v. Morrison*, 529 U.S. 598, 611-12 (2000) ("Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce."); *United States v. Lopez*, 514 U.S. 549, 561 (1995) (noting that statute in question "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce")).  Accordingly, the Second Circuit has held that, "where the relevant jurisdictional element is satisfied, RLUIPA constitutes a valid exercise of congressional power under the Commerce Clause."  *Westchester Day School VII*, 504 F.3d at 354.

As discussed above, Plaintiffs' proposed project will affect interstate commerce.  *See* Part IV.a.i.1.  Thus, RLUIPA's application in the instant case is constitutional under the Commerce Clause.  *See Westchester Day School VII*, 504 F.3d at 354.

### b.  Congress's Enforcement Power Under § 5 of the Fourteenth Amendment

Having found that application of RLUIPA in the instant case is constitutional under the Commerce Clause, the Court need not consider whether its application could be grounded alternatively in § 5 of the Fourteenth Amendment.  *See Westchester Day School VII*, 504 F.3d at 354.

### 2.  Tenth Amendment

The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or the people." U.S. CONST. amend. X.  As the Supreme Court has explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992). The Constitution delegates to Congress the power to regulate interstate commerce. *See* U.S. CONST. art I., § 8, cl. 3.  However, Congress has no power "directly to compel the States to require or prohibit" particular acts. *See New York*, 505 U.S. at 166.

Defendants argue that RLUIPA is unconstitutional under the Tenth Amendment. *See* Def. Post-Trial Mem. at Proposed Conclusion of Law ¶¶ 190-93.  Since Defendants submitted to the Court their Proposed Conclusions of Law, the Second Circuit has held that RLUIPA does not directly compel states to require or prohibit any particular acts, and therefore, does not violate the Tenth Amendment. *See Westchester Day School VII*, 504 F.3d at 355.

### 3.  First Amendment Establishment Clause

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I.  In determining whether a particular law violates the Establishment Clause, courts must examine the conduct at issue under the three-prong analysis articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *See Westchester Day School VII*, 504 F.3d at 355.  "Under *Lemon*, government action that interacts with religion must: (1) have a secular purpose; (2) have a principal effect that neither advances nor inhibits religion; and (3) not bring about an excessive government entanglement with religion.  *See id.* (*citing Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)).

Defendants argue that RLUIPA fails the *Lemon* test and, thus, is unconstitutional under

the Establishment Clause.  *See* Def. Post-Trial Mem. at Proposed Conclusion of Law ¶¶ 194-200.

Since Defendants submitted to the Court their Proposed Conclusions of Law, the Second Circuit

has held that RLUIPA's land use provisions satisfy the *Lemon* test, and therefore, do not violate

the Establishment Clause.  *See Westchester Day School VII*, 504 F.3d at 355-56.

### b.   42 U.S.C. § 1983

42 U.S.C. § 1983 provides that a person cannot, under color of state law, deprive another

person of rights secured by the Constitution or the laws of the United States.  *See* 42 U.S.C. §

1983.  Section 1983 does not itself provide substantive rights, but rather offers "a method for

vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 145 n. 3

(1979).

The predicate for Plaintiffs' § 1983 claims are asserted violations of the Free Exercise,

Free Speech, and Free Association Clauses of the First Amendment and the Equal Protection and

Procedural Due Process Clauses of the Fourteenth Amendment.

### i.   Liability Under 42 U.S.C. § 1983

#### 1.   Municipal Defendants and Individual Defendants in their Official Capacities

A municipality can be held liable only if the alleged unconstitutional action implements

an official "policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy."  *Monell v. Department of Social Services*, 436

U.S. 658, 694 (1978) (quotations omitted).   Where an official "has final authority over

significant matters involving the exercise of discretion," his choices represent government

policy.  *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983).  "An official has

final authority if his decisions, at the time they are made, for practical or legal reasons constitute

the municipality's final decisions." *Id.* Proof of policy-making authority requires evidence of the official's scope of employment and his role within the municipality. *Id.*

The Town, through the Town Board, acted as the final decisionmaker in processing the Church's SEQRA application under New York State and Town of Greenburgh laws. The Town designated itself Lead Agency and possessed final authority regarding various decisions throughout the SEQRA review process including, ultimately, whether to grant or deny the Church's application. Thus, the Town, Town Board, and Town Board members (including Supervisor Feiner) sued in their official capacities, may be held liable under 42 U.S.C. § 1983.

### 2. Supervisor Feiner in His Individual Capacity

Although Plaintiffs brought this action against Supervisor Feiner in both his individual and official capacities, Plaintiffs' Post-Trial Statement does not address the legal or factual basis on which Supervisor Feiner should be held liable in his individual capacity, nor argue why he is not entitled to qualified immunity. Thus, this Court considers the claims against Supervisor Feiner in his individual capacity to have been withdrawn.

### ii. First Amendment

### 1. Free Exercise

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. The Free Exercise Clause, which has been applied to the states through the Fourteenth Amendment, "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).

The appropriate standard of review for analyzing claims under the First Amendment's Free Exercise Clause depends upon the facts of the particular case. A strict scrutiny standard of

review is appropriate in situations that involve "individualized governmental assessment[s]." *Cottonwood*, 218 F.Supp.2d at 1222-24.  A strict scrutiny analysis is also appropriate where "[g]overnment enforcement of laws or policies . . . substantially burden the exercise of sincerely held religious beliefs."  *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2000) (*citing Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) and *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963)).  "Where the government seeks to enforce a law that is neutral and of general applicability, however, then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices."  *Id.* (*citing Church of the Lukumi Babalu Aye*, 508 U.S. at 531, and *Employment Div., Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-79 (1990)).

Here, strict scrutiny analysis is appropriate.  This Court has already found, in evaluating Plaintiffs' RLUIPA claims, that the Town's treatment of the Church's SEQRA application constituted an "individualized governmental assessment[]."  *See* Part IV.a.i.1.  Strict scrutiny is also appropriate because the Town's SEQRA enforcement substantially burdened the exercise of Plaintiffs' sincerely held religious beliefs.  The Court has already found, also in evaluating Plaintiffs' RLUIPA claims, that the Town placed a substantial burden on the exercise of Plaintiffs' religious beliefs.  *See* Part IV.a.i.3.  As discussed above, the substantial burden analysis under RLUIPA derives from First Amendment First Exercise jurisprudence.  *See* Part IV.a.i.3.  Accordingly, this Court's substantial burden analysis under RLUIPA applies with equal force to the analysis under the Free Exercise Clause.  Further, this Court has no doubt that the Church's, as well as Reverend Karaman's, religious beliefs are sincerely held.

Under a strict scrutiny analysis, "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."  *Fifth*

*Ave. Presbyterian Church*, 293 F.3d 570 at 574 (*citing Church of the Lukumi Babalu Aye*, 508 U.S. at 546 (internal quotations omitted)).  This test, of course, is the same as the one this Court has already conducted under Section 2(a)(1) of RLUIPA.  Thus, this Court's conclusion that the substantial burden to Plaintiffs' religious exercise was not justified by a compelling governmental interest applies equally to Plaintiffs' Free Exercise claims.

Accordingly, because the denial of Plaintiffs' application substantially burdened their religious exercise and Defendants failed to demonstrate a compelling governmental interest for that denial, this Court holds that Defendants violated the First Amendment Free Exercise Clause.

### 2.  Free Speech

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend I.  The general principle of the First Amendment is that it "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

Plaintiffs allege that Defendants deprived them of their right to free speech by discriminating against them based on the religious nature of their expression, inhibiting their right to freely express their faith to their worshippers and the community unreasonable, and applying land use regulations in a manner to delay, obstruct, and unreasonably deny Plaintiffs the ability to use their Property for expressive purposes.  *See* Sec. Amend. Compl. ¶¶ 116-119. Plaintiffs claims here are, in essence, the same as their claims under the First Amendment Free Exercise Clause, and indeed, are better construed as such.  The Court considers Plaintiffs' claims here to have been intrinsically and completely addressed by the above Free Exercise analysis.

Accordingly, Plaintiffs' claims under the First Amendment Free Speech Clause are dismissed.

### 3.  Free Assembly

Although Plaintiffs alleged a Freedom of Assembly claim under the First Amendment, *see* Sec. Amend. Compl. ¶¶ 123-25, they did not address the claim in their Post-Trial Statement. Accordingly, this Court considers the claim to have been withdrawn.

### iii.  Fourteenth Amendment

### 1.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  To prevail on an Equal Protection claim, a plaintiff must show (1) treatment different from similarly situated individuals; and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007) (quotations omitted).  Alternatively, a plaintiff may establish an Equal Protection claim by showing that (1) "[it] has been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Plaintiffs have not offered evidence of another SEQRA application that this Court considers to be on all fours with Fortress Bible Church's application.  They have, however, provided numerous examples of applications that are similar to the Church's in size, scope, and

certain relevant conditions.  These applications reflect instances in which the Town considered and approved, at least conditionally, the exact conditions it claimed justified denial of the Church's application.  Taken together, the Town's treatment of these applications compared with its treatment of the Church's application portray a deliberate effort by the Town to thwart the Church's application.

### a.   Similarly Situated

This Court reviews below those applications it considers to be similarly situated to Fortress Bible Church's application, based on size, scope, geographic location, and the presence of specific relevant conditions.  Applications for which evidence was presented at trial but that are not reviewed are those that this Court does not consider to be similarly situated to the Church's application.

### i.  LOSCO: Traffic Concerns

The LOSCO building application proposed construction of an 18,180 square foot two-story office building.  The proposed LOSCO site is located less than one mile from the Pomander Drive property, at the intersection of West Hartsdale Avenue/Dobbs Ferry Road/Knollwood Road, the same intersection involved at the Pomander Drive property.  In evaluating the LOSCO application, the town studied traffic conditions at this intersection and relied upon many of the same individuals involved in reviewing the Fortress Bible Church application.  The Town ultimately adopted a Conditioned Negative Declaration, thereby determining that that the LOSCO project would not have a significant effect on the environment and a DEIS would not be required.

The LOSCO application is notable for the Town's treatment of traffic conditions, the issue it repeatedly identified as its primary concern with Fortress Bible Church's application.  On

both applications, the Town evaluated traffic at the intersection of Dobbs Ferry Road and West Hartsdale Avenue.   In reviewing LOSCO's application, the Town assumed that the Fortress Bible Church's project had been completed and was generating traffic.   That is, the Town assumed that traffic at the intersection would include the traffic that already existed, as well as the new traffic generated by both the Fortress and LOSCO projects.   The police department expressed concerns regarding the flow of traffic at the intersection.   Nevertheless, the Town issued a Conditional Negative Declaration without requiring LOSCO to make any improvements to the intersection.   On the Fortress Bible Church application, on the other hand, the Town concluded that traffic at the intersection required the Church to perform mitigation measures. The Church proposed numerous such measures.   Nevertheless, the Town refused to issue a Conditional Negative Declaration, largely based on its traffic concerns.   At trial, Traffic Consultant Maris admitted that the problems he required Fortress Bible Church to "eliminate" also existed for the LOSCO project.   The Town has offered no explanation for its decision to require Fortress Bible Church, but not LOSCO, to mitigate traffic concerns at the intersection. The Town's differential treatment is particularly difficult to comprehend given that the Town's traffic analyses assumed worse traffic conditions on the LOSCO application.

### ii.  Union Baptist Church: Parking Concerns

Union Baptist Church, a religious institution located in Greenburgh, submitted to the Town a site plan application involving an expansion from an existing 8,000 square foot church to an approximately 40,000 square foot facility.   Union Baptist Church's proposal required (i) a determination of significance by the Lead Agency under SEQRA; (ii) site plan approval by the Town Board; and (iii) a variance for its proposed parking plan.   The Town Board declared itself

to be Lead Agency for purposes of the SEQRA review and ultimately issued a Negative Declaration on the application.

The Town's treatment of Union Baptist Church's and Fortress Bible Church's parking proposals differed markedly.  The Union Baptist Church application proposed parking that was inadequate under the Town Code—the proposal included only 57 spaces, though the Town Code required 287.  Accordingly, Union Baptist Church proposed off-site parking arrangements for the remaining 230 spaces, including on the street and at locations across a four lane highway.  Much of this parking was limited to the Sunday mid-day time period, i.e. during services, and subject to a one year lease.  Police Chief Kapica did not consider the proposal to be safe, nor did the Town's traffic consultant or planning commissioner consider it to be adequate.  Rather than requiring Union Baptist Church to comply with the Town's parking ordinance and mitigate its parking concerns, however, the Town approved Union Baptist Church's proposal.  In contrast, Fortress Bible Church's application, and all of its proposed modifications, met or exceeded the number of parking spaces required under the Town Code.  The Town nevertheless expressed concern about the amount of parking included in Fortress Bible Church's proposal.  Fortress Bible Church responded by proposing alternatives that contained additional on-site parking. Even after Fortress Bible Church offered these alternatives, the Town expressed dissatisfaction with the proposed parking.  The Town did not, however, suggest or examine the feasibility of off-site parking, even after it assumed preparation of the FEIS.  A commercial shopping center located approximately one-half mile from the Pomander Drive property might have been suitable for off-site parking.  The Town's different responses to their parking concerns may be explained by their attitudes toward the projects. Supervisor Feiner "enthusiastically" supported the Union Baptist Church project, even, at one point, making it a personal goal to get the application

approved in the year 2004.  On the other hand, the Town wanted to "kill" the Fortress Bible Church project.

### iii.  Solomon Schechter School: Traffic and Parking Concerns

Solomon Schechter School, a Jewish Day School, submitted an application for site plan approval on October 19, 1998.  The proposed, and eventually constructed, facility consists of a 129,324 square foot middle/high school to accommodate a maximum of 675 students in Grades 6 through 12.  The site is located in a mixed use neighborhood, within one-half mile of the Pomander Drive property and is accessed from West Hartsdale Road.  The Town Board was the Lead Agency for purposes of SEQRA review of the Solomon Schechter School application.  The Town Board ultimately granted site approval.

The Town treated the Solomon Schechter School application differently from the Fortress Bible Church application in a number of ways.  As on the LOSCO application, the Town analyzed traffic conditions, including at the Dobbs Ferry Road/West Hartsdale intersection, as though the Church's facility had been completed.  Nevertheless, the Town did not require Solomon Schechter School to mitigate traffic concerns.  As discussed in comparison to the LOSCO application, the Town did require Fortress Bible Church to perform traffic mitigation and identified traffic concerns as the primary reason for denying the Church's application.

The Solomon Schechter School application, like the Union Baptist Church application, also proposed inadequate parking.  The Town's Findings Statement on the Solomon Schechter School application noted that the proposed parking met the Town Code requirements, but that there would be certain times during the year when extra parking would be needed.  The Town permitted the school to place overflow parking off-site at an adjacent school and to make other

accommodations.   As discussed in comparison to the Union Baptist Church application, the Town expressed concern about the parking proposed by Fortress Bible Church.   The Church revised its proposal and created alternatives with additional parking.   At no point, however, did the Town offer to accommodate other parking solutions for the Church.

The Town's treatment of the two applications also differed in the Town's willingness to facilitate the application process.   On the Solomon Schechter School application, the Town met with the Solomon Schechter School applicant on multiple occasions.   The Town also referred the Solomon Schechter School DEIS and site plan to the Town Planning Board for a report and recommendation.   The Town granted site plan approval following concurrent environmental and site plan review and a public hearing on the site plan.   On the Fortress Bible Church application, the Town explicitly instructed its staff and consultants to refrain from meeting with the Church or its consultants.   The Town also refused to make a referral to the Town Planning Board or to hold a hearing on the Fortress Bible Church application, despite multiple requests from the Church.

The Town offered no explanation at trial for the differences in this treatment of the two projects.

### iv.  The Hackley School: Steep Slope and Retaining Wall Concerns

The Hackley School is situated on approximately 285 acres of land, most of which is located in the Town of Greenburgh.   It is located in a mixed use neighborhood.   The Hackley School submitted an application for amended site plan approval for redevelopment of the land on February 13, 2001, seeking to significantly expand the school.   The proposed expansion project provided for a net increase of more than 75,000 square feet of new buildings (in two phases) and

proposed construction of new roads, parking facilities, storm water drainage infrastructures, and four new buildings.  The Town Board acted as Lead Agency on the application and the application involved many of the same consultants as those involved with the Fortress Bible Church application.  The Town Board ultimately approved the Hackley School's proposal.

Although both the Hackley School and Fortress Bible Church applications were submitted before the Town adopted its Steep Slope Ordinance, the Town manipulated the application processes such that only Fortress Bible Church was required to comply with the Steep Slope Ordinance.  The Hackley School proposed construction on steep slopes in a manner that would not have complied with the Steep Slope Ordinance.  The Town granted the Hackley School a waiver from its moratorium on development on steep slopes and also expedited review of the application such that it was granted eight days before the Town adopted the Steep Slope Ordinance, thereby exempting the school from complying with the Ordinance in the first phase of its development.  In reviewing the Fortress Bible Church application, the Town stalled the review process such that the Ordinance went into effect before it issued a decision on the Church's application.  The Town then relied upon the Church's non-compliance with the Ordinance as grounds upon which to deny its application.  At trial, Defense witnesses were unable to explain how the Church's proposal failed to comply with the Steep Slope Ordinance.

The Hackley School application also involved retaining walls, including at least one wall that was fifteen to twenty feet high with a linear distance of more than one thousand feet.  The Town did not express any concerns regarding the schools retaining walls.  On the Church's application, however, the Town identified the site's retaining walls as a safety hazard.  The Church proposed placing a fence on top of the retaining wall, a measure which the Town considered to resolve the safety concerns.  Nevertheless, the Town's Findings Statement

identified safety concerns relating to the retaining walls as a basis upon which to deny the Church's application.  When confronted at trial with the Town's inconsistent treatment of the applications' retaining walls, Supervisor Feiner attempted to claim that the retaining walls created only a minor issue that could be "solved."  Such an assertion was in direct contravention of the Town's Findings Statement.

**v.  Avalon Green: Concerns Regarding the Threat of Litigation**

Avalon Green, a multi-family townhouse developed proposed in the Town of Greenburgh, submitted a site plan involving that required preparation of an EIS and a special permit.  The Town Board was the Lead Agency and also had approval authority for issuance of the site plan and the special permit.  Avalon Green threatened to, and in fact did, commence litigation on its application.

At trial, the Town attributed its refusal to meet with Fortress Bible Church representatives and consultants during the SEQRA process as due to concerns that the Church had threatened litigation regarding the application.  On the Avalon Green project, however, the Town met with Avalon Green representatives not only after there existed a threat of litigation, but even after Avalon Green had actually commenced litigation.  The Town has not offered any explanation regarding why it responded to the Church's, but not Avalon Green's, application by refusing to meet with the applicant and its representatives.

**b.  Basis for Differential Treatment**

Having found that similarly situated institutions were treated differently than Fortress Bible Church, this Court must consider whether such differential treatment is supported by a rational justification or based on impermissible discrimination.  This Court cannot find any

rational basis for the consistency with which the Town identified concerns that purportedly justified denying the Church's application but did not justify denying other applications— especially given that those applications often involved the exact same conditions or conditions, such as traffic congestion concerns, that were actually less problematic under the Church's application.

Because this Court finds that the Town's treatment was not supported by a rational justification, it need not consider whether it was based upon impermissible discrimination.

### c.   Conclusion

Plaintiffs have proven that similarly situated institutions were treated differently than Plaintiffs, without any rational basis.  Therefore, Defendants have violated Plaintiffs' Fourteenth Amendment Equal Protection rights.

## 2.   Procedural Due Process

Plaintiffs mistakenly interpret this Court's May 4, 2006, summary judgment decision as dismissing Defendants' Fourteenth Amendment procedural Due Process claims.  *See* Pl. Post-Trial Mem. at 8 ("By Decision dated May 4, 2006, the Court denied Defendants' motion for summary judgment, except with respect to a single cause of action alleging denial of procedural and substantive due process.").  The decision, however, neither considered nor dismissed Plaintiffs' procedural Due Process claims.  *See* Summ. J. Decision at 13, 17 (May 4, 2006) ("For the reasons stated above, Defendants' motions for summary judgment on Plaintiffs RLUIPA, Free Exercise, Freedom of Speech, Freedom of Association and Equal Protection claims are DENIED, as is the Town's motion for summary judgment on all of Plaintiffs' § 1983 claims, and Defendants' motion for summary judgment on Plaintiffs' substantive due process claim is

GRANTED.").   Nevertheless, because Plaintiffs did not address the claim in their Post-Trial Statement, this Court considers the claims to have been withdrawn.

### c.  New York State Constitution

#### i.  Free Exercise

The New York State Constitution provides that "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind."   N.Y. CONST. art. I, § 3.   This state constitutional provision is comparable to the First Amendment Free Exercise Clause of the Federal Constitution.

It is well established that a state constitutional claim may be broader, but not narrower, than a federal constitutional claim.   *See, e.g.*, *People v. Kohl*, 72 N.Y.2d 191, 210 (N.Y. 1988) ("The guarantees of the Federal Constitution, as construed by the Supreme Court, represent only the minimum level of individual rights which no state may disregard.   The protections provided by the New York State Constitution may well be broader . . . ."); *see also Festa v. New York City Department of Consumer Affairs*, 820 N.Y.S.2d 452 (N.Y. Sup. 2006) ("The function of the comparable provisions of the State Constitution, if they are not to be considered purely redundant, is to supplement those rights to meet the needs and expectations of the particular State.").   Thus, having already found that Defendants violated Plaintiffs' Free Exercise rights under the United States Constitution, *see* Part IV.b.ii.1, the Court necessarily finds that Defendants also have violated Plaintiffs' Free Exercise rights under the New York State Constitution.

#### ii.  Free Speech

The Free Speech Clause of the New York State Constitution provides that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects, being

responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."  N.Y. CONST. art. I, § 8.  This state constitutional provision is comparable to the First Amendment Free Speech Clause of the Federal Constitution.

Plaintiffs' Free Speech claims under the New York State Constitution, like their Free Speech claims under the Federal Constitution, are better construed as Free Exercise claims. Having found that Plaintiffs' asserted Free Speech claims were encompassed within the Court's First Amendment Free Exercise analysis, the Court dismisses Plaintiffs' claims under the Free Speech Clause of the New York State Constitution.

### iii.  Free Assembly

Although Plaintiffs alleged a Freedom of Assembly claim under Article I, Section 9 of the New York State Constitution, *see* Sec. Amend. Compl. ¶¶ 126-28, they did not address the claim in their Post-Trial Statement.  Accordingly, this Court considers the claim to have been withdrawn.

### iv.  Equal Protection

The New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof" and that "[n]o person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."  N.Y. CONST. art. I, § 11.  This state constitutional provision is comparable to the Fourteenth Amendment Equal Protection Clause of the Federal Constitution.

As with Plaintiffs' Free Exercise claims under the New York and Federal Constitutions, *see* Part IV.b.ii.1; Part IV.c.i, having already found that Defendants violated Plaintiffs' Equal

Protection rights under the United States Constitution, *see* Part IV.b.iii.1, the Court also finds that Defendants have violated Plaintiffs' Equal Protection rights under the New York State Constitution. *See United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 592 (2d Cir. 1989) ("We observe, as the Appellate Division did, that analysis under the federal and New York State constitutions is the same for purposes of equal protection."); *see also Sanchez v. Turner*, No. 00 Civ. 1674, 2002 WL 1343754, at *11 n. 13 (S.D.N.Y. June 19, 2002) ("Accordingly, the Court's decision with respect to plaintiffs' Fourteenth Amendment [Equal Protection] claim applies equally to the claim under the New York State Constitution.").

### v.  Procedural Due Process

As with Plaintiffs' procedural Due Process claims under the Fourteenth Amendment, *see* Part IV.b.iii.2, because Plaintiffs have not briefed their procedural Due Process claims under New York State Constitution, this Court considers the claims to have been withdrawn.

### d.  New York State Law Claims

### i.  N.Y. C.P.L.R. Article 78

Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination "was affected by an error of law or was arbitrary and capricious or an abuse of discretion." *See Matter of Gernatt Asphalt Products v. Town of Sardinia*, 87 N.Y.2d 668, 688, 642 N.Y.S.2d 164, 176 (N.Y. 1996). Substantively, the role of the court is "to determine whether the agency took a 'hard look' at the proposed project and made a 'reasoned elaboration' of the basis for its determination. *WEOK Broadcasting Corp. v. Planning Bd. of Town of Lloyd*, 79 N.Y.2d 373, 383 (N.Y. 1992). "Where an agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision

was not rational, or is arbitrary and capricious or not supported by substantial evidence, the agency's determination may be annulled." *Id.* Substantial evidence is "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" or "the kind of evidence on which responsible persons are accustomed to rely in serious affairs." *Id.*

As discussed above, Defendants contend that the Town denied the Church's application because its proposal: (i) creates unsafe traffic conditions in and around the property; (ii) poses adverse impacts to the Town's police and fire resources; (iii) creates problems related to steep slopes and impervious surface coverage; (iv) creates a public nuisance which endangers the safety of children; and (5) raises various concerns among the property's neighbors. This Court has already found, in evaluating Plaintiffs' RLUIPA claims, that the Town's purported concerns were unsupported, if not wholly fabricated. Without implying that the standards under RLUIPA and Article 78 are the same, this Court finds it unnecessary to repeat here its analysis regarding the Town's purported concerns. For the same reasons that those concerns do not constitute compelling governmental interests under RLUIPA, neither are they supported by substantial evidence under New York law.

Accordingly, this Court finds that the Town's SEQRA determination was not supported by substantial evidence and, therefore, should be annulled.

## V.    RELIEF

### a.  Injunctive Relief

Where a RLUIPA violation has occurred, RLUIPA provides for "appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). It is readily apparent that injunctive relief constitutes "appropriate relief" under RLUIPA. *See Guru Nanak*, 326 F.Supp.2d at 1161-62

(E.D.Ca. 2003).   Thus, Plaintiffs are entitled to injunctive relief for Defendants' violations of Section 2(a)(1) of RLUIPA.

Plaintiffs are likewise entitled to injunctive relief for Defendants' violations of 42 U.S.C. § 1983.  *See Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972).

Accordingly, the Court hereby annuls and sets aside: (i) the Positive Declaration issued by the Town Board on July 19, 2000; (ii) the FEIS issued by the Town Board on December 1, 2003; and (iii) the Findings Statement adopted by the Town Board on April 14, 2004.

The Court orders that the Fortress Bible Church's January 2000 site plan (EAF) application is deemed approved for purposes of SEQRA and that there shall be no further SEQRA review by the Town or its Boards (including, but not limited to, the Town Board and the Zoning Board of Appeals).

The Court further orders that: (i) within sixty days of the date of this Opinion and Order, the Town Board shall adopt a resolution approving the Church's January 2000 site plan (EAF) (Joint Exh. 11(e)), pursuant to Town Law § 276, subject to reasonable and customary conditions and updated to comply with New York State Department of Environmental Conservation Phase II stormwater regulations; (ii) within sixty days of the date of this Opinion and Order, the Town Board shall adopt a resolution granting the Church a waiver from the requirement of having a landscaped parking island every fifteen spaces; (iii) within sixty days of the date of this Opinion and Order, the Town, by its Zoning Board of Appeals, shall adopt a resolution granting the Church's application for a side yard variance subject to reasonable and customary conditions; and (iv) within ninety days of this Opinion and Order, the Town, by its Building Department, shall issue a building permit for the Church's January 2000 site plan (EAF), as modified to

comply with New York State Department of Environmental conservation Phase II stormwater regulations, and subject to any reasonable and customary conditions or requirements.

Defendants are hereby enjoined and restrained from taking any action that unreasonably delays or interferes with any of the foregoing directives.

### b.  Compensatory Damages

Courts are divided on the issue of whether the "appropriate relief" available under RLUIPA extends to monetary damages.  *Compare Madison v. Commonwealth of Virginia*, 474 F.3d 118, 131-32 (4th Cir. 2006) (monetary damages are not available under RLUIPA) *with Smith v. Allen*, 502 F.3d 1255, 1265 (11th Cir. 2007) (monetary damages are available under RLUIPA).  The Second Circuit has not yet resolved the issue.  "The operative issue is whether New York, in accepting federal funds pursuant to RLUIPA, has waived sovereign immunity as to money damages."  *See Pugh v. Goord*, 571 F.Supp.2d 477, 507 (S.D.N.Y. 2008).  The Supreme Court has held that a state's sovereign immunity will be waived only when "(1) Congress evince[s] a clear and unequivocal intent to hold the States liable in federal court; and then (2) a state voluntarily engage[s] in that particular activity."  *Id.* at 509 (*citing Close v. State of New York*, 125 F.3d 31, 39 (2d Cir. 1997).

Courts within this Circuit have found that "the term 'appropriate relief against government' makes no mention of compensatory or other damages, and thus is insufficient to provide the unambiguous waiver necessary for a finding that New York, by accepting federal funds, waived its right to sovereign immunity on claims for money damages under RLUIPA." *Id.* at 509; *see also Bock v. Gold*, No. 05 Civ. 151, 2008 WL 345890, at *6 (D.Vt. Feb. 7, 2008) ("Unlike 42 U.S.C. § 1983 which explicitly creates 'an action at law', RLUIPA only creates an action for 'appropriate relief' which is at best an ambiguous extension to monetary claims.").

This Court agrees and therefore finds that Plaintiffs are not entitled to monetary damages under RLUIPA.

Plaintiffs are, however, entitled to compensatory damages under 42 U.S.C. § 1983. Indeed, "the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Community School District v. Stachura*, 477 U.S. 299, 307 (1986) (internal quotations omitted).

Plaintiffs are instructed to submit to the Court a separate application, including supporting documentation, setting forth the amount they believe to constitute appropriate compensatory relief.   The application shall include documentation supporting the following costs: (i) increased construction costs incurred as a result of delays; (ii) increased traffic improvement costs incurred as a result of delays; (iii) reimbursement for excessive SEQRA fees; (iv) consultants' fees incurred as a result of the Positive Declaration; (v) attorneys' fees and costs incurred as a result of Defendants' violation of Open Meetings Law § 107, which this Court found Defendants to have violated in its March 29, 2004, order; and (vi) costs incurred as a result of this litigation.[13]   Plaintiffs may also submit a request for any other compensation to which they believe they are entitled.   Unless otherwise set forth in this Opinion and Order or in the March 29, 2004, order, this request for documentation should not be construed as the Court deeming that specific requests for compensatory relief are appropriate.

### c.  Sanctions

The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.  *See Fujitsu Limited v. Federal Express Corporation*, 247 F.3d 423,

---

[13] Although Plaintiffs have submitted documentation regarding much of this information, the information before the Court is not complete.

436 (2d Cir. 2001).  Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, the court must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence.  *See id.*  "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis."  *Id.* (citations omitted).  The Second Circuit has observed that its "case-by-case approach to the failure to produce relevant evidence seems to be working."  *Id.*

The record is replete with evidence regarding Defendants' intentional destruction of evidence and disregard for discovery obligations.  For example, Councilwoman Weinberg admitted that she intentionally discarded documents subject to discovery in this matter.  At trial, she initially claimed that she was never advised to refrain from destroyed and discarding documents.  However, as her deposition transcript reflects, she was advised by Plaintiffs' counsel at her deposition to refrain from destroying documents in her possession.  Despite counsel's explicit instruction, subsequent to the deposition, Councilwoman Weinberg discarded documents.  She admitted that the documents she discarded concerned the Church's application.

Deputy Town Attorney Insardi, an attorney with almost twenty years of criminal and civil litigation experience, testified that she did not place a litigation hold or in any way advise Town staff and consultants to retain documents related to the Church's application, despite her claim that she believed the Church had threatened litigation as early as May 2002.  In January 2005, after commencement of this litigation, Deputy Town Attorney Insardi was deposed pursuant to an Order of this Court on the specific topic of Defendants' failure to produce certain electronic documents.  Even after the deposition, she did not advise anyone at the Town that Defendants were required to preserve evidence.  Given her position as a Deputy Town Attorney, Insardi's

failure to advise Town staff and consultants of their discovery obligations is inconceivable and troubling.  Supervisor Feiner, also a licensed attorney (albeit a non-practicing one), testified that he did not refrain from destroying documents, even though he anticipated litigation in this matter as early as December 2001.

Because the Town did not instruct its staff and consultants to retain documents, evidence likely relevant and probative to this litigation was destroyed.  For instance, Town Traffic Consultant Maris testified that he electronically wrote over draft conceptual plans on the Church's project that he prepared for the Town.  As a result, alternatives and draft alternatives were destroyed.  Likewise, Town Planning Commissioner Stellato discarded all of his notes from meetings concerning the Church's application.

In addition to destroying evidence and not placing the appropriate litigation hold on documents in the Town's possession, Defendants failed to produce certain evidence to Plaintiffs. Such was made clear at trial when Defendants attempted to enter into evidence correspondence between Deputy Town Attorney Insardi and Town Traffic Consultant Maris, which had been undisclosed until the evening before the evidence was offered at trial.  That the correspondence was between Insardi and Maris renders the incident particularly egregious, being that it should have been produced separately from each of their files.  Defendants' failure to produce such a document raises concerns that there exist additional internal Town Documents that Defendants have never produced, in contravention of their discovery obligations.

Defendants' blatant disregard for its discovery obligations under the Civil Rules of Procedure compels this Court to hereby sanction Defendants in the amount of $10,000 for their spoliation of evidence and failure to comply with their discovery obligations under the Civil Rules of Procedure.

## VI.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendants have violated Section 2(a)(2) of RLUIPA, the First Amendment Free Exercise Clause, the Fourteenth Amendment Equal Protection Clause, the Free Exercise Clause of the New York Constitution, the Equal Protection Clause of the New York Constitution, and Article 78 of the N.Y. CPLR.

*It is so ordered.*

Dated: White Plains, New York

_August 11_____, 2010

Stephen C. Robinson, U.S.D.J.